**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| LODSYS, LLC, et al.,<br><br>    Plaintiff,<br><br>v.<br><br>BROTHER INTERNATIONAL CORPORATION, et al.<br><br>    Defendants. | Civil Action No. 2:11-cv-90 (JRG)<br><br>**LEAD CASE**<br><br>**JURY TRIAL DEMANDED** |
| LODSYS GROUP, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>COMBAY, INC., et al.,<br><br>    Defendants. | Civil Action No. 2:11-cv-272 (JRG) |
| LODSYS GROUP, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ADIDAS AMERICA, INC., et al.,<br><br>    Defendants. | Civil Action No. 2:11-cv-283 (JRG) |
| LODSYS GROUP, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, et al.,<br><br>    Defendants. | Civil Action No. 2:11-cv-284 (JRG) |
| LODSYS GROUP, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>BECKER PROFESSIONAL DEVELOPMENT CORPORATION, et al.,<br><br>    Defendants. | Civil Action No. 2:11-cv-286 (JRG) |

| | |
|---|---|
| LODSYS GROUP, LLC, | |
|      Plaintiff, | |
| v. | Civil Action No. 2:11-cv-288 (JRG) |
| ROSETTA STONE, INC., | |
|      Defendants. | |
| LODSYS GROUP, LLC, | |
|      Plaintiff, | |
| v. | Civil Action No. 2:11-cv-289 (JRG) |
| DELL, INC., | |
|      Defendants. | |
| LODSYS GROUP, LLC, | |
|      Plaintiff, | |
| v. | Civil Action No. 2:11-cv-290 (JRG) |
| AVG TECHNOLOGIES USA, INC., et al., | |
|      Defendants. | |
| LODSYS GROUP, LLC, | |
|      Plaintiff, | |
| v. | Civil Action No. 2:11-cv-291 (JRG) |
| GMCI INTERNET OPERATIONS, et al., | |
|      Defendants. | |

**PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**PAGE**

1. "user['s] perception of the commodity" / "information regarding a use of the product".................................................................................................................1

2. "perception information" ...................................................................................2

3. "elicit" / "probe" ..............................................................................................3

4. "units of a commodity" / "commodity" / "product" ........................................5

    A.    Commodities and Products need not be "physical."..........................5

    B.    Commodities and Products need not be "bought or sold." ................6

    C.    Commodities and Products need not be "standalone." ......................7

5. "component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location" ..............7

6. "trigger event"...................................................................................................9

7. "counter" / "increment a counter"...................................................................10

8. "if the counter exceeds a threshold" ...............................................................14

9. "interaction scripts" ........................................................................................14

10. "carrying information about the value to users of using the product"............15

11. "user interface" ...............................................................................................16

12. "two-way local interaction" ............................................................................18

13. "a memory within each of the units of the commodity"..................................19

14. "forwarding the input" ....................................................................................21

15. "a priority code associated with the input".....................................................22

16. Additional Terms Proposed for Construction by Kaspersky ..........................22

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*01 Communique Lab., Inc. v. LogMeIn, Inc.,*
    687 F.3d 1292 (Fed. Cir. 2012) ....................................................................9

*AllVoice Computing PLC v. Nuance Commc'ns,*
    504 F.3d 1236 (Fed. Cir. 2007) ....................................................................9

*Ambato Media, LLC v. Clarion Co., LTD.,*
    No. 2:09-cv-242-TJW, 2011 WL 2912764 (E.D. Tex. July 18, 2011) ..........9

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,*
    632 F.3d 1246 (Fed. Cir. 2011)......................................................................5

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,*
    672 F.3d 1335 (Fed. Cir. 2012)......................................................................3

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co..,*
    359 F.3d 1367 (Fed. Cir. 2004)..................................................................2, 3

*Datamize, Inc. v. Fid. Brokerage Servs., LLC.,*
    No. 03-321, 2004 WL 1683171 (E.D. Tex. Apr. 22, 2004)....................6, 19

*Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.,*
    34 F.3d 1048 (Fed. Cir. 1994)......................................................................11

*Exxon Research and Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001)..................................................................2, 8

*F5 Networks Inc. v. A10 Networks, Inc.,*
    No. 2:10-cv-654-MJP, 2011 WL 2681182 (W.D. Wash. July 8, 2011) ........8

*Grober v. Mako Prods., Inc.*,
    686 F.3d 1335 (Fed. Cir. 2012)....................................................................14

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
    175 F.3d 985 (Fed. Cir. 1999) ..................................................................5, 11

*Mettler-Toledo, Inc. v. Fairbanks Scales Inc.,*
    551 F.Supp. 576 (E.D. Tex. 2008)................................................................9

*Middleton, Inc. v. Minn. Mining & Mfg. Co.,*
    311 F.3d 1384 (Fed. Cir. 2002) ..................................................................20

*Noah Sys., Inc. v. Intuit Inc.,*
    675 F.3d 1302 (Fed. Cir. 2012) ....................................................................9

*Oatey Co. v. IPS Corp.,*
    514 F.3d 1271 (Fed. Cir. 2008) ................................................................................19

*Process Control Corp. v. HydReclaim Corp.,*
    190 F.3d 1350 (Fed. Cir. 1999) ................................................................................15

*Renishaw PLC v. Marposs Societa' per Azioni.,*
    158 F.3d 1243 (Fed. Cir. 1998) ............................................................................7, 19

*Saxon Innovations, LLC v. Nokia Corp.,*
    No. 6:07-CV-490, 2009 WL 2413261 (E.D. Tex. July 31, 2009) ................................20

*Spectrum Int'l, Inc. v. Sterilite Corp.,*
    164 F.3d 1372 (Fed. Cir. 1998) ..........................................................................13, 20

*SRI Int'l v. Matsushita Elec. Corp. of Am.,*
    775 F.2d 1107 (Fed. Cir. 1985) ................................................................................22

*Thorner v. Sony Computer Entm't Am. LLC.,*
    669 F.3d 1362 (Fed. Cir. 2012) ..................................................................11, 12, 22

*U.S. Ethernet Innovations, LLC, v. Acer, Inc.,*
    No. 10-3724, 2012 WL 3763667 (N.D. Cal. Aug. 29, 2012) .........................................9

*Voice Capture, Inc. v. Intel Copr.,*
    354 F. Supp. 2d 997 (S.D. Iowa 2004) ......................................................................20

*Widevine Techs., Inc. v. Verimatrix, Inc.,*
    No. 2-07-cv-321, 2009 WL 3734106 (E.D. Tex. Nov. 4, 2009) .....................................8

**1.   "user['s] perception of the commodity" / "information regarding a use of the product"**

These claim phrases are easily understood by the jury and need not be construed.  In contrast, Defendants' constructions provide no clarity for the jury and would only obscure the terms.  For example, Defendants propose supplanting the unambiguous word "perception" with only the word "opinion," which Defendants interpret to mean "subjective opinion" and also interpret to exclude the user's needs, uses, and understanding.  *See* Defendants' Responsive Claim Construction Brief ("Opposition" or "Opp.") at 3.[1]  As discussed in Plaintiff's Brief (at pages 4-5), however, the claims and the specification include many examples of user perceptions as needs, uses, and understanding, which Defendants ignore.  Thus, Defendants' assertion that the word "opinion" excludes these examples illustrates that Defendants' construction—without the clarification in Plaintiff's alternative construction that a "user's opinion…includ[es] attitude, needs, desires, uses, understanding, and complaints with respect to the commodity"—would only confuse the jury into misunderstanding the claim terms as excluding those examples.

Similarly, Defendants interpret the term "prior" as being synonymous with "actual," but concede that the user information described in the claim phrases can be merely "formed based on" the user's actual use of the product, which Defendants interpret to include information such as "requests to schedule maintenance," "submission of a purchase order," and "requests for interactive assistance."  Opp. 3-4, 22.  While Defendants' expansive interpretation of their own constructions resolves much of the substantive dispute between the parties regarding the claim phrases' *meaning*, it also illustrates that their constructions do not clarify, but rather obscure, the plain meaning of the claim phrases.  For example, it is not readily apparent that a jury would understand the temporal word "prior" to be the same as "actual."  Similarly, a jury may not

---

[1] Defendants misrepresent the parties' positions by asserting that "[a]ll parties agree that 'user's perception' is limited to a user's subjective opinion."  Opp. 3.  Plaintiff does not, in fact, agree.

understand Defendants' constructions to include "requests to schedule maintenance," "submission of a purchase order," and "requests for interactive assistance," confusing the jury into misunderstanding the claim language as excluding those examples.

In addition, even Defendants' expansive interpretation of their own constructions risks improperly limiting the claim phrases to exclude other examples in the specification such as obtaining information from a user about anticipated uses of the product.  *See* Col. 29, ll. 11-12 ("a probe about intentions when the product's use begins"); Col. 29, 18-28 ("pre-use probes").[2]

## 2.   "perception information"

Defendants assert this term is indefinite because it appears only in claim 69 of the '078 patent and the specification does not "provide guidance as to its construction."  Opp. 20. Defendants ignore well-settled law that the specification need not provide the meaning of a term where "the components of the term have well-recognized meanings" or are otherwise discernible.[3]   Here, both "perception" and "information" have discernible meanings, and Defendants have not demonstrated otherwise.   Plaintiff's Brief 3-6.   Defendants also misunderstand Plaintiff's argument that "perception information" is substantially identical to "information about a user's perception."   Opp. 20.   Plaintiff maintains the two phrases are "substantially identical," which means "identical in substance."   Defendants' assertion that Plaintiff somehow admits a need for different constructions is misplaced, especially given Plaintiff's position that the terms need no construction.[4]   Defendants also assert that Plaintiff has

---

[2] The specification references herein are made to the column and line numbers as they appear in the '078 patent, unless otherwise indicated.  All emphasis is added unless otherwise indicated.

[3] *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004); *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

[4] Likewise, Defendants' assertion regarding the "generating" limitation in claim 69 of the '078 patent misses the mark, because Defendants ignore that Plaintiff has equated "perception information" with "information about the user's perception" and "results of the two-way local interaction" in claim 1.  Plaintiff's Brief 6.

not rebutted the presumption that different terms in a patent have different meanings (Opp. 21), but Plaintiff demonstrates that the two terms are used in parallel fashion in the independent claims.  Plaintiff's Brief 6-7.[5]  In addition, Defendants' assertion that "perception information" must be insolubly ambiguous because Plaintiff has stated it is "substantially identical" to another term is belied by Defendants' proposal of identical constructions for "commodity" and "product," which terms Defendants allege are "analogous."  Opp. 9, 20-21.

**3.   "elicit" / "probe"**

As discussed in Plaintiff's Brief (at page 9), Plaintiff and Kaspersky agree the terms "elicit" and "probe" are common English words with no special meanings in the context of the patents and need not be construed.  In fact, Defendants' Opposition reveals that there apparently is no dispute among the parties regarding the *meaning* of these terms, as Defendants concede the scope of the terms merely excludes "passively obtaining information without a user's involvement."  Opp. 27.  Plaintiff agrees.  However, construing these common terms to mean "actively request" would only improperly narrow or obscure the terms for the jury.

For example, even extrinsic evidence referenced by Defendants in the Joint Claim Construction Statement (the "Joint Statement") describes that "elicit" means "to draw forth or bring out (something latent or potential)…to call forth or draw out (a response or reaction)," and "probe" means "to make an exploratory investigation."  *See* Supplemental Declaration of Kit W. Roth ("Sup. Roth Dec.") Ex. A (*Webster's Ninth New Collegiate Dictionary* 404, 937 (1990)).

Consistent with the plain meaning of the terms, the specification describes that the

---

[5] Defendants' reliance on *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335 (Fed. Cir. 2012), is misplaced.  In *Aspex*, the Court was forced to choose between two competing constructions for a term and selected the construction that would not duplicate a different term. Here, Defendants have not offered a different construction that would distinguish "perception information" from "information about a user's perception of the commodity"; rather they simply assert the term is beyond comprehension.  Opp. 20-21.  Moreover, "it is not unknown for different words to be used to express similar concepts."  *Bancorp Servs.*, 359 F.3d at 1373-74.

invention may draw out information by providing users with the option to perform "Customer Initiated Interactions (CII) [which] are product Development Interactions (DI) that are triggered by the Customer."  Col. 32, ll. 54-55; Col. 3, ll. 30-34 (contemplating users providing information "when they have a problem and when they have an unmet need").  Examples include "interactive evaluations and suggestions," a "help button," an "electronic suggestion pad," or "On-line Customer Support."  Col. 12, ll. 3-5; Col. 28, ll. 16-27; Col. 32, l. 54 – Col. 33, l. 7. Such interactions *initiated by the user* might not be captured by Defendants' proposed construction: "actively request," depending on the meaning of the phrase "actively request."

For example, the invention may provide the user with an "electronic suggestion pad"—a free-form entry area for users to enter information they want to report (such as problems and suggestions), which does not include specific "requests" of the user for information:

> An electronic suggestion pad helps a Vendor learn the unanticipated problems and suggestions Customers may have while using a Customer Directed Product (CDP). … ***It is a side channel for Customers who have something they want to report or contribute, but haven't been questioned specifically on that point***. The electronic suggestion pad is ***purposefully unstructured and free-form*** so Customers can describe, in the ways that make the most sense to them, their descriptions of problems and their suggestions for the product.

> Since the use of an electronic suggestion pad will be contextual, it is suggested that the trigger 282 be customer initiated.  Col. 39, ll. 49-63.

These examples illustrate that (as the parties agree) the scope of the terms "elicit" and "probe" merely excludes "passively obtaining information without a user's involvement."  However, the examples also illustrate that it would be unwarrantedly narrowing (or at least confusing) to supplant these well-understood terms with the phrase "actively request."

Defendants' Opposition reveals the confusion that would arise from adopting their "actively request" construction.  Defendants argue that the term "request" can include the nonsensical notion of a "passive request."  Opp. 28.  Defendants also rely on the patents' use of the term "passive probe" to argue that "probe" and "elicit" must be "active."  Opp. 28.  The

4

Federal Circuit, however, has held that an unmodified noun is broader than, *and includes*, the scope of the same noun as modified by an adjective in another claim. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254-55 (Fed. Cir. 2011). Defendants also maintain that if "probe" is construed to mean "actively request," then "passive probe" "will be understood readily" and needs no further construction. Opp. 39. Yet the result would be reading "passive probe" to mean the nonsensical phrase "passive active request."

**4.   "units of a commodity" / "commodity" / "product"**

> **A.   *Commodities and Products need not be "physical."***

Defendants' constructions would improperly exclude the myriad software embodiments described in the specification.   Plaintiff's Brief 11.   Defendants' assertions that the terms "commodity" and "product" should be limited to physical items are largely based on their proffered constructions for "user interface" and "memory within each of the units of the commodity" (Opp. 5, 9), which are incorrect as discussed below.  Indeed, even Defendants' own websites describe software as having a user interface and use the term "product" in reference to non-physical software products.  Plaintiff's Brief 13, 29.

Defendants also assert that (within the dependent claims) all exemplary units of a commodity are physical goods.  Opp. 5-6.  Defendants' assertion is misleading for two reasons. First, the presence of physical goods in the dependent claims only requires that the "units of a commodity" in the independent claims be construed broadly enough to include those physical goods.  Defendants provide no justification for limiting an independent claim to the scope of its dependent children.   If anything, the variety of physical goods that may be units of the commodity demonstrates the breadth of the disputed term. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999).  Second, Defendants have misquoted the claim language in order to contend that all of the dependent claims describe physical goods:

claim 50 recites that the unit is a "demonstration unit," not "demonstration equipment" as Defendants assert in their Opposition (at pages 5-6).

Defendants' assertion that the "Module" uses a combination including hardware is incorrect.  Opp. 6.  The specification portion cited by Defendants recites that the "*invention*," not the "Module," uses that combination, a distinction Defendants obscure by omitting the word "invention" from their quote.  Col. 2, ll. 22-28.  Further, Defendants' reliance on a single embodiment (*i.e.*, the car service) does not justify importing a limitation into the claims.  Opp. 6.

Defendants' citations to extrinsic evidence also demonstrate that "physical" is not required.  Opp. 6 n.11.  For example, *Routledge's Dictionary of Economics* defines commodity as "something <u>usually</u> physical." (emphasis added).  Similarly, *The New Palgrave - A Dictionary of Economics* does not mention physicality, instead stating a commodity is "a thing produced for use or sale," which certainly includes software products.  *Id.* [6]

### B.    Commodities and Products need not be "bought or sold."

Defendants assert that a "commodity" must be "bought or sold."  Opp. 7.  Inexplicably, the very portion of the specification cited by Defendants proves the Vendor is not always selling goods to the Customer:

> The Vendor is the company that sells the Customer Directed Product (CDP), which may be either a product or a service [Note that <u>a "vendor" may also be an educational institution</u> (such as a university that wants to evaluate the effectiveness of <u>an educational technology curriculum product</u>), <u>a nonprofit organization</u> (such as a foundation that wants frequent client feedback <u>from a program of one of its grantees</u>, to help improve that program rapidly), <u>a government agency</u> (such as the State Department, which may want a CB-PD Module that helps improve its <u>automated language education laboratories</u>), etc. In other words, <u>the Vendor referred to here may be any type of organization or institution</u>.  Col. 17, ll. 8-21.

---

[6] Defendants assert that Plaintiff's constructions should be rejected because inserting the construction for one term in the '565 patent into the construction for a different term in the '078 patent creates a grammatical redundancy.  Opp. 9-10.  Defendants ignore that "where there are even small differences in the language of claims in related patents, the claim language in each patent should be construed independently."  *Datamize, Inc. v. Fid. Brokerage Servs., LLC*, No. 03-321, 2004 WL 1683171, *6 (E.D. Tex. Apr. 22, 2004) (Folsom, J.).

Even more confusing is Defendants' assertion related to the specification's example of an "educational and non-commercial 'product'" (Col. 13, ll. 56-57).  Opp. 7.  Although Defendants assert Plaintiff relies on a single citation (Col. 13, ll. 50-57) to show the educational curriculum embodiment, this embodiment is actually also mentioned in the description of the vendor (discussed above and cited by Defendants) as "an educational technology curriculum product." Col. 17, ll. 12-13.  Thus, contrary to Defendants' assertion (Opp. 7), the specification does not describe the educational institution "Vendor" selling *computers* to students, but it <u>does</u> describe educational curricula as a "non-commercial 'product.'"  Col. 13, 55-57.

### C.   Commodities and Products need not be "standalone."

Defendants' also attempt to insert a word used in the ongoing reexamination proceedings (*i.e.*, "standalone") into the construction of "commodity" and "product."  Opp. 8.  Defendants fail to explain what "standalone" means, and the word is more likely to confuse the jury than the disputed terms.[7]  The first two quotations offered by Defendants were statements by the Examiner, not the patent holder, and neither even mentions the word "standalone."  Opp. 8.  The remaining quotation offered by Defendants also does not support their assertion.  The dispute addressed by that quotation was whether Kravette's copiers and monitoring system together comprised a single unit of a commodity.  Collins Dec., Ex. H at 22-25.  Thus, Plaintiff's reference to Kravette's description of the copiers as "standalone" was merely to differentiate the copiers from the entire system.  Plaintiff did <u>not</u> assert the unrelated concept that an item must be "standalone" to be a unit of a commodity.

### 5.   "component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location"

As discussed in Plaintiff's Brief (at page 14), the use of the word "component" gives rise

---

[7] *See, e.g.*, *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (improper to "add a narrowing modifier before an otherwise general term").

to a presumption the limitation is not means-plus-function.  Defendants make no serious effort to

rebut that presumption.  Plaintiff has already offered numerous citations to the specification that

provide context for understanding the "component" as a structural element of the claimed

system.  Plaintiff's Brief 14-16.  Defendants ignore those citations and rely on a handful of cases

(Opp. 23 n.16), but Defendants' appeal to *Welker* and *F5* is misplaced.  Although the Court in

*Welker* did find that the limitation in question fell under § 112 (6), that case dealt with

"mechanism," not "component."  Defendants' citation to *F5* is also misleading, as that Court

found "component" was not a means-plus-function term. *See F5 Networks, Inc. v. A10 Networks,*

*Inc.,* No. 2-10-cv-654-MJP, 2011 WL 2681182, *11 (W.D. Wash. July 8, 2011); *Widevine Tech.*

*v. Verimatrix, Inc.*, No. 2-07-cv-321, 2009 WL 3734106, *16 (E.D. Tex. Nov. 4, 2009).

Defendants' other arguments are similarly misleading.  Defendants misstate that Plaintiff

has pointed to the "central location" as corresponding structure, which they contend is merely a

physical place and not a structure.  Opp. 23.  In fact, Plaintiff asserted:

> For example, one embodiment of the component is described in the specification
> as the vendor's computer, including an authoring system for designing or
> updating a unit's interactions (managing the interactions) and a reporting system
> that receives the various results of the interactions from different units (collecting
> the results).

Plaintiff's Brief 14-15.  Moreover, even assuming *arguendo* that the term "component" did

invoke 35 U.S.C. § 112 (6), Defendants have failed to rebut the numerous examples of

corresponding structure in the specification in order to meet the high burden of their

indefiniteness argument.  *See Exxon Research*, 265 F.3d at 1375.  Instead, Defendants simply

assert that the IDR, CB-PDR, and CDRP referenced in Plaintiff's Brief are no more than "black

boxes" and do not denote any algorithm for performing their respective functions.  Opp. 23-24.

Defendants, however, ignore more than a page of Plaintiff's Brief devoted to the numerous

explanations of these structures in the specification.  For example, Plaintiff cited to seven

8

columns that describe the IDR before highlighting several key portions of the system, including "[a]n exemplary flow chart for the authoring system."   Plaintiff's Brief 15.   Plaintiff also described the CDRP and CB-PDR in detail, including citations throughout the specification and flow charts depicting their function.   Plaintiff's Brief 15-16.   An examination of Figures 8, 9, and 11-13 also contain "sufficient algorithmic structure" to render the limitation definite.[8]

Defendants contend that the component limitation cannot be met by the systems Plaintiff identified because allegedly none of those systems perform both functions required of the "component" limitation.   Opp. 24.   The patent specification, however, makes clear that the systems can be combined into single units or divided into multiple units, as appropriate:

> The operation of the Customer Design System (CDS) in FIG. 1 is already described in the preferred embodiments as spanning multiple locations. The division points between those locations may be moved, so that many of the connecting "lines" between parts of this invention may become either local or long-distance lines. In other words, many of the lines in the Figures between various parts and functions in this invention may be within one physical unit or they may connect two or more physical units.   Col. 75, ll. 19-27.

Moreover, both the managing and collecting functions of the disclosed system may be performed by "the Vendor's computer."   *See* Col. 9, ll. 50-57 (managing); Col. 76, ll. 4-8 (collecting).[9]

## 6.   "trigger event"

The parties apparently agree on the meaning of the term "trigger event."   Defendants concede their construction is met by any event that results in an action "as simple as

---

[8] *See, e.g.*, *Mettler-Toledo, Inc. v. Fairbanks Scales Inc.*, 551 F. Supp. 2d 576, 588-89 (E.D. Tex. 2008) (algorithm "might be expressed textually, or shown in a flow chart"); *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1244-46 (Fed. Cir. 2007); *Ambato Media, LLC v. Clarion Co.*, 2:09-CV-242-TJW, 2011 WL 2912764, *12 (E.D. Tex. July 18, 2011).

[9] The cases cited by Defendants (at page 24 n. 18) do not support Defendants' assertion.  In fact, *U.S. Ethernet Innovations, LLC, v. Acer, Inc.*, No. 10-3724, 2012 WL 3763667, at *6 (N.D. Cal. Aug. 29, 2012), notes that several systems may be considered a single component, and *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317-19 (Fed. Cir. 2012) involved a dual-function algorithm for which only half of the algorithm was enabled.  In *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, (Fed. Cir. 2012), the Court allowed a claim limitation to be met by several distinct systems that operated as one system, in light of a disclaimer that "Server Computer 12 may comprise one or more computers."   *Id.* at 1296-97.

incrementing a counter to as complex as initiating product development interactions."  Opp. 10-12.  Plaintiff agrees, as this merely acknowledges the operation of the invention described in the claim language following the term "trigger event."  *See, e.g.*, '565 patent Claim 1 ("monitor a product for…a trigger event…increment a counter corresponding to the trigger event upon detection of the…trigger event, cause the display of a user interface…").  Thus, Defendants' proposed construction is unnecessary, potentially confusing, and would not add clarity for the jury that is not already provided by the surrounding claim language.  In contrast, as discussed in Plaintiff's Brief (at 17-19), Plaintiff's proposed construction accurately captures the scope of the term and will be easily understood by a jury in the context of the surrounding claim language.

### 7.   "counter" / "increment a counter"

To support their contention that a "counter" must store "integers" that can be "increased sequentially," Defendants incorrectly assert that Plaintiff's proposed construction ignores the plain meaning of the word "counter."  Opp. 13.  Plaintiff's construction, however, captures the meaning of the term "counter" as understood by a person of ordinary skill in the art when the patents' original application was filed.   Even extrinsic evidence referenced by Defendants in the Joint Statement defines the term "counter" in the same way as Plaintiff's proposed construction:

- "A device, such as a register or computer storage location, used to represent the number of occurrences of an event."  Sup. Roth Dec., Ex. B (*Webster's New World Dictionary of Computer Terms* 133 (5th ed. 1994)).
- "A device (e.g., a register or computer storage location) used to represent the number of occurrences of an event."  Sup. Roth Dec., Ex. C (Donald D. Spencer, *Spencer's Computer Dictionary for Everyone* 61 (3rd ed. 1985)).

In fact, Defendants' quotation of extrinsic evidence omits a virtually identical definition, matching Plaintiff's construction.  Opp. 14; Collins Dec., Ex. K.

Defendants attempt to bolster the unnecessary limitations in their proposed construction (*i.e.*, "integers" and "increased sequentially") by providing examples from the specification that

Defendants contend store "incremental iterations of integer values."  Opp. 13-14.  Defendants'

first two examples (the '565 patent at Col. 11, l. 67 – Col. 12, l. 3 and Col. 29, ll. 57-67),

however, describe only the display of a user interface upon a certain number of occurrences of an

event, but do not describe a numeric counter sequentially increased.  Tellingly, the most detailed

of the two examples refers to the number of events in integers as "the 2nd, 10th, 70th and 95th

use of a feature," but does <u>not</u> refer to the counter as containing integers, instead referring to the

counter as containing "*values*."  '565 patent Col. 29, ll. 57-67.  Defendants' third example ('565

patent Col. 56, ll. 14-19) does not refer to a counter as used in the claims, but rather a table for

*reporting* a product's "passive probes" and "diary logs."  '565 patent Col. 56, ll. 11-12.  In fact,

in this portion of the specification, the Applicant saw fit to specify a counter's increment by an

integer ("increment that counter by one").  '565 patent Col. 56, l. 19.   The absence of similar

language elsewhere in the specification further evidences that a "counter" is not limited to

integers but includes any "appropriate metric."[10]   Defendants' reference to Figure 23 is also

misplaced, as Figure 23 confirms a counter includes any appropriate metric.   Fig. 23

("Increment/Record counter, timer, number of errors, metric, etc.").

Moreover, Defendants' examples from the specification are, at best, merely several

embodiments of the invention and should not be used to limit the scope of the term "counter" to

*exclude* the term's meaning as understood at the time.[11]  Defendants also assert that Plaintiff's

examples of embodiments implying non-integer counters *could* be "implemented with an integer

---

[10] *See, e.g.*, Col. 35, l. 10; *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012) ("If the applicant had redefined the term 'attached' to mean only 'attached to an outer surface,' then it would have been unnecessary to specify that the attachment was 'to [an] outer surface' in the specification.").

[11] *See, e.g.*, *Johnson Worldwide*, 175 F.3d at 991 ("Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition."); *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (limitations of an embodiment should not be incorporated into the claims).

based counter." Opp. 14-15. However, the Court should not insert limitations into a construction simply because the limitation "could" be used as the structure of the term, absent a clear disavowal by the patentee. Indeed, even where a patentee has described, in *every* embodiment, only one kind of structure for the term, that fact does *not* compel limiting the term to only that structure. *See Thorner*, 669 F.3d at 1367-68.

Defendants also incorrectly assert that Plaintiff's proposed construction would "read the *counting* aspect out of the 'increment a counter' term." Opp. 17. However, Defendants ignore that in Plaintiff's construction the counter is updated to "reflect *an increase in the number of occurrences of an event*." Indeed, Defendants concede this point in asserting that "Plaintiff's own construction… involves…counting." Opp. 17.

Defendants also assert that Plaintiff's construction "reads out the true meaning of the word 'increment' altogether." Opp. 17. Defendants' construction, however, improperly narrows the true meaning of the word "increment" by limiting the term to "sequentially increas[ing] the numeric value of a counter." Even the extrinsic evidence referenced by Defendants in the Joint Statement defines the term "increment" as also involving a decrease of the counter's value:

- "An amount added to or subtracted from a value of a variable." Sup. Roth Dec. Ex., C (Donald D. Spencer, *Spencer's Computer Dictionary for Everyone* 134 (3rd ed. 1985))
- "A value used to alter a counter or a register…To move a hopper or stacker upward or downward." Sup. Roth Dec., Ex. D (*IBM Dictionary of Computing* 330 (1993)).

In contrast, Plaintiff's constructions capture the terms' true scope. As the specification describes, a counter can be any kind of metric representing the number of occurrences of an event (not merely integers), and incrementing the counter requires only updating the counter to reflect an increase in the number of occurrences of the event. Col. 35, ll. 9-15.

Defendants also assert that Plaintiff's proposed constructions of the terms "counter" and "increment a counter" were disavowed by amendment during the '565 patent's prosecution "to

overcome U.S. Patent No. 4,816,904 to McKenna ('McKenna')."  Opp. 15-17.  Defendants'

assertion is irrelevant because prosecution history estoppel is not an issue for claim construction.

*See Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998).  In any

event, Defendants' assertion mischaracterizes the prosecution history and is based on the false

assumption that the Examiner allowed the '565 patent over McKenna and another reference

(U.S. Patent No. 4,787,053 to Moore) "only because of this newly added 'counter' limitation."

*Id*.  In fact, the Applicant traversed McKenna in light of a host of claim limitations reciting:

> monitoring a product for an occurrence in the product of a trigger event of a
> predefined plurality of trigger events;
> incrementing a counter corresponding to the trigger event upon detection of the
> occurrence of the trigger event in the product;
> displaying a user interface, configured to probe a user for information regarding a
> use of the product, if the counter exceeds a threshold;

Collins Dec., Ex. O at 17-23. Defendants ignore all but the "counter" aspect of these limitations.

Moreover, the Examiner allowed the '565 patent over McKenna expressly because

"McKenna does not disclose monitoring a product for an occurrence in the product of a trigger

event of a predefined plurality of trigger events"—a limitation of the '565 patent that does not

even include the "counter."  Collins Dec., Ex. Q at 3.  The Examiner also stated that the '565

patent was allowable over McKenna, Moore, and another reference (Levine ("Protecting Your

Power")) because of the many claim limitations quoted above, not merely the "counter" and

"increment a counter" aspects.  *Id*.  Tellingly, the Examiner noted that Levine "teaches [a]

threshold-exceeding condition," but allowed the '565 patent because Levine "does not teach

causing the display of a user interface, configured to probe for information regarding a use of the

product, based on a threshold-exceeding condition."  *Id*.  Accordingly, Defendants are wrong

that the Examiner allowed the '565 patent over McKenna and Moore specifically and only

because of the "counter" limitation.  Similarly, to the extent that Defendants are arguing that the

terms are limited by prosecution disclaimer, they have not identified any "clear and unmistakable

13

disavowal of scope." *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012).

**8.   "if the counter exceeds a threshold"**

Defendants' assert that construing this claim phrase to mean "if the counter's value meets a predefined criteria" ignores the words "exceeds a threshold" in the phrase.  Opp. 18.  However, Plaintiff merely proposes to construe this phrase consistently with the specification, which describes: "actual triggers occur at specific instances when both the trigger increments the counter, and *that counter reaches specific values*."  Col. 29, ll. 52-54.  Defendants attempt to characterize this language as "call[ing] for a counter exceeding a…value."  Opp. 18.  Not only is this a mischaracterization of the specification's language, Defendants' only support for their assertion merely presupposes their erroneous construction of the term "counter."  *Id*. at 19.  Defendants also mischaracterize Plaintiff's argument in the '565 patent reexamination as conceding that the user interface displayed in the '565 patent's claimed invention must *only* be displayed if the counter exceeds a threshold.  *Id*. at 19-20.  As the quoted language from the reexamination makes clear, however, Plaintiff merely asserted (and the Examiner subsequently agreed) that the claim element would only be satisfied if the user interface is displayed in response to the counter exceeding a threshold, regardless of whether the user interface was *also* displayed for any other reason.  *Id*. at 19; Collins Dec., Ex. S at 19.  Thus, Plaintiff merely asserted that prior art would not anticipate the claims, where, in the prior art, the display *never* resulted from a trigger and threshold condition.  Plaintiff's argument specifically recognized that the display of the user interface may also occur "for any reason."  *Id*.  Defendants' attempt to construe the claim phrase to mean "*only* when the counter exceeds a predetermined value" is simply an unsupported attempt to limit the proper scope of the claim.

**9.   "interaction scripts"**

Defendants assert the term "interaction scripts" is indefinite because "the intrinsic

evidence is ambiguous as to whether the 'interaction scripts' are instructions for the display of interactive content or the actual interactive content itself" and because "Plaintiffs' citations support multiple constructions."  Opp. 25.  However, Defendants' assertion that the term may be subjected to several different constructions is alone sufficient to avoid indefiniteness:

> It is true, as HydReclaim urges, that we should attempt to construe the claims to preserve their validity, *see Smith v. Snow,* 294 U.S. 1, 14, 55 S.Ct. 279, 79 L.Ed. 721 (1935) (holding that "if the claim were fairly susceptible to two constructions, that should be adopted which will secure to the patentee his actual invention"); *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1556, 37 USPQ2d 1609, 1617 (Fed.Cir.1996) ("When claims are amenable to more than one construction, they should when reasonably possible be interpreted so as to preserve their validity."), reading them in light of the specification, *see Vitronics, Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996).

*Process Control v. HydReclaim*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) (emphasis added).[12]

## 10.  "carrying information about the value to users of using the product"

Defendants assert that "carrying" must mean "containing," although they offer no evidence in support of that construction.  Opp. 26-27.  Instead, Defendants simply argue that Plaintiff's construction must be wrong (although Plaintiff has not proposed a construction for this term).[13]  Defendants fail to demonstrate that "carrying" has been used in a way that requires construction in order to be understood by the jury.

Defendants also attempt to limit the "information about the value to users of using the product" to "subjective opinions."  Opp. 27.  As discussed above regarding the "user's perception of the commodity," the specification identifies types of information that Defendants'

---

[12] Defendants quote this phrase from *Process Control* out of context: "[where the construction of a term] results in a nonsensical construction of the claim as a whole, the claim must be invalidated."  Opp. 25.  *Process Control* held a claim indefinite, however, only when there was a single, non-viable construction.  *See* 190 F.3d at 1356 ("where as here, claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated").

[13] Defendants improperly include an email that demonstrates only Plaintiff's attempts at compromise to limit the issues, which efforts were rejected by Defendants.  Opp. 26.

contend are not "subjective."

**11.  "user interface"**

As discussed in Plaintiffs' Brief (at page 11) and above, the specification includes embodiments of the invention that are purely software products.  Despite this fact, Defendants propose a construction for the term "user interface" that would exclude those embodiments, by requiring that the invention's user interface includes hardware.  On that basis alone, Defendants' construction should be rejected.

Defendants also contend that since claim 1 of the '078 patent describes "a user interface…configured to provide a medium for two-way local interaction between one of the users and the corresponding unit of the commodity," the user interface *must* include "some form of hardware" for the user to be able to interact with the unit.  Opp. 29.  However, Defendants reach too far in contending the "user interface" must include *every* element necessary for interaction between the user and the unit, which presents a slippery slope.  For example, a power supply is necessary for a user to interact with the fax machine embodiment (Col. 21, ll. 16-19), yet it could hardly be said that the power supply is part of the fax machine's user interface.

Likewise, many software products provide a medium for user interaction by displaying information to a user graphically on a screen.  Although the user may use a keyboard, mouse, or pointing device (such as the user's finger) to manipulate the graphical information, those physical items are not considered *part of* the software product's user interface.  Even extrinsic evidence referenced by Defendants in the Joint Statement describes this distinction between the user interface and the physical items used to manipulate the interface:

> **user interface**  *The portion of a program with which a user interacts*.  If the user *enters commands at the keyboard* and the program responds by operating in a specific manner, *the program has a command-line interface*.  If commands to the program are typically given via menu selections, the program is said to have a menu-driven interface.  *A program that displays information graphically and*

16

*requires a pointing device for user interactions is said to have a graphical user interface*.  Supp. Roth. Dec., Ex. E (*Microsoft Press Computer Dictionary* 405 (2d ed. 1994)) (emphasis added).

Defendants' assertions regarding claim 1 of the '565 patent further illustrate this point. Opp. 29-30.  That claim describes that the invention "cause[s] the display of a user interface…if the counter exceeds a threshold," which Defendants concede "establishes that the user interface is displayed, i.e., *presented on some form of hardware*."  Opp. 30 (emphasis added).  However, in that example it would be improper to say that such a graphical user interface *must* include the screen upon which it is displayed, just as any software graphic does not include the computer screen upon which it may be temporarily displayed.

Similarly, Defendants erroneously contend that Figure 24 illustrates a user interface that includes hardware.  Opp. 31.  However, the specification describes Figure 24 as "an opening interaction from a *software product*" (Col. 33, ll. 9-26), which may be displayed on a screen, and the Figure itself states: "To help improve how *this software* works for you, answer the questions when they appear" (Fig. 24).  It is beyond dispute that a non-physical software product by nature does not include physical components.  Yet Defendants contend "the '*software product*' depicted in Figure 24 necessarily includes the display shown in the figure" (Opp. 31), revealing Defendants' efforts to strain reason in defending their erroneous construction.  Indeed, in reference to Figure 24, the specification also describes one example of a purely software user interface as a "universal product interface 870 in FIG. 24," consisting of "a usability tested interface or pattern(s) of interaction(s) that are independent of a particular internal operating system or product category."  Col. 13, ll. 15-24.

Relying on lines 41 through 65 of the specification's column 20, Defendants assert that the specification lists only hardware as examples of user interfaces.  Defendants omit that this section of the specification describes only "the physical apparatus of one embodiment."  Col. 20,

ll. 41-42.  Similarly, Defendants mischaracterize lines 46 through 67 of column 57 as describing a "system us[ing] a 'color monitor' as the interface."  Opp. 31.  Defendants omit the fact that this section of the specification *first* describes generating reports regarding *user interfaces in purely software products*, and then describes a "report on a color monitor" "[i]f the product is physical and not software."  Col. 57, ll. 59-63.

### 12.   "two-way local interaction"

Defendants' have agreed to replace "communication" with "interaction" in their proposed construction, resolving Plaintiff's primary dispute with Defendants' construction.  Opp. 32 n.19. However, Defendants argue that the disputed phrase "two-way local interaction" must refer only to interactions at a single location, apparently without any remote component.  Opp. 32.  Plaintiff agrees that the interaction must occur at the user's location, as shown by Plaintiff's construction. The only dispute is whether Defendants' argument intends to improperly exclude *any* remote connection from the process.  As the specification repeatedly describes, interactions are sometimes downloaded to the units from a remote computer before they are available to the user.  Plaintiff's Brief 14-15 (discussing the interaction authoring system that transmits the interactions to the units); Col. 47, ll. 27-34 ("When user data is uploaded, new interactions are downloaded to the UP Module in the product."); Col. 43, ll. 51-64; Figs. 8, 12.

Defendants argue that "local" must preclude any remote aspect because claim 54 omits the word "local" and includes the word "on-line."  Opp. 33.  However, claim 54 illustrates the remote aspect discussed above, as its description of "carrying results of the two-way *local* interaction from each of the units to a central location" reveals that even though the interaction has an online aspect, it also includes a "local interaction" aspect.[14]

---

[14] Defendants also rely heavily on the discussion of the Instrument Design Repository in the specification's column 26 to support their distinction between local and remote (Opp. 32), but

13.   **"a memory within each of the units of the commodity"**

Defendants seek to limit this term to require "a memory *physically located* within each of the units of the commodity."  Opp. 33-36 (emphasis added).  Defendants' insertion of the words "physically located" into the claim language is an improper attempt to limit the claims.  *See Renishaw PLC*, 158 F.3d at 1249 (it is improper to "add a narrowing modifier before an otherwise general term that stands unmodified in a claim.").[15]  First, Defendants' proposed construction is inconsistent with the intrinsic evidence.  By inserting the words "physically located," into the claim, Defendants attempt to limit the claims to units of a commodity with a physical ability to have memory inside.  But this construction ignores the specification's explicit discussion of numerous non-physical units of the commodity referenced in Plaintiff's Brief (at pages 11, 31-32).  Defendants' construction would improperly excludes these embodiments.  *See, e.g., Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) (rejecting claim construction that excludes an embodiment in the patent).

Defendants assert that their proposed claim construction is consistent with the embodiment of the patent in which Value Locator Repository pointers and descriptions are downloaded into a holding corral on the user's system (the "VLR downloadable module") because, they assume, the VLR downloadable module is not a unit of the commodity and, therefore, need not have "memory within" it.  Opp. 35-36.  However, the specification contemplates that the VLR downloadable module is a unit of the commodity, and Defendants have not shown otherwise.  For example, the patent states, "This invention may make a range of

---

that discussion describes the interaction authoring system used by the vendor, not the unit of commodity used by the user.  Moreover, that discussion confirms that remote interactions/probes may be downloaded, after which they become local interactions/probes.  Col. 26, ll. 14-21.

[15] Defendants ask the Court to adopt a definition of "within" from a different patent regarding automobile fuel pump assemblies.  Opp. 33.  But Defendants ignore that "the claim language in each patent should be construed independently."  *Datamize, Inc.*, 2004 WL 1683171 at *6.

contributions by providing environment-wide learning and feedback systems…Examples of such systems could be based on one or more dynamically evolving repositories of user value judgments and navigational pointers…let us call these Value Locator Repositories." Col. 86, l. 55 – Col. 87, l. 8. The specification identifies one such Value Locator Repository as the VLR's pointers and descriptions including a "'mobile' CBPD Module" (*i.e.*, the VLR downloadable module), which can be downloaded to the user's system. Col. 88, ll. 6-11. Thus, Defendants' unsupported argument that its proposed claim construction is consistent with the VLR downloadable module embodiment should be rejected.

Defendants' reliance on the prosecution history is also misplaced. Opp. 35. Defendants rely solely on claim amendments to infer a narrowing of scope. However, Defendant's arguments are apparently based on the doctrine of prosecution history estoppel, which is not an issue for claim construction. *Spectrum Int'l, Inc.*, 164 F.3d at 1378-79. To the extent Defendants are attempting to argue prosecution history disclaimer, they have identified no "clear and unambiguous disclaimer" by the Applicant. *See Middleton, Inc. v. Minnesota Mining & Mfg. Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002) (reversing district court's claim construction finding no clear and unambiguous disclaimer based on amendment). Moreover, during prosecution the applicant removed "that is included" from the phrase "a memory ~~that is included~~ within each of the units of the commodity." Opp. 35. This deletion broadened the claim, making clear that the claim is not limited to a memory "physically included" within the units of the commodity. *See, e.g., Saxon Innovations, LLC v. Nokia Corp.*, 6:07-CV-490, 2009 WL 2413261, at *5 (E.D. Tex. July 31, 2009) (Love, J.) (removing word broadened scope of claims); *Voice Capture, Inc. v. Intel Corp.*, 354 F. Supp. 2d 997, 1001 (S.D. Iowa 2004) (same).

Defendants' reliance on extrinsic evidence fares no better. A person of ordinary skill in the art would have considered "memory" to include virtual memory. *See, e.g.*, Sup. Roth Dec.,

Ex. C (Donald D. Spencer, *Spencer's Computer Dictionary for Everyone* 171 (3rd ed. 1985)) (referencing virtual memory in definition of memory); Supp. Roth Dec., Ex. F (Martin Weik, *Computer Science and Communications Dictionary* 998 (2000)) (same).  Defendants' proposed definition artificially limits "memory" to physical memory by requiring that the memory is "physically located within."   A person of ordinary skill in the art would have recognized that virtual memory is a memory that is "available to the operating programs…and…may be smaller, equal to, or larger than the real memory present."   Supp. Roth Dec., Ex. F (Martin Weik, *Computer Science and Communications Dictionary* 1895 (2000)).   In the context of the patent, one of ordinary skill in the art would recognize that virtual memory is "within" a unit of a commodity, such as a software program, because it is "available to" the program and once the program is running, the memory is "allocated to" it.   Sup. Roth Dec., Ex. B (*Webster's New World Dictionary of Computer Terms* 13 (5th ed. 1994)) ("**allocation**   The process of reserving computer storage areas for instructions or data, done…automatically by a program").

**14.  "forwarding the input"**

As discussed in Plaintiff's Brief, there is no need to construe the straightforward term "forwarding," and Defendants' proposed construction imports two other contested terms, "server" and "product," into the construction.  Defendants incorrectly contend that Plaintiff's position is that "forwarding" can mean sending the input, which originated at the product, back to the product.  The plain meaning of "forward," which will be apparent to the jury without construction, means transmitting the input to another location <u>other</u> than the original source of the input.  To the extent that Defendants' construction captures that concept, the plain meaning of the term "forwarding" is sufficient.   Indeed, Defendants admit that the word is easily understood to anyone familiar with email.  Opp. 37-38 n.21.

**15.  "a priority code associated with the input"**

This phrase requires no construction, as the plain meaning will be apparent to the jury. Defendants contend this term cannot include a priority code set by the analysis system because the only embodiments illustrating "forwarding the input" involve priority codes set by the product.  Opp. 37-38.   However, even where a patentee has described, in *every* embodiment, only one kind of structure for the term, that fact does *not* compel limiting the term to only that structure.  *See Thorner*, 669 F.3d at 1367-68.   In addition, as described in Plaintiff's Brief (at pages 33-34), the analysis system can assign a priority code to an input, and can forward an input, in the form of a report, "to the person who is to be notified of the report."  Col. 54, 52-67.

**16.  Additional Terms Proposed for Construction by Kaspersky**

Kaspersky proposes several additional terms for construction—"passive probe," "server," "results," "communication element," "medium," and "central location"—which Plaintiff and Defendants agree are common, readily-understood terms that need no construction.  Opp. 39. Kaspersky's sole argument that these terms should be construed is Kaspersky's contention that the products at issue in the patented invention cannot be software products.  *See Kaspersky Lab's Response Claim Construction Brief 5-7.*   However, that contention is appropriately addressed by the parties' dispute regarding the terms "units of a commodity," "commodity," and "product," and therefore does not justify construing Kaspersky's additional terms.  Kaspersky has offered no other support for each of its proposed constructions of these additional terms.  Thus, the Court should reject Kaspersky's proposed constructions of these terms.[16]

---

[16]  Kaspersky attempts to support its constructions of the terms "user's perception of the commodity" and "information regarding a use of the product" by applying those terms to its accused products.  Kaspersky's Brief 2-5.  However, "[a] claim is construed in light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device." *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1118 (Fed.Cir.1985).

Dated:  March 29, 2013.                    Respectfully Submitted,


By:     *s/Kit W. Roth*_____
        Kit W. Roth
        (admitted *pro hac vice*)
        Michael M. Goldfarb
        (admitted *pro hac vice*)
        Christopher M. Huck
        (admitted *pro hac vice*)
        KELLEY, GOLDFARB,
        HUCK & ROTH, PLLC
        700 Fifth Avenue, Suite 6100
        Seattle, Washington 98104
        Phone:  (206) 452-0260
        Fax:  (206) 397-3062
        Email: goldfarb@kdg-law.com
               huck@kdg-law.com
               roth@kdg-law.com

        William E. "Bo" Davis, III
        Texas State Bar No. 24047416
        THE DAVIS FIRM, PC
        111 West Tyler Street
        Longview, Texas 75601
        Phone:  (903) 230-9090
        Fax:  (903) 230-9090
        Email:  bdavis@bdavisfirm.com

        **Attorneys for Plaintiff Lodsys, LLC and
        Lodsys Group, LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(V).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email, on this the 29th day of March, 2013.

By:    _s/Kit W. Roth_____
Kit W. Roth

24