**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **LODSYS, LLC,** *et al.* | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 2:11-cv-00090-JRG** |
| | § | |
| **BROTHER INTERNATIONAL CORPORATION,** *et al.* | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**


Before the court are Plaintiff's Opening Claim Construction Brief (Dkt. No. 555),

Defendants' Response Brief (Dkt. No. 578), Kaspersky Lab's Response Claim Construction

Brief (Dkt. No. 590-1), and Plaintiff's Reply Brief (Dkt. No. 591).

The Court held a hearing on April 30, 2012.

**<u>Table of Contents</u>**

I. Introduction ....................................................................................................................1

   A.   Background ..............................................................................................................1

   B.   The Parties' Submissions .......................................................................................2

   C.   Statutory Citations .................................................................................................2

II. Claim Construction Principles ..........................................................................................3

   A.   Overview ................................................................................................................3

   B.   The Claims .............................................................................................................4

   C.   The Specification ....................................................................................................5

   D.   The Prosecution History .........................................................................................7

III. Agreed Constructions ......................................................................................................8

IV. Disputed Claim Terms ......................................................................................................8

   A.   Summary ................................................................................................................8

   B.   Level of Ordinary Skill in the Art ..........................................................................10

   C.   "units of a commodity" / "commodity" / "product" ................................................11

      1.   Parties' Proposed Constructions ........................................................................ 11

      2.   The Core Disagreements ................................................................................... 12

      3.   Discussion ........................................................................................................ 12

         a) The Parties' Arguments ..................................................................................12

         b) Court's Construction of "commodity" .............................................................14

         c) Court's Construction of "units of a commodity" ..............................................24

         d) Court's Construction of "product" ..................................................................27

   D.   "user interface" ....................................................................................................30

      1.   Parties' Proposed Constructions ........................................................................ 30

      2.   The Core Disagreement ..................................................................................... 30

      3.   The Parties' Arguments ..................................................................................... 30

      4.   Discussion ........................................................................................................ 32

E. "a memory within each of the units of the commodity" .................................34

   1. Parties' Proposed Constructions ................................................ 34

   2. The Core Disagreement ........................................................ 35

   3. The Parties' Arguments ........................................................ 35

   4. Discussion ..................................................................... 37

F. "user's perception of the commodity" / "information regarding a use of the product".................................................................................43

   1. Parties' Proposed Constructions ................................................ 43

   2. The Core Disagreement ........................................................ 43

   3. The Parties' Arguments ........................................................ 43

   4. Discussion ..................................................................... 46

G. "perception information" .................................................................49

   1. Parties' Proposed Constructions ................................................ 49

   2. The Parties' Arguments ........................................................ 49

   3. Discussion ..................................................................... 50

H. "elicit" / "probe" ...........................................................................54

   1. Parties' Proposed Constructions ................................................ 54

   2. The Core Disagreement and the Parties' Arguments............................ 54

   3. Discussion ..................................................................... 56

I. "component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location"................57

   1. Parties' Contentions ............................................................ 57

   2. The Parties' Arguments ........................................................ 57

   3. Discussion ..................................................................... 58

    a) Background ................................................................... 58

    b) The Present Limitation ........................................................ 61

J. "two-way local interaction" ...............................................................67

   1. Parties' Proposed Constructions ................................................ 67

2.    Claim Language and the Parties' Arguments ................................................ 67

3.    Discussion ................................................................................................. 69

K.   "trigger event".................................................................................................71

1.    Parties' Proposed Constructions ............................................................... 71

2.    Discussion ................................................................................................. 71

L.   "counter" / "increment a counter" / "if the counter exceeds a threshold" ........................72

1.    Parties' Proposed Constructions ............................................................... 72

2.    The Parties' Arguments ............................................................................. 72

3.    Discussion ................................................................................................. 78

a) "counter" ........................................................................................................78

b) "increment a counter"....................................................................................82

c) "if the counter exceeds a threshold"..............................................................83

M.   "forwarding the input" / "a priority code associated with the input" ...............84

1.    Parties' Proposed Constructions ............................................................... 84

2.    Claim Language in Context ....................................................................... 85

3.    Discussion ................................................................................................. 85

a) "forwarding the input".....................................................................................85

b) "a priority code associated with the input" ...................................................86

N.   "passive probe" / "server" / "communication element" / "memory" ...............88

1.    Parties' Proposed Constructions ............................................................... 88

2.    Discussion ................................................................................................. 88

O.   "interaction scripts" / "carrying information about the value to users of using the product"...................................................................................................89

1.    The Parties' Proposed Constructions ........................................................ 89

2.    Discussion ................................................................................................. 89

a) "interaction scripts".........................................................................................89

b) "carrying information about the value to users of using the product" .........93

P.   "a transaction for sale of a product or a service contract for the commodity" .................95

   1.   Parties' Proposed Constructions ..................................................................... 95

   2.   Claim Language in Context ........................................................................... 95

   3.   Discussion .................................................................................................... 96

V. Conclusion ........................................................................................................97

# I.
## Introduction

### A. Background

The parties are Plaintiffs Lodsys, LLC and Lodsys Group, LLC (collectively, "Lodsys" or "plaintiffs"), Brother International Corporation *et al*. and all defendants presently in the above captioned action and in each of the cases consolidated with the above captioned action,[1] except Kaspersky Lab, Inc.,[2] (collectively, "defendants"), and Defendant Kaspersky Lab, Inc. ("Kaspersky") (collectively, plaintiffs, defendants, and Kaspersky are referred to as "the parties").

The three patents-in-suit are U.S. Patent Nos. 7,620,565 ("the '565 patent"), 7,222,078 ("the '078 patent"), and 5,999,908 ("the '908 patent"), although the '908 patent has not been asserted against Kaspersky. The patents are in the same family and share substantially the same specification.[3] All issued from continuation applications ultimately from application No. 08/243,638, filed May 16, 1994, now abandoned, which was a continuation-in-part of application No. 07/926,333, filed August 6, 1992, now abandoned.

In general terms, the patents-in-suit are drawn to an interactive system that allows one to obtain information from a user about the user's "perception" of a "commodity." That information may then be used in developing or improving the "commodities." The terms "commodities" and "perception" are disputed terms.

---

[1] The terms being addressed are for the following cases which have been consolidated for pretrial purposes: Case Nos. 2:11-cv-00090-JRG, 2:11-cv-00272-JRG , 2:11-cv-00283-JRG; 2:12-cv-284-JRG, 2:12-cv-286-JRG, 2:12-cv-287-JRG, 2:12-cv-288-JRG, 2:12-cv-289-JRG, 2:12-cv-290-JRG, 2:12-cv-291-JRG.

[2] Kaspersky has not been accused of infringing the '908 patent. Hence, Kaspersky's arguments are limited to those claims of the '565 and '078 patents actually asserted against Kaspersky.

[3] To the extent that there may be differences between the specifications, arising from the individual prosecution of those applications, none of the parties has relied on, or pointed to, such differences for any substantive issue.

## B. The Parties' Submissions

The parties have filed or provided the following submissions setting out their respective proposed constructions and arguments:

| Date Filed | Dkt. No. | Submission |
|---|---|---|
| January 11, 2013 | 505 | Joint Claim Construction and Prehearing Statement ("JCCS [Dkt. No. 505]") |
| February 19, 2013 | 555 | Plaintiff's Opening Claim Construction Brief ("Lodsys' Brief [Dkt. No. 555]") |
| March 18, 2013 | 578 | Defendants' Responsive Claim Construction Brief ("Defendants' Response [Dkt. No. 578]") |
| March 18, 2013 | 578-1 | Kaspersky Lab's Response Claim Construction Brief under P.R. 4-5(b) ("Kaspersky's Response [Dkt. No. 578-1]") |
| March 29, 2013 | 590 | Kaspersky's Unopposed Motion to File Corrected Response Claim Construction Brief and "[Corrected] ("Kaspersky's Motion") Kaspersky Lab's Response Claim Construction Brief under P.R. 4-5(b) ("Kaspersky's Corrected Response [Dkt. No. 590]") |
| March 29, 2013 | 591 | Plaintiff's Reply Claim Construction Brief ("Lodsys' Reply [Dkt. No. 591]") |
| April 19, 2013 | 615 | Notice of Filing of Joint Claim Construction Chart [per rule 4-5(d) ("JCCC [Dkt. No. 615] at") |
| Submitted on CD at the close of the claim construction hearing | | File histories for the patents-in-suit. |

## C. Statutory Citations

On September 16, 2011, President Obama signed into law the America Invents Act (AIA), Pub. L. No. 112–29. Section 4, entitled "Inventor's Oath or Declaration," *inter alia*, added subsection designations to the paragraphs of 35 U.S.C. § 112. Sec. 4(e), "Effective Date," provides: "The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent application that is filed on or after that effective date." Although § 112, as amended, is currently

in the form of that statute, those amendments, largely non-substantive, would not be applicable to the patents-in-suit.

Accordingly, the statutory citations herein – for § 112 and otherwise – are to the patent statute – 35 U.S.C. – <u>prior</u> to the AIA amendments. For example, § 112(1) refers to § 112, para. 1, § 112(2) refers to § 112, para. 2, and § 112(6) refers to § 112, para. 6 of 35 U.S.C. without the AIA amendments.

## II.
## Claim Construction Principles

### A. Overview

A patent is a fully integrated written instrument. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). A patent, by statute, must provide a written description of the invention, a disclosure that would enable one of ordinary skill in the art to make and use the invention, and a disclosure of the best mode known to the inventor for practicing the invention. *See* 35 U.S.C. § 112(1).[4] A patent must also contain claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(2).[5] The claims of a patent provide the measure of a patentee's right to exclude others from practicing the claimed invention. *See* 35 U.S.C. § 154.[6]

---

[4] 35 U.S.C. § 112(1) provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

[5] 35 U.S.C. § 112(2) provides:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

[6] 35 U.S.C. § 154(a)(1) provides:

> Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the

## B. The Claims

Primary claim construction principles are discussed and explained in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). Among those are that "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' " *Id.* at 1312, quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004), and citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). *See also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (claim construction "begins and ends" with the actual words of the claims). "That principle has been recognized since at least 1836, when Congress first required that the specification include a portion in which the inventor 'shall particularly specify and point out the part, improvement, or combination, which he claims as his own invention or discovery.' "*Phillips*, 415 F.3d at 1312.

"[T]he words of a claim 'are generally given their ordinary and customary meaning,' "and "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313. "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.* at 1313. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Thus, in some instances, "general purpose dictionaries may be

United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

helpful," but, as the court explained, "[i]n many cases that give rise to litigation * * * determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id*. at 1314; *see Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1333 (Fed. Cir. 2008) ("when considered in the context of and not divorced from the intrinsic evidence, there is nothing improper about referencing [a] definition in correctly construing the claim."). "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' "*Id.*, *quoting Innova/Pure Water*, 381 F.3d at 1116. " 'Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " *Phillips*, 415 F.3d at 1314.

Thus, the claim construction process begins with the language used in the claims because "[q]uite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* (citation omitted).

"Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* That is referred to as "claim differentiation." "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

## C.  The Specification

The specification nevertheless remains important in claim construction. "The claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.' * * * [T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the

single best guide to the meaning of a disputed term.' *Id*. at 1315, *quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d at 1576, 1582.

In particular, "[c]onsistent with that general principle," the cases recognize that (1) "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs," and (2) "[i]n other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id*. at 1316.

However, two claim construction principles are: (1) claims are read in light of the specification, but (2) limitations from the specification must not be read into the claims. The line between the two is not always clear. *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998) ("[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification.") In *Phillips*, the Federal Circuit advised that the "line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323 (citations omitted).

The Federal Circuit also advised: "[t]o avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case.

Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive. The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent." *Id*. at 1323 (citations omitted).

Nevertheless, the Federal Circuit has acknowledged that, "[i]n the end, there will still remain some cases in which it will be hard to determine whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature. While that task may present difficulties in some cases, we nonetheless believe that attempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification." *Id*. at 1323-24.

**D.  The Prosecution History**

The words in the claim may also be interpreted in light of the prosecution history, if in evidence. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). "Like the specification, the prosecution history provides evidence of how the [United States Patent and Trademark Office ("PTO")] and the inventor understood the patent. Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent." *Phillips*, 415 F.3d at 1317 (citations omitted).

"Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*. "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*.

## III.
## Agreed Constructions

The parties have agreed that the following terms do not require construction:

- "predefined plurality of trigger events"
- "configured"
- "results"
- "central location"
- [user interface configured to provide a] "medium"

JCCC [Dkt. No. 615] at 10.

## IV.
## Disputed Claim Terms

### A. Summary

In brief summary:

| Disputed Term/Phrase | Court's Construction |
|---|---|
| "units of a commodity" / "commodity" / "product" | "product or service." |
| "user interface" | The Court declines to limit "user interface" to including hardware. "User interface" may refer, in the context in which the term is used, to hardware, software, or a combination of hardware and software. No further construction is necessary. |
| "a memory within each of the units of a commodity" | "within" means "inside" but is not limited to "physically located within" |
| "user['s] perception of the commodity" / "information regarding a use of the product" | A "user's perception" or "information regarding a use of the product" does not require "prior" or "actual" use. No further construction is necessary. |
| "perception information" | "perception information" is amenable to construction, namely "perception information based on inputs of the users at the respective user-interfaces" reflects the "user perceptions" "elicit[ed]" in the first limitation of claim 69 of the '078 patent and is not insolubly ambiguous. The phrase does not render claim 69 indefinite under § 112(2). |

| Disputed Term/Phrase | Court's Construction |
|---|---|
| "elicit" / "probe" | The parties agree that "elicit" and "probe" exclude "passively obtaining information without a user's involvement." No further construction is necessary. |
| "component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location" | Claim does not use the word "means" and is therefore entitled to a rebuttable, but strong, presumption that the limitation should not be construed as a means-plus-function limitation governed by § 112(6).<br><br>The Court concludes that the defendants and Kaspersky have not overcome that presumption here. Accordingly, the issue of whether the specification discloses "corresponding structure" that is "clearly linked" to the claimed function is not reached. |
| "two-way local interaction" | "interactions between the user and the unit at the user's location" |
| "trigger event" | "an event that initiates an action" |
| "counter" / "increment a counter" / "if the counter exceeds a threshold" | "counter" means "a memory location for storing values that represent the number of occurrences of an event."<br><br>"increment a counter" means "update a counter to reflect an increase in the number of occurrences of an event"<br><br>"if the counter exceeds a threshold" will be construed as written - no further construction is necessary. |
| "forwarding the input" / "a priority code associated with the input" | "forwarding the input" - the parties agree that "forward" is distinct from "reply," and means transmitting the input to another location other than the original source of the input - no further construction is necessary<br><br>"a priority code associated with the input" is construed as "information that indicates the priority of the input" |
| "passive probe" / "server" / "communication element" / "memory" | Terms do not require construction |
| "interaction scripts" / "carrying information about the value to users of using the product" | "interaction scripts" refers to "interactive content" - the claim is not insolubly ambiguous or invalid as indefinite under § 112(2)<br><br>The actual claim language, "information about the value to users of using the product," is not necessarily limited to a user's "subjective opinion," and defendants have not provided a persuasive showing that the specification necessitates so construing that claim language - no further |

| Disputed Term/Phrase | Court's Construction |
|---|---|
| | construction is necessary. |
| "a transaction for sale of a product or a service contract for the commodity" | No construction is necessary |

The foregoing is a brief summary provided for the convenience of the parties, and does not include the Court's rationale, discussed below, in accepting or rejecting various constructions and contentions advanced by the parties.

**B. Level of Ordinary Skill in the Art**

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313 ("the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application.").

The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

None of the parties has proposed any particular level of ordinary skill in the art, or presented evidence or argument on any of the foregoing factors. Accordingly, the Court can only assume that the level of ordinary skill in the art is not disputed, and that no party contends that the level of skill in the art is decisive or persuasive in the construction of any disputed term.

## C.  "units of a commodity" / "commodity" / "product"

### 1.  Parties' Proposed Constructions

The parties' proposed the following constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"units of a commodity"** | **'078:** 1, 11, 27, 28, 38, 39, 60, 69, 74 | "instances of a product or a service" | "standalone physical goods that are bought or sold" | specific physical goods used alone or in connection with a service |
| **"commodity"** | **'078:** 1, 3-5, 10-13, 19, 22, 24, 25, 27, 28, 32, 33, 38, 39, 40, 44, 47, 50, 51, 52, 60, 63, 64, 67, 68, 69, 73, 74 | This term should be construed within the entire phrase "units of a commodity."<br><br>If the Court determines this term should be separately construed: "product or service" | "a standalone physical good that is bought or sold" | physical goods used alone or in connection with a service |
| **"product"** | **'565:** 1, 5, 7, 8, 10, 13, 15, 17, 19, 20, 22, 25-28<br>**'908:** 37 | No construction necessary<br><br>If the court determines this term should be construed:<br><br>"item or service, including hardware or software, provided to a user" | "a standalone physical good that is bought or sold" | Claim 1, 5, 8, 10, 13: A product is not the same as the unit.<br><br>Claim 14, 17, 19, 20, 22, 25, 26: A product is distinct from the device that is performing the method steps.<br><br>Claim 27 and 28: A product is distinct from the executable code and from the computing device. |
| JCCC [Dkt. No. 615] at 2-3 | | | | |

## 2. The Core Disagreements

The core disagreements arising from the defendants' proposed construction are whether "commodity" and "product" must be a (1) "standalone," (2) "physical good," (3) "that is bought or sold." The core disagreements arising from Kaspersky's proposed construction *vis-à-vis* "units of a commodity" and a "commodity" are whether the "commodity must be "physical goods used alone or in connection with a service," *i.e.* "services" alone would not qualify as a "commodity." Kaspersky did not originally propose a construction for "commodity." JCCS [Dkt. No. 505] at 6. The core disagreements arising from Kaspersky's proposed construction *vis-à-vis* "product" are (1) for certain claims, whether a "product" may be "the same as the unit," (2) for other claims, whether a "product" must be distinct from the device that is performing the method steps," and (3) for yet other claims, whether a "product" must be "distinct from the executable code and from the computing device." Kaspersky did not originally propose a construction for "product." JCCS [Dkt. No. 505] at 12.

## 3. Discussion

### a) The Parties' Arguments

Lodsys urges that "[w]hile the patented invention undisputedly covers 'standalone physical goods,' it is clear from the specification that it also covers other products and services, such as software." Lodsys' Brief [Dkt. No. 555] at 10. Lodsys, for example, points to, *inter alia*, the following portion of the specification:

> For the purposes of this description, <u>both the Products and the Services</u> appropriate for this invention <u>will be referred to as Products</u>. In many types of services it is possible to include a CB-PD Module, such as in the rental of automobiles; scheduling, during or after the delivery of travel services (such as an on-line system to plan a trip, and during a stay at a resort); etc. Thus, many services might be turned into Customer Directed Services (CDS) by means of this invention.

Lodsys' Brief [Dkt. No. 555] at 10, quoting '078 patent, col. 16, lines 59-67 (emphasis by Lodsys).

Lodsys also urges that those "products and services" are expressly disclosed as including nonphysical software products. Lodsys notes that the '078 patent, *inter alia*, at col. 12, lines 27-31, discloses that "[a] sixth example [of the invention] includes information industry products (a software product, corporate application software, a corporate information system, a computer

operating system, a computer, a computer peripheral, data communications devices, etc.)." Lodsys' Brief [Dkt. No. 555] at 11.

Lodsys further urges that the specification discloses the invention in the context of products and services that are not "bought or sold," such as "educational and non-commercial 'product[s],' " citing the '078 patent, col. 13, lines 50-57, which discloses in context:

> A second potential impact is that this makes material transformations in the products and services that include this invention. For example, the Defined Customer Desires (DCD) that receive the most attention by the product's vendor may be those that appear to have the largest direct impact on the financial success and marketing performance of the product (or the fundamental goals of the organization, which may or may not be commercial; for example, an educational institution may be developing a technology-based curriculum product to produce certain learning outcomes or performance results, such as new skills in its students, and it may use a CB-PD Module to assess outcomes of its curriculum product during use, helping provide a constant flow of improvement information for this educational and non-commercial "product").

'078 patent, col. 13, lines 42-57.

The defendants urge that "commodity" must be a "physical good" pointing, *inter alia*, to claim 1 calling for "a user interface, <u>which is part of</u> each of the units of the commodity" (defendants' emphasis) and "a memory <u>within each</u> of the units of the commodity" (defendants' emphasis). Defendants urge that if a "commodity" is not a "physical good," then the claim becomes nonsensical because interfaces and memories cannot exist within an intangible, or non-physical, item. Defendants' Response [Dkt. No. 578] at 5. Defendants also point to dependent claims that call for specific physical items, *e.g.*, claim 6, "telephone extension equipment," claim 8, "facsimile equipment," claim 11, "consumer television equipment." *Id*. The defendants also point to instances in the specification that refer to physical goods. *Id*. at 6. Kaspersky makes a similar argument. Kaspersky's Corrected Response [Dkt. No. 590] at 6.

The defendants further point to, *inter alia*, The Random House Dictionary of the English Language 2074 (2d ed. 1987) defining "commodity" as "an article of trade or commerce, esp. a product as distinguished from a service."

The defendants also urge that a "commodity" must be "bought or sold." The defendants note that the specification refers "to '[t]he Parties in this Invention' as including, *inter alia*, the customer, the vendor, and the distributor, in a context where the Vendor sells goods to the Customer." Defendants' Response [Dkt. No. 578] at 7 citing '078 patent, col. 17, lines 1-28. The defendants also rely on several dictionary definitions.

In response to Lodsys' reference to educational and non-commercial products, the defendants urge that the asserted claims "do not cover a non-physical educational curriculum standing alone. Rather, to the extent that the education curriculum embodiment is claimed, it would be within the context of a physical good (e.g., a computer) bought or sold that can utilize that curriculum." Defendants' Response [Dkt. No. 578] at 7.

Lastly, the defendants rely on portions of the prosecution history in arguing that a "commodity" must be a "stand alone" product. *Id*. at 8.

### b) Court's Construction of "commodity"

The term "commodity" does not appear in the specification of the '078 patent, other than the abstract.[7] Rather, the specification describes the invention in the context of products and services. Indeed, the specification is replete with references to "products" and "services." As Lodsys notes, the specification explains that "both the Products and the Services appropriate for this invention will be referred to as Products."

As noted above "the words of a claim 'are generally given their ordinary and customary meaning' * * * that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13, (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which [it] appears, but in the context of the entire patent, including the specification." *Id*. at 1313.

---

[7] The abstract was added in a preliminary amendment. USP7222078_SFH.pdf (file history for '078 patent on CD provided after the conclusion of the *Markman* hearing) Bookmark 2004-5-21 Abstract, Preliminary Amendment.

The defendants have not pointed to anything in the specification that suggests that "commodity" was intended to have a narrower construction than its ordinary and customary meaning, or that the term refers to something other than the various products and services discussed in the specification.

The defendants' reference to various dictionary sources in an effort to limit the ordinary and customary meaning of "commodity" is unavailing. The term "commodity" has both broad and narrow interpretations. The defendants have not made any persuasive showing that "commodity" was intended to be limited to its most restrictive meaning. For example, the defendants point to The Random House Dictionary of the English Language 2074 (2d ed. 1987), defining "commodity" as "an article of trade or commerce, esp. a product as distinguished from a service," is not persuasive. The same dictionary also defines "commodity" as "something of use, advantage, or value." Similarly, Webster's Ninth New Collegiate Dictionary (1985), which defendants also rely on, [Dkt. No. 578-9] defines "commodity" as "1: an economic good: as a: a product of agriculture or mining b: an article of commerce esp. when delivered for shipment (*commodities* futures) 2 a: something useful or valuable b: CONVENIENCE, ADVANTAGE, 3 *obs.* QUANTITY LOT."

The other dictionary definitions that defendants have proposed, Defendants' Response [Dkt. No. 578] at 6 n. 11, have been considered, but are likewise not persuasive. Certainly "commodity" may consist of goods bartered through commodity exchanges, such as corn, wheat, *etc.*, and certainly a "commodity" may consist of physical goods, but the definitions that defendants rely on do not establish that "commodity" is necessarily limited to a "physical good," or that such limited scope was intended by the patentee. Rather, the ordinary and customary meaning of "commodity" is broader than that, including generally something useful or valuable.

The defendants also rely on other claim language. Defendants are correct that other claim language may assist in determining the meaning of a term in a particular claim. *See Phillips*, 415 F.3d at 1314 ("the context in which a term is used in the asserted claim can be highly instructive."). For example, in *Phillips*, one of the terms at issue was "steel baffles." The court noted that "steel" "strongly implies that the term 'baffles' does not inherently mean objects made of steel." *Id*.

Claim 1 of the '078 patent calls for:

> 1. A system comprising:
>
> units of a commodity that can be used by respective users in different locations,
>
> <u>a user interface, which is part of each of the units of the commodity</u>, configured to provide a medium for two-way local interaction between one of the users and the corresponding unit of the commodity, and further configured to elicit, from a user, information about the user's perception of the commodity,
>
> <u>a memory within each of the units of the commodity</u> capable of storing results of the two-way local interaction, the results including elicited information about user perception of the commodity,
>
> a communication element associated with each of the units of the commodity capable of carrying results of the two-way local interaction from each of the units of the commodity to a central location, and a component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location.

As discussed below, the underlying dispute between the parties *vis-à-vis* "user interface" is whether "user interface" is necessarily limited to hardware. The Court concludes below that "user interface" is not necessarily so limited. Similarly, the Court concludes below that "memory within" is not necessarily limited to a memory "physically located within." Thus, although those terms may provide context, and may be instructive, those terms do not necessarily limit "commodity" to a "physical good."

Also, it seems from the briefing that a primary underlying issue is whether computer software constitutes a "product" or whether computer software constitutes a "service." For example, Kaspersky argues that software is not a physical product, and that "software by itself does not include 'memory,' a 'user interface' that provides a 'medium' for 'two-way local interaction,' or a 'communications element' that can carry information from users to a 'central location,' along with information from 'passive probes' as recited in dependent claim 5," and that "[t]he recitation of physical devices such as memory, transmitter, and processor demonstrates that these elements cannot be met by software alone." Kaspersky's Corrected Response [Dkt. No. 590] at 6.

Certainly, claim 1 calls for "a user interface" which "<u>is part of each of the units of the commodity</u>." And similarly calls for "a memory" "<u>within each of the units of the commodity</u>." Software, as discussed below, may include a "user interface" that "is part of" the software, and

may include "memory" that is "within" the software. Thus, to the extent that the parties argue whether software constitutes a "product" or a "service," as a "service," software generically may clearly meet the terms of the claim. With respect to specific software and other "services," the nature of that software and those services may or may not fall within the express terms of the claim. That is an issue for the infringement phase of this case. *Markman*-type claim construction does not <u>necessarily</u> resolve all outstanding infringement issues.

The defendants also note that dependent claims refer to physical goods, such as "facsimile equipment," "telephone extension equipment," "consumer television equipment." However, those dependent claims narrow "commodity" in the base claim to specific types of "commodities." Thus, if anything, those dependent claims suggest a broader construction for "commodity" in the base claim. *See Phillips*, 415 F.3d at 1314-15 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. * * * For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). In particular, those claims do not limit the construction of "commodity" in the base claim, and, indeed, under the doctrine of claim differentiation, suggests that "commodity" is a broader term. Although claim differentiation is a guideline, not a rigid rule, *see Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) ("Claim differentiation is a guide, not a rigid rule."), in all events, those dependent claims do not serve to narrow "commodity" in the base claim to a "physical product."

Accordingly, the Court declines to adopt the defendants' proposed construction requiring that "commodity" consist of a "physical good."

Secondly, the defendants urge that "commodity" must be "bought or sold." However, as Lodsys correctly points out, the specification clearly refers to "educational and non-commercial 'product[s].'" The defendants, in response, urge that the education curriculum embodiment is in the context of a physical good (e.g., a computer) bought or sold that can utilize that curriculum. Lodsys, in reply, notes that the specification also explains that:

> (b) The Vendor is the company that sells the Customer Directed Product (CDP), which may be either a product or a service [Note that a "vendor" may also be an educational institution (such as a university that wants to evaluate the effectiveness of an educational technology curriculum product), a nonprofit organization (such as a foundation that wants frequent client feedback from a program of one of its grantees, to help improve that program rapidly), a government agency (such as the State Department, which may want a CB-PD Module that helps improve its automated language education laboratories), etc. In other words, the Vendor referred to here may be any type of organization or institution.

'078 patent, col. 17, lines 8-21. Lodsys' Reply [Dkt. No. 591] at 6-7. Clearly, the specification refers to non-commercial settings including educational institutions, nonprofit organizations, and more broadly to "any type of organization or institution." The defendants have not pointed to any portion of the specification that limits the disclosed invention to a physical good (e.g., a computer) bought or sold that can utilize that curriculum.

The dictionary definitions that the defendants rely on, Defendants' Response [Dkt. No. 578] at 7, are not persuasive because while those definitions indicate that a "commodity" is something that <u>can</u> be bought and sold, those definitions do not <u>restrict</u> "commodity" to something that can be bought and sold.

Accordingly, the Court declines to adopt the defendants' proposed construction that the "commodity" must be "bought or sold."

With respect to "stand alone," the portion of the prosecution history that the defendants refer to is a portion of the *inter partes* reexamination of the '078 patent. In an Action Closing Prosecution (ACP) dated September 25, 2012, the examiner noted that:

> In the Order Granting *Inter Partes* Reexamination, mailed 28 September 2011, the examiner addresses issues of claim construction. Specifically, at pages 10-12 of the Order, the examiner interpreted the term "commodity" as meaning "a product or service", and interpreted the term "unit of a commodity" as meaning "a single instance of a product or a single use of a service."

ACP [Dkt. No. 578-3] at 6-7. The patent owner argued, *inter alia*, that "the terms 'commodity' and 'unit of a commodity' have been explicitly tied to the terms 'product' and 'service' as those terms are used in the '078 patent * * *," "the use of the terms as applied to Kravette's [a prior art reference] combination of copiers plus a monitoring system is 'wholly inconsistent with the use of the terms in the '078 patent' * * *, and that persons of ordinary skill in the art would not have recognized the plurality of copiers plus the monitoring system of Kravette as constituting 'a single instance of a product * * *,'" "the examiner's interpretation of the terms 'commodity' and 'unit of a commodity' constitute an impermissible broadening of the Patent Owner's claims * * *." ACP [Dkt. No. 578-3] at 7-8.

The examiner responded that "[d]uring reexamination proceedings, terms in the claims are given their broadest reasonable interpretation consistent with the specification." *Id*. at 9. The examiner further explained:

> Certainly the interpretation of claim terms must be consistent with the specification. However, as noted in the Order, the term 'commodity' does not appear in the specification of the '078 patent. Because [the] term was introduced in a pre-amendment during prosecution of parent application 09/370,663, [to] replace the term 'product,' and because the term 'product' does appear throughout the specification, it logically follows that one interpretation of the claimed 'commodity' is 'product.'

> Based upon terminology used in some of the claims (particularly claims 6, 8, 11, 50 and 54), and characterizations of the invention in the specification, the term 'commodity' was interpreted as a product or service, and a 'unit of a commodity' was interpreted as a single instance of a product, or a single use of a service.

> Although the terms "product" and "service" are used extensively throughout the specification of the '078 patent, there is no explicit definition presented, and there does not appear to be any disclosure that would serve to limit the proper interpretation of these terms beyond their ordinary and customary meaning. That being the case, the terms will be interpreted consistent with their ordinary and

customary meaning, as perceived by an ordinary artisan at the time of the invention.

ACP [Dkt. No. 578-3] at 9-10. (emphasis omitted).  Later in the ACP, the examiner noted that the "term 'product' is (and was at the time of the '078 patent) broad.  The relevant definition offered by Merriam-Webster's dictionary website (www.m-w.com) for the term 'product' is '2. a (1): something produced: *especially*: COMMODITY 1 (2): something (as a service) that is marketed or sold as a commodity.' " ACP [Dkt. No. 578-3] at 15.

The examiner also disagreed with the patent owner's arguments *vis-à-vis* the rejection over Kravette:

> The Patent Owner takes issue with the interpretation of the claim term "unit of a commodity" [interpreted by the examiner as including "a single instance of a product'] as being broad enough that it would be anticipated by Kravette's combination of copiers plus a monitoring system.  The implication is that it is the Patent Owner's position that a "single instance of a product" cannot include comprised of multiple components, but that in such as case, each component would itself embody a product.

ACP [Dkt. No. 578-3] at 10. (emphasis omitted).  The examiner then went on to explain why that argument was not accepted.  For example, the examiner noted that "there are certainly 'products' at the time of the '078 patent that was [*sic.*] comprised of several components and yet would have been commonly understood by an ordinary artisan as being 'a single instance of a product.' " ACP [Dkt. No. 578-3] at 13.  The examiner used computers and automobiles as examples.

In response, the patent owner argued that the examiner was wrong in adopting a "broadest reasonable" construction, and argued that "claim interpretation for an expired patent undergoing reexamination must be conducted by the Office in a manner analogous to the standard used by courts in an infringement context."  Response to *Inter Partes* Reexamination Action Closing Prosecution dated September 25, 2012 [Dkt. No. 578-10] at 18.  The patent owner argued that "the Patent Owner respectfully submits that applying the correct standard would at least require that the meaning of the terms 'product' and 'service' be interpreted consistent with the use of these terms in the '078 patent such that (i) 'unit of a commodity' would be interpreted to mean 'a single instance of a product or a single instance of a service,'

and (ii) 'units of a commodity' would be interpreted to mean 'multiple instances of a product or multiple instances of a service.' " *Id*. at 19.

The patent owner also argued that "with regard to the foregoing definition of 'product' and particularly regarding the situation where two or more products are combined, the Patent Owner respectfully submits that such a combination of products creates a new product when a person of ordinary skill in the relevant art at the time of the invention would readily recognize the combination of products as a new product that is identifiable and distinguishable from the component products from which it is constructed; otherwise the combination does not result in the creation of a new 'product' but is merely a combination of existing products." *Id*. at 20.

With regard to the rejection based on Kravette, the patent owner argued:

> For example, the Patent Owner respectfully submits that it is erroneous to apply the terms commodity (again, defined by the Examiner as "a product or service") and a unit of a commodity (again, defined by the Examiner as "a <u>single</u> instance of a product or a <u>single</u> use of a service," emphasis added) to the combination of copiers plus a monitoring system disclosed in Kravette (see Reexam Order, pp. 23-25) because this combination of copiers plus a monitoring system disclosed in Kravette exceeds the ordinary and customary meaning of the terms "product" and "service" as these terms would be readily recognized and reasonably understood by persons of ordinary skill in the relevant art at the time of the invention.

*Id*. at 21.

The patent owner denied having argued that a "single instance of a product" cannot include a "product" having multiple components – as the examiner had asserted in the ACP above. Rather, the patent owner urged:

> On the contrary, the Patent Owner readily acknowledged that a "product" or a "service" may (or may not) be comprised of multiple components-and even that each of these multiple components may be a "product" or a "service" in its own right. However, it is the Patent Owner's position that (a) whether a specific combination of components in fact constitutes "a single instance of a product or a service" entirely depends on how the combination of such components would be reasonably perceived by persons of ordinary skill in the relevant art at the time of the invention in view of the ordinary and customary meaning of the terms "product" and "service"; and (b) the mere integration of two or more products and services does not necessarily render a new product or service.

Response to *Inter Partes* Reexamination Action Closing Prosecution Dated September 25, 2012 [Dkt. No. 578-10] at 22-23.

In that context, the patent owner argued that a PBX system disclosed in the specification, which the examiner had relied on in asserting that a "product" may consist of several components, was not "automatically" a "product":

> Therefore, while the section of the '078 patent quoted above does disclose a "PBX telephone system," it is not automatic that this PBX telephone system (alone or in combination with the "the individual phone stations") must be a "product" as seemingly suggested by the Examiner; instead, the "PBX telephone system" as a whole (the PBX plus phone stations) can only be characterized as a single "product" if and only if it would be perceived by persons of ordinary skill in the relevant art at the time of the invention as a single "product" according to the ordinary and customary meaning of the term "product" (and corresponding to the term unit of a commodity in the '078 patent claims) which, the Patent Owner submits, is in no way determinative from the disclosure quoted above "alone."

Response to *Inter Partes* Reexamination Action Closing Prosecution Dated September 25, 2012 [Dkt. No. 578-10] at 22-23.

> The patent owner then argued:

> In addition, the Patent Owner respectfully submits that a PBX system is readily distinguishable from Kravette because: (i) the stand-alone copiers of Kravette are entirely operable without being connected to the monitoring system, whereas the component telephones must be connected to the PBX to function at all; and (ii) a copier-plus-monitoring system is not sufficiently distinguishable from a stand-alone copier for a skilled artisan to reasonably conclude that the copier-plus-monitoring-system is a new "product" distinct and identifiable from the stand-alone copier (but instead would continue to view both the copier plus monitoring system as separate products), whereas in contrast a PBX and its associated user equipment require combination with each other to be operable and thus would each be component products that in combination together form a new product from the perspective of skilled artisans.

*Id*. at 24-25. The defendants rely on the preceding argument in urging that a "commodity" must be "stand-alone." Defendants' Response [Dkt. No. 578] at 8.

The Federal Circuit has commented that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Accordingly, the Federal Circuit has advised that "we have recognized that a 'clear and unmistakable' disavowal during prosecution overcomes the ' "heavy presumption" that claim terms carry their full ordinary and customary

meaning.' " *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013), quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323, 1326 (Fed. Cir. 2003).

It is clear from the foregoing that the patent owner was distinguishing the copiers disclosed in Kravette from a PBX system in the context of the argument that a "product" "can only be characterized as a single 'product' if and only if it would be perceived by persons of ordinary skill in the relevant art at the time of the invention as a single 'product' according to the ordinary and customary meaning of the term 'product' * * *." The patent owner did not argue that a "commodity" or a "unit of a commodity" must be "stand-alone." In all events, there was no clear and unambiguous disavowal.

Lastly, Kaspersky, in the JCCS [Dkt. No. 505] did not propose a construction for "commodity." JCCS [Dkt. No. 505] at 6. In its brief, Kaspersky urged that software alone cannot meet the asserted claims. Kaspersky's Corrected Response [Dkt. No. 590] at 5-7. In the Joint Claim Construction Chart per local rule 4-5(d), Kaspersky has urged that "commodity" should be construed as "physical goods used alone or in connection with a service." JCCC [Dkt. No. 615] at 2. In a footnote, Lodsys "objects to, and reserves the right to move to strike, the new positions taken and new constructions offered, for the first time, by Kaspersky Lab, Inc. in this Joint Claim Construction Chart as contrary to Kaspersky's obligations and disclosures under P. R. 4-1, 4-2, and/or 4-3." JCCC [Dkt. No. 615] at 2, n. *.

Without deciding Lodsys' objection, the Court simply notes that the defendants' proposed construction requiring that a "commodity" be a "physical good" has been rejected, and that applies as well to Kaspersky's proposed construction. The remainder of Kaspersky's proposed construction, "used alone or in connection with a service" appears to simply foster Kaspersky's non-infringement argument that software alone cannot meet the asserted claims. Whether Kaspersky's accused product(s) meet the asserted claims as finally construed will be decided in conjunction with deciding infringement. Kaspersky has not shown that the term "commodity" *per se* is limited to a "good" or "product" that is "used alone or in connection with a service."

The Court concludes that "commodity" should be construed as "products or services."

### c) Court's Construction of "units of a commodity"

Lodsys urges that "units of a commodity" should be construed as "instances of a product or a service." The defendants urge that the phrase should be construed as "standalone physical goods that are bought or sold." Kaspersky urges that the phrase should be construed as "specific physical goods used alone or in connection with a service." JCCC [Dkt. No. 615] at 2.

The defendants' and Kaspersky's proposed constructions are declined for the same reasons as discussed above in conjunction with "commodity."

Additionally, the defendants urge that "units of a commodity" means multiple units of a single commodity. The defendants argue that "[a] person skilled in the art would recognize that use of 'unit of a commodity' in lieu of the plural 'commodities' distinguishes multiple quantities of the same commodity from multiple different commodities. Defendants give meaning to this aspect of the claims in the proposed constructions." Defendants' Response [Dkt. No. 578] at 9. Defendants rely on Webster's New Ninth Collegiate Dictionary (1985), and the definition of "unit" as "a single quantity regarded as a whole in calculation."

It is not readily apparent whether there is any actual dispute between the parties. Lodsys does not seem to disagree that "units" is the plural of "unit." Lodsys simply substitutes "instances" for "units" in its proposed construction. Lodsys does not, however, specifically address whether "unit of a commodity" in lieu of the plural form distinguishes multiple quantities of the same commodity from multiple different commodities, *e.g.*, "units of a commodity." On the other hand, the defendants do not point to any portion of the specification that makes a distinction between multiple quantities of the same commodity and multiple different commodities. Nor do the defendants point to any language in the claims (other than the plural and singular forms of words) that distinguishes multiple quantities of the same commodity from multiple different commodities.

Additionally, the parties have not provided the Court with any meaningful basis on which to evaluate those contentions – or even whether those contentions are germane to <u>any</u> issue in this case. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326-27 (Fed. Cir. 2006)("[I]in reviewing claim construction in the context of infringement, the legal function of giving meaning to claim terms always takes place in the context of a specific accused infringing device or process. While a trial court should certainly not prejudge the ultimate

infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction."), *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1350 (Fed. Cir. 2006)("[T]his record on appeal does not supply any meaningful comparison of the accused products to the asserted claims. Without knowledge of the accused products, this court cannot assess the accuracy of the infringement judgment under review and lacks a proper context for an accurate claim construction.").

Accordingly, the Court simply notes that the term "units" is the plural form of "unit," but does not draw any further conclusions. Indeed, the parties have not provided the Court with any meaningful briefing on whether "unit of a commodity" in lieu of the plural form distinguishes multiple quantities of the same commodity from multiple different commodities, *e.g.*, "units of a commodity." Simply because a claim uses a term in a singular – or plural – form does not necessarily mean that the claim should be construed literally based on those singular or plural forms.

Normal rules of grammatical construction sometimes apply to claim construction. *See Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004)("Applying this grammatical principle here, the phrase 'at least one of' modifies each member of the list, i.e., each category in the list.").

However, there are instances in which normal grammatical rules are trumped by particular usages in patent parlance – especially in instances whether a singular form is allegedly limited to "one and only one," or whether a singular form may include "more than one." *See e.g. SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1360 (Fed. Cir. 2012)("[T]his court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.' * * *," quoting *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008)), *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.' * * * Unless the claim is specific as to the number of elements, the article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article. * * *

Under this conventional rule, the claim limitation 'a,' without more, requires at least one. * * * Moreover, standing alone, a disclosure of a preferred or exemplary embodiment encompassing a singular element does not disclaim a plural embodiment.").

Whether a singular form of a term in a claim precludes the plural, or *vice versa*, frequently depends on how a term is used in context, as well as what the specification discloses. *See e.g.*, *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011)(relying on claim language), *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1284 (Fed. Cir. 2011)(analyzing claims to determine whether there was any difference between singular and plural forms), *Hyperphrase Techs., LLC v. Google, Inc.*, 260 Fed. Appx. 274, 279 (Fed. Cir. 2007)(non-precedential)[8]("The district court's error, however, was in going beyond this explicit definition to hold that a data reference may only refer to one and only one possible record. * * * Neither the phrase 'one and only one' nor any equivalent language appears in the claim. Although the claim recites 'a' second record instead of 'one or more' records, we have held that the use of the singular form 'a' in conjunction with 'comprising' and without narrowing language, such as 'one and only one,' typically encompasses both singular and plural possibilities."), *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005)(district court's inference that "if the patent intended more than one cable, it would have expressly indicated that by using a plural term" found to be error – "This convention [that "a" or "an" means "one or more" in open-ended

---

[8] Federal Circuit Rule 32.1, provides in part:

(b) Nonprecedential Opinion or Order. An opinion or order which is designated as nonprecedential is one determined by the panel issuing it as not adding significantly to the body of law.

(c) Parties' Citation of Nonprecedential Dispositions. Parties are not prohibited or restricted from citing nonprecedential dispositions issued after January 1, 2007. This rule does not preclude assertion of claim preclusion, issue preclusion, judicial estoppel, law of the case, and the like based on a nonprecedential disposition issued before that date.

(d) Court's Consideration of Nonprecedential Dispositions. The court may refer to a nonprecedential disposition in an opinion or order and may look to a nonprecedential disposition for guidance or persuasive reasoning, but will not give one of its own nonprecedential dispositions the effect of binding precedent. The court will not consider nonprecedential dispositions of another court as binding precedent of that court unless the rules of that court so provide.

claims] is overcome only when 'the claim is specific as to the number of elements' or 'when the patentee evinces a clear intent to * * * limit the article.' ”), *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1348 (Fed. Cir. 2000)(“While use of the singular form of a word does not preclude a meaning which includes the plural, * * * these descriptions of the singular injections into individual eggs, without more, do not limit the claims to cover only inoculations of an entire flock of birds. Logic precludes reading a rule that permits singular usage to encompass the plural to require instead the plural meaning.”), *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105-06 (Fed. Cir. 1996) (reviewing the “claims, specification and file history” to determine that “a vacuum cup” means one and only one vacuum cup).

The parties have not addressed any of the foregoing. The Court declines to do so in the first instance.

### d) Court's Construction of “product”

Lodsys urges that no construction is necessary, but if necessary “product” should be construed as “item or service, including hardware or software, provided to a user.” The defendants proposed that “product” should be construed as “a standalone physical good that is bought or sold.” Kaspersky urges in the '565 patent, in claims 1, 5, 8, 10, 13, “a product is not the same as the unit,” in claims 14, 17, 19, 20, 22, 25, 26, “a product is distinct from the device that is performing the method steps,” and in claims 27 and 28, “a product is distinct from the executable code and from the computing device.” JCCC [Dkt. No. 615] at 2-3.

The Court declines to adopt the defendants' proposed construction of “product” for the same reasons discussed above in conjunction with “commodities.”

As for Kaspersky's proposed constructions, Kaspersky did not propose constructions for “product” in the Joint Claim Construction Statement. JCCS [Dkt. No. 505] at 12. Kaspersky first proposed those constructions in the Joint Claim Construction Chart [JCCC] under local Rule 4-5(d). JCCC [Dkt. No. 615] at 2-3. As noted above, Lodsys has objected to Kaspersky's constructions offered for the first time in the JCCC.

The JCCC was filed on April 19, 2013, after the parties had filed their respective claim construction briefs. Kaspersky in its claim construction brief urges that claims 1, 15, and 27 of the '565 patent use “product” to refer to hardware, and urges that “[t]he recitation of physical

devices such as memory, transmitter, and processor demonstrates that these elements cannot be met by software alone." Kaspersky's Corrected Response [Dkt. No. 590] at 6.

Local Patent Rule 4-3(b) provides for the filing of a Joint Claim Construction and Prehearing Statement not later than 60 days after service of the "Invalidity Contentions." The rule provides that the Joint Claim Construction Statement must include:

> (b) Each party's proposed construction of each disputed claim term, phrase, or clause, together with an identification of all references from the specification or prosecution history that support that construction, and an identification of any extrinsic evidence known to the party on which it intends to rely either to support its proposed construction of the claim or to oppose any other party's proposed construction of the claim, including, but not limited to, as permitted by law, dictionary definitions, citations to learned treatises and prior art, and testimony of percipient and expert witnesses.

Under Local Patent Rule 4-4, the parties then have thirty (30) days after filing of the Joint Claim Construction and Prehearing Statement to "complete all discovery relating to claim construction, including any depositions with respect to claim construction of any witnesses, including experts, identified in the Joint Claim Construction and Prehearing Statement."

Local Patent Rule 4-5 addresses claim construction briefing, and Rule 4-5(d) provides that "[a]t least 10 days before the Claim Construction Hearing held pursuant to P.R. 4-6, the parties shall jointly file a claim construction chart" containing columns listing the disputed claim terms, columns listing the parties' proposed constructions, and a fourth column left blank for the Court's construction.

Thus, introducing newly proposed claim constructions in the Rule 4-5)(d) JCCC, after the conclusion of the parties' infringement and invalidity contentions, discovery, and claim construction briefing, and shortly before the claim construction hearing, especially without seeking leave of Court, upsets the fundamental purpose sought by the Local Patent Rules of expediting and ordering the necessary stages of claim construction.

If the Court were to comment at this stage on Kaspersky's proposed constructions, the Court would be doing so without the benefit of the parties' briefs, and potentially to the prejudice of not only Lodsys, but the other defendants as well.

Moreover, the Court is not aware of how, if at all, Kaspersky's belated proposed constructions may impact any issue in this case. *See Wilson Sporting Goods*, 442 F.3d at 1326-27, *Lava Trading*, 445 F.3d at 1350.

Accordingly, the Court declines to comment on Kaspersky's proposed constructions, and deems those proposed constructions to have been waived.

With respect to Lodsys' proposed construction, substituting "item" for "product" does not solve or address any identifiable dispute between the parties. As for whether "product" includes "services," the specification, as discussed above, expressly equates "products" with both "products" and "services" ("For the purposes of this description, both the Products and the Services appropriate for this invention will be referred to as Products.").

Lodsys adds "including hardware or software, provided to a user," apparently in response to arguments made by the defendants and Kaspersky, to emphasize that "product" may include both hardware and software. However, given the foregoing discussion, there is no necessity for adopting that "including" language. Whether specific hardware or software is found to infringe the asserted claims – after <u>all</u> disputed claim terms are construed – is an issue for the infringement phase of this action.

Accordingly, the Court concludes that "product" should be construed as "product or service."

## D. "user interface"

### 1. Parties' Proposed Constructions

The parties' proposed the following constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"user interface"** | **'078**: 1, 2, 4, 8, 16, 17, 19, 30, 38, 60, 65, 66, 69, 74<br><br>**'565**: 1, 15, 27<br><br>**'908**: 37 | No construction necessary<br><br>If the Court determines this term should be construed:<br><br>"the user interfaces is where interaction between a user and a unit occurs" | "the hardware and corresponding software in the [product/commodity/computer product] that enables interaction between the user and the [product/commodity/computer product]" | "where interaction between humans and machines occurs, accomplished by a hardware device with corresponding software" |
| JCCC [Dkt. No. 615] at 3 | | | | |

### 2. The Core Disagreement

The core disagreement is whether "user interface" *per se* requires hardware, for example, a display *etc.*

### 3. The Parties' Arguments

Lodsys urges that "user interface" is a recognized term in the computing arts indicating the place of interaction between a user and a system. Lodsys urges that a "user interface" may be implemented with software, hardware or a combination of both. Lodsys points to the IBM Dictionary of Computing at 724 (George McDaniel ed., 10th ed. 1993) explaining: "user interface (1) Hardware, software, or both that allows a user to interact with and perform operations on a system, program, or device * * *." Lodsys' Brief [Dkt. No. 555] at 27.

Lodsys argues that is the sense that "user interface" is used in the patents-in-suit, namely the place where interaction between a user and a unit occurs. Lodsys urges that in the case of exclusively software products, such user interface is implemented by software alone. Lodsys

notes that the specification includes examples of user interfaces within software products, such as the embodiment of Fig. 24, described in the specification as "an opening interaction from a software product." '078 patent, col. 33, lines 9-26. Lodsys further urges that the specification discloses generating reports using user interfaces in software products, pointing to the '078 patent, col. 57, lines 46-67. Lodsys contends that the specification thus illustrates that "user interface" is not limited to hardware, and both the defendants' and Kaspersky's proposed constructions would exclude embodiments disclosed in the specification. Lodsys' Brief [Dkt. No. 555] at 28.

Lodsys further urges that the claim language illustrates that a user interface may be implemented in software alone. Lodsys points to claim 1 of the '565 patent calling for "a processor * * *configured to * * * cause the display of a user interface * * * if the counter exceeds a threshold." Lodsys urges that claims of the '078 patent are drawn to the user interface presenting information such as "text lists, charts, views, arrangements, hierarchies, graphical maps, sample extracts, abstracts, summary descriptions, or hypertext." Lodsys' Brief [Dkt. No. 555] at 28-29.

The defendants, on the other hand, urge that the plain language of the claims requires that the "user interface" include hardware. The defendants argue that claim 1 of the '078 patent and claim 37 of the '908 patent "explicitly state that the user interface provides the medium for interaction between a user and the unit." Defendants' Response [Dkt. No. 578] at 29. The defendants argue that "[w]ithout some form of hardware as part of the user interface, such as a display and a mouse, keyboard, or other buttons, the user would be unable to interact with the unit. Indeed, Plaintiffs fail to explain how a user would be able to interact with a user interface that is purely software with no hardware present. In fact, no such interaction is possible." *Id*.

The defendants also urge that all of the user interface components are part of the product in the '565 patent, or the commodity in the '078 patent, or computer product in the '908 patent. The defendants further point to the September 25, 2012, ACP (mentioned above) issued during *inter partes* reexamination in which the examiner commented that the "user interface is part of the unit of the commodity itself." ACP [Dkt. No. 578-3] at 21. The defendants urge that the specification is replete with references to hardware that is part of the "user interface." Defendants' Response [Dkt. No. 578] at 30.

The defendants further urge that "[e]ven the specification passages that Plaintiffs cite as purportedly supporting their construction * * * make clear that some form of hardware must be present in the disclosed user interface." *Id*. at 31.

The defendants contend that Lodsys' alternative construction, "the user interface is where interaction between a user and a unit occurs," should be rejected "because it is circular, and, as a result, unhelpful to a jury. It does not indicate what the claimed user interface is." *Id*.

Kaspersky points to "user interface" as one of the terms that Kaspersky contends precludes the asserted claims from covering software only products. Kaspersky's Corrected Response [Dkt. No. 590] at 5.

Lodsys replies that "[a]lthough the user may use a keyboard, mouse, or pointing device (such as the user's finger) to manipulate the graphical information, those physical items are not considered part of the software product's user interface." Lodsys' Reply [Dkt. No. 591] at 16. Lodsys points to the <u>Microsoft Press Computer Dictionary</u> 405 (2d ed. 1994), in support. That dictionary provides: "user interface  The portion of a program with which a user interacts. If the user enters commands at the keyboard and the program responds by operating in a specific manner, the program has a command-line interface. If commands to the program are typically given via menu selections, the program is said to have a menu-driven interface. A program that displays information graphically and requires a pointing device for user interactions is said to have a graphical user interface." Lodsys' Reply [Dkt. No. 591] at 16-17.

Lodsys urges that such an interface is covered by the claims that the defendants referred to, *i.e.*, regarding claim 1 of the '565 patent calling for "cause[s] the display of a user interface * * * if the counter exceeds a threshold," Lodsys urges that "in that example it would be improper to say that such a graphical user interface must include the screen upon which it is displayed, just as any software graphic does not include the computer screen upon which it may be temporarily displayed." Lodsys' Reply [Dkt. No. 591] at 17.

## 4. Discussion

The core dispute, once again, is whether the term "user interface" <u>requires</u> hardware. The defendants' and Kaspersky's proposed constructions would both require hardware, whereas Lodsys' proposed construction does not.

The foregoing technical definition that Lodsys points to, namely from the <u>IBM Dictionary of Computing</u>, plainly provides that a "user interface" may be understood to be "[h]ardware, software, or both * * *." The MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (5th ed. 1994) at 2110, in the field of computer science, similarly explains that "user interface" is "1. The point at which a user or a user department or organization interacts with a computer system. 2. The part of an interactive computer program that sends messages to and receives instructions from a terminal user." Indeed, it is noted that the defendants listed the <u>IBM Dictionary</u> as extrinsic evidence on the Joint Claim Construction Statement, JCCS [Dkt. No. 505] at 29, but, it is also noted, that the defendants did not point to that or any other similar technical reference source in their brief – presumably because those sources did not provide support for the defendants' argument.

Thus, insofar as the record reveals, the ordinary and customary meaning of "user interface" includes hardware, software, or both depending on context. The defendants have not persuasively shown that "user interface" within the context of the asserted claims <u>requires</u> hardware. Nor have the defendants persuasively shown that the specification (or prosecution history) limits "user interface" to hardware.

Defendants' argument that "[w]ithout some form of hardware as part of the user interface, such as a display and a mouse, keyboard, or other buttons, the user would be unable to interact with the unit," may be correct in the sense that input/output (I/O) devices such as displays, keyboards *etc.* allow a user to interact with a device or computer. Depending on the context, "user interface" may or may not be construed broadly to include such I/O devices. But "user interface," as reflected in the foregoing references, is not <u>necessarily</u> limited to such hardware. The term, on the current record, includes the portion of a computer program that sends and receives instructions from a user. For example, the Microsoft Windows® operating system includes graphical user interfaces (GUIs) that are part of the program/software, not the hardware on which the program/software is run. Those GUIs are ultimately communicated to a user through a computer display – but the computer display *per se* is not the GUI – it simply displays the GUI.

Thus, available reference sources indicate that from the perspective of one of ordinary skill in the art, "user interface" could refer to hardware, software, or both. And that also appears

to be the way the term is used in the specification and claims. For example, claim 1 of the '078 patent calls for "a user interface, which is part of each of the units of the commodity, configured to provide a medium for two-way local interaction between one of the users and the corresponding unit of the commodity, and further configured to elicit, from a user, information about the user's perception of the commodity * * *." Although the "user interface" is claimed in terms of being "part of each of the units of the commodity," the Court has declined the defendants' and Kaspersky's proposed constructions that would limit "commodity" solely to a physical product. A "user interface" may be "part of" software in the sense that the software defines the "user interface." The Court thus likewise declines to adopt the defendants' proposed construction of "user interface" that would limit the term to "the <u>hardware</u> and corresponding software * * *" – a "user interface" may consist of software alone.

Kaspersky's proposed construction, "where interaction between humans and machines occurs, accomplished by a hardware device with corresponding software," similarly requires "hardware." The Court declines to adopt that construction for the same reason.

The Court further declines to adopt Lodsys' proposed construction, "the user interfaces is where interaction between a user and a unit occurs," because it does not directly address the parties' underlying dispute. Again, the underlying dispute between the parties is whether "user interface" is necessarily limited to hardware. The Court concludes that "user interface" is not necessarily so limited. That resolves the parties' underlying dispute, and no further construction is deemed necessary.

**E. "a memory within each of the units of the commodity"**

**1. Parties' Proposed Constructions**

The parties' proposed the following constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"a memory within each of the units of the commodity"** | **'078**: 1 | "memory allocated to each of the units of the commodity" | "a memory physically located within each of the units of the commodity" | Same as Defendants |
| JCCC [Dkt. No. 615] at 4 | | | | |

### 2. The Core Disagreement

The core disagreement centers on the word "within." The defendants and Kaspersky urge that "within" means "physically located within." Lodsys urges that excludes purely software embodiments.

### 3. The Parties' Arguments

Lodsys argues that "the '078 patent's specification makes clear that the term ["memory within"] includes "memory allocated to" each of the units. Lodsys' Brief [Dkt. No. 555] at 31. Lodsys urges that the specification of the '078 patent describes the invention in terms that cover products that are purely "non-physical software." Lodsys argues that "[c]onstraining the term 'memory within' to mean only 'memory physically located within' each of the units, would therefore improperly exclude examples of the invention plainly illustrated and disclosed in the specification." Lodsys' Brief [Dkt. No. 555] at 31. Lodsys argues that "the specification includes multiple examples of memory that may be allocated to the invention but need not be 'physically located within' the unit." *Id*. at 32. Lodsys accuses the defendants of not construing the claim language, but rather attempting to introduce new, limiting claim language. *Id*.

The defendants urge that "[t]he ordinary meaning of a memory 'within' a unit of the commodity is that the memory is located inside the commodity." Defendants' Response [Dkt. No. 578] at 33. The defendants urge that Lodsys' proposed construction, changing "within" to "allocated to," would "be satisfied as long as the memory is 'allocated' to the commodity, even if the memory is located in a server a thousand miles away. This construction must be rejected because it impermissibly redefines the term' 'within' away from its ordinary meaning." *Id*. at 34.

The defendants also urge that their proposed construction is consistent with the specification. The defendants contend that the invention was designed to "embed" a new type of product feature in a range of products and services to solicit feedback from customers. The defendants argue that "[b]ecause the feedback module containing the memory is 'embedded' or inserted into the product, it follows that the memory inside the module also is physically located in the product." *Id*.

The defendants also urge that Lodsys' proposed construction is inconsistent with the prosecution history. The defendants note that during prosecution, claim 1 of the '078 patent

originally recited "a memory that is <u>associated with</u> each of the units of the commodity." During prosecution, applicant amended the claim to recite "a memory that is ~~associated with~~ <u>included within</u> each of the units of the commodity." The defendants note that the claim was later amended to recite "a memory ~~that is included~~ within each of the units of the commodity." "In short," the defendants say, "the claim was amended from reciting memory 'associated with' a unit of the commodity to requiring that the memory be 'within' the unit." *Id*. at 35. The defendants argue that Lodsys' proposed construction ignores that prosecution history.

The defendants also point to <u>Webster's Ninth New Collegiate Dictionary</u> 1355 (1991) explaining that "within" is "used as a function word to indicate enclosure or containment."

In reply, Lodsys argues that "[b]y inserting the words 'physically located,' into the claim, Defendants attempt to limit the claims to units of a commodity with a physical ability to have memory inside. But this construction ignores the specification's explicit discussion of numerous non-physical units of the commodity * * *. Defendants' construction would improperly excludes [*sic.*] these embodiments." Lodsys' Reply [Dkt. No. 591] at 19.

With respect to prosecution history, Lodsys argues that prosecution history estoppel "is not an issue for claim construction." *Id*. at 20, citing *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998).[9] Lodsys further argues that there was no "clear and unambiguous disclaimer" by the applicant. Lodsys' Reply [Dkt. No. 591] at 20. Lodsys also argues that deleting "that is included" from the phrase "a memory ~~that is included~~ within each of the units of the commodity" had the effect of broadening the claim, *i.e.*, according to Lodsys, "making clear that the claim is not limited to a memory 'physically included' within the units of the commodity." *Id*. at 20.

Lodsys finally argues, relying on several dictionary definitions, that "[a] person of ordinary skill in the art would have considered 'memory' to include virtual memory," and that the defendants' proposed construction would "artificially limit[ ] 'memory' to physical memory

---

[9] Lodsys makes a similar argument in connection with the disputed terms "counter" / "increment a counter" / "if the counter exceeds a threshold" which are addressed below. The Court addresses *Spectrum* and Lodsys' contention in conjunction with those terms.

by requiring that the memory is 'physically located within.' " *Id*. at 21. Lodsys contends that "[i]n the context of the patent, one of ordinary skill in the art would recognize that virtual memory is 'within' a unit of a commodity, such as a software program, because it is 'available to' the program and once the program is running, the memory is 'allocated to' it." *Id*.

## 4. Discussion

It is not the province of the Court, during claim construction, to re-write the claims. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1359 (Fed. Cir. 2006)("While SRAM strongly urges the court to interpret the claim to encompass the innovative precision indexing shifting feature it contends it has invented, we are powerless to rewrite the claims and must construe the language of the claim at issue based on the words used. * * * In this case, the words are clear and the claim covers no more than the recited method of taking up lost motion and effecting a shift."), *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951 (Fed. Cir. 1993)("If Hoganas, who was responsible for drafting and prosecuting the patent, intended something different, it could have prevented this result through clearer drafting. * * * It would not be appropriate for us now to interpret the claim differently just to cure a drafting error made by Hoganas. That would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention."), *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.") (internal quotes omitted).

The asserted claims expressly call for "a memory <u>within</u> each of the units of the commodity," not "memory <u>allocated to</u> each of the units of the commodity" as Lodsys proposes. The term "within" is a common English word. <u>Merriam-Webster's Collegiate Dictionary</u> (10th ed. 1999) at 1359, defines "within" as "in or into the interior : INSIDE." Other available definitions are similar: "adverb 1. in or into the interior or inner part; inside. 2. in or into a house, building, etc.; indoors: The fire was burning on the hearth within. 3. on, or as regards, the inside; internally. 4. inside an enclosed place, area, room, etc.: He was startled by a cry from within. 5. in the mind, heart, or soul; inwardly. preposition 6. in or into the interior of or the parts or space enclosed by: within city walls. 7. inside of; in. 8. in the compass or limits of; not beyond: within

view; to live within one's income. 9. at or to some point not beyond, as in length or distance; not farther than: within a radius of a mile. 10. at or to some amount or degree not exceeding: within two degrees of freezing." http://dictionary.reference.com/browse/within.

Again, the Federal Circuit in *Phillips* advised that "the words of a claim 'are generally given their ordinary and customary meaning' * * * that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13. The ordinary and customary meaning of "within" is, pursuant to the sources cited by the parties and foregoing sources, "inside." Lodsys has pointed to nothing indicating that the customary and ordinary meaning of "within" is "allocated to" per Lodsys' proposed construction.

Furthermore, the prosecution history does not support Lodsys' contention. During prosecution of the '078 patent, in an amendment dated September 29, 2005, responding to an Office Action dated March 29, 2005, the applicant amended application claim 48 as follows:

> 48.   (Currently Amended) A system comprising:
>
> units of a commodity that are used by respective users in different locations,
>
> a user interface which is part of each of the units of the commodity, provides a medium for two-way local interaction between one of the users and the corresponding unit of the commodity, and is configured to elicit, from a user, information about ~~his~~the user's perception of the commodity,
>
> a memory that is ~~associated with~~ included within each of the units of the commodity and stores results of the two-way local interaction, the results including elicited information about user perception of the commodity,
>
> a communication element that is associated with each of the units of the commodity and carries results of the two-way local interaction from each of the units of the commodity to a central location, and
>
> software that manages the interactions of the users in different locations and collection of the results of the interactions at the central location.

[Dkt. No. 578-25] at 3. The remarks made in that amendment do not specifically address that amendment. However, it is clear that the change from "associated with" to "included within" was a narrowing amendment.

In a subsequent amendment dated February 24, 2006, the applicant further amended application claim 48 as follows:

> 48.    (Currently Amended) A system comprising:
>
> units of a commodity that ~~are~~ can be used by respective users in different locations,
>
> a user interface, which is part of each of the units of the commodity, configured to provide[[s]] a medium for two-way local interaction between one of the users and the corresponding unit of the commodity, and [is] further configured to elicit, from a user, information about the user's perception of the commodity,
>
> a memory ~~that is included~~ within each of the units of the commodity ~~and~~ capable of storing ~~stores~~ results of the two-way local interaction, the results including elicited information about user perception of the commodity,
>
> a communication element ~~that is~~ associated with each of the units of the commodity ~~and~~ capable of carrying ~~carries~~ results of the two-way local interaction from each of the units of the commodity to a central location, and
>
> a component ~~software that~~ capable of managing ~~manages~~ the interactions of the users in different locations and collecting ~~collection of~~ the results of the interactions at the central location.

[Dkt. No. 578-26] at ECF 7, doc. p. 2. Lodsys argues that deleting "that is included" had the effect of broadening the claim. It plainly did not. The September 29, 2005, amendment calling for "a memory that is ~~associated with~~ included within each of the units of the commodity" clearly limited the claim to the location of the memory. The February 24, 2006, amendment "a memory ~~that is included~~ within each of the units of the commodity" deleted words, but did not substantively change the limitation - the claim remained limited to that location. Moreover, comparing the original claim language "a memory that is associated with each of the units of the

commodity" with the claim language after the February 24, 2006, amendment "a memory within each of the units of the commodity," it is readily apparent that the applicant narrowed the claim from "a memory that is associated with," namely having no location limitation, to "a memory within" – namely a location limitation.

Lodsys argues that there was no clear disavowal of claim scope. The applicant's "remarks" in conjunction with the February 24, 2006 amendment said simply that "[c]laims 48 * * * are sought to be amended to more clearly point out the subject matter recited therein." [Dkt. No. 578-26] at ECF 22, doc. p. 17. The defendants/Kaspersky do not point to any further arguments the applicant made in conjunction with that amendment.

Prosecution history disclaimer may arise through claim amendments, an applicant's arguments, or a combination of the two. *See e.g., Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010)("The doctrine of prosecution disclaimer attaches where an applicant, whether by amendment or by argument, 'unequivocally disavowed a certain meaning to obtain his patent.' *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). For example, an amendment that clearly narrows the scope of a claim, such as by the addition of a new claim limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate the limitation or that would otherwise recapture the claim's original scope."), *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318, 1328 (Fed. Cir. 2003)("In the course of prosecuting a patent application, a patentee may redefine a claim term. * * * An amendment or argument made in the course of prosecution may also serve as a disclaimer of a particular interpretation of a claim term.").

As noted above, the Federal Circuit has advised that prosecution disclaimer must be clear and unambiguous.

When prosecution history disclaimer is based on an applicant's arguments, it is clear that those arguments must be evaluated *vis-à-vis* the actual claim language, the prior art (if those arguments are made in the context of asserting that claims, as amended, define over the prior art), and the actual arguments the applicant made. Namely, the applicant's arguments must be evaluated within the actual environment and context in which they were made to determine whether there was any true disavowal of claim scope.

But both (1) claim amendments and/or (2) argument may suffice to create prosecution history disclaimer. That is, claim amendments may alone result in prosecution history disclaimer.

Prosecution history disclaimer looks at how one of ordinary skill in the art would have viewed claim amendments during prosecution – namely, whether those claim amendments served to affect the scope of a finally issued claim – broader or narrower – than the words of the claim may suggest if viewed in isolation from the specification and prosecution history.

Here, the foregoing amendments to application claim 48, which became patent claim 1 of the '078 patent, clearly limited the original claim language "a memory that is associated with each of the units of the commodity" to "a memory that is ~~associated with~~ included within each of the units of the commodity" and ultimately to "a memory ~~that is associated with included~~ within each of the units of the commodity."

Although the original claim called for "associated with" and Lodsys now advocates changing "within" to "allocated to," the applicant, during prosecution, plainly chose to amend the claims to narrow the scope from "associated with" to "within." That is clearly prosecution history disclaimer. If the applicant had intended "allocated to," as Lodsys now argues, rather than "within," then the applicant should have made the appropriate amendment during prosecution.

On the other hand, the defendants and Kaspersky urge that "within" means "a memory physically located within each of the units of the commodity." As Lodsys correctly notes, the claim calls for "within," but not "physically located within."

The Court agrees with the defendants' argument that Lodsys' proposed construction, changing "within" to "allocated to," would improperly broaden the claim because the claim, under that construction, would "be satisfied as long as the memory is 'allocated' to the commodity, even if the memory is located in a server a thousand miles away." Defendants' Response [Dkt. No. 578] at 34. The defendants urge that "construction must be rejected because it impermissibly redefines the term 'within' away from its ordinary meaning." *Id*. The Court agrees.

Specifically, the Court adopts the common meaning of "within" as "inside." However, the Court declines to adopt the defendants' proposed construction that a "memory" must be "physically located" within the units of the commodity. That is not what the claims provide.

Kaspersky originally urged that "memory" should be construed as "physical device used to store programs or data on a temporary or permanent basis for use in a computer or other digital "electronic device." JCCS [Dkt. No. 505] at 34-35. In the JCCC [Dkt. No. 615], however, Kaspersky has indicated "Same as Defendants."

The Court concludes that the meaning of "within," in the limitation of the '078 patent calling for "a memory <u>within</u> each of the units of the commodity," is that the memory is "inside" each of the units of the commodity. The Court reaches the same conclusion *vis-à-vis* claims 1 and 6 of the '565 patent. The Court declines to limit the claim language to "<u>physically located</u> within" because neither the claim language, nor the specification, nor the prosecution history necessitate doing so.

As the Federal Circuit advised in *Wilson Sporting Goods* and *Lava Trading*, it is many times difficult to resolve issues of claim construction without having a context for doing so. On the present record, the foregoing appears to resolve the parties' current dispute.

## F. "user's perception of the commodity" / "information regarding a use of the product"

### 1. Parties' Proposed Constructions

The parties' proposed the following constructions:

| Disputed Terms | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"user's perception of the commodity"** | **'078**: 1 | No construction necessary<br><br>If the Court determines this term should be construed:<br><br>"user['s] opinion about the commodity, including attitude, needs, desires, uses, understanding, and complaints with respect to the commodity" | "user['s] opinion about the commodity formed from prior use of the commodity"<br><br>Defendants are alternatively agreeable to use of the term "actual" in place of "prior" in the claim construction. | Proposal 3: "the user['s] opinion about the commodity formed from use of the commodity, which does not include opinions on any content delivered by the commodity"<br><br>Opinion about a commodity is not elicited simply by offering the commodity for sale. |
| **"information regarding a use of the product"** | **'565**: 1, 15, 27 | No construction necessary | "information regarding prior use of the product" | Information regarding how a product is used. |
| JCCC [Dkt. No. 615] at 4 | | | | |

### 2. The Core Disagreement

The core disagreement is the defendants' and Kaspersky's contention that a user's "perception" must be based on prior or actual use of a product.

### 3. The Parties' Arguments

Lodsys urges that the disputed phrases would be easily understood by a jury and need not be construed. Lodsys' Brief [Dkt. No. 555] at 3, 7. With respect to "user's perception of the commodity," Lodsys urges that if a construction is necessary, that construction should be an "opinion * * * including attitude, needs, desires, uses, understanding, and complaints," because those examples represents the types of perceptions included in the claims and the specification. *Id*. at 4. With regard to the defendants' proposed construction, Lodsys contends that "[w]hile it is certainly possible that a perception may be formed from use of the commodity, there is no

such requirement in the claims or the specification," and "user perception may include needs, comparisons to competing products, or other perceptions that do not necessarily arise from a use of the product." *Id.* at 5.

With respect to "information regarding a use of the product," Lodsys urges that the defendants' inclusion of "prior" is inconsistent with the claims and specification which, according to Lodsys, refer to information about ongoing and anticipated uses of the product – for example, claims 2, 3 and 4 of the '565 patent which refer to information including "requests to schedule maintenance," "submission of a purchase order," and "requests for interactive assistance." *Id.* at 8. Lodsys further notes that the specification discloses probing for information during product use and anticipated uses of the product. *Id.*

The defendants urge that the specification explains that user opinion is formed from actual "use of the commodity." The defendants contend that the examples Lodsys points to actually support their contention that user feedback about the commodity is being collected while the user is using the commodity. The defendants urge that "opinions formed during use of the product concern an actual use that has already occurred by the time the user provides his or her feedback. It does not cover a situation in which the user has not yet used the commodity." Defendants' Response [Dkt. No. 578] at 4. The defendants urge that is consistent with the specification that describes a process in which the user provides feedback based on the user's use of the commodity. *Id.* The defendants argue that Lodsys' proposed construction "improperly covers opinions about a product that the user has not yet used and may never use." *Id.* at 5.

The defendants raise a similar argument *vis-à-vis* "information regarding a use of the product." The defendants argue that "every example on which Plaintiffs rely relates to probing for information formed based on users' prior/actual use of the product." *Id.* at 22. The defendants argue that "the alleged invention is providing a system for obtaining user feedback. A user cannot provide feedback without having used the product because such a person would not have been a user at all." *Id.* at 22-23 (emphasis omitted).

Kaspersky's originally proposed constructions were "[s]ame as the Defendants." JCCS [Dkt. No. 505] at 1, 3, 24. With respect to "user's perception of the commodity," the defendants originally offered three proposed constructions: "Proposal 1," "Proposal 2," "Proposal 3." In the Rule 4-5(d) JCCC, the defendants did not repeat those three proposals, but Kaspersky now

proposes "Proposal 3: 'the user['s] opinion about the commodity formed from use of the commodity, which does not include opinions on any content delivered by the commodity' and "Opinion about a commodity is not elicited simply by offering the commodity for sale." JCCC [Dkt. No. 615] at 4. Kaspersky now contends that phrase "information regarding a use of the product" should be construed as "[i]nformation regarding how a product is used." Because that change was made after the conclusion of briefing, Kaspersky's brief does not directly address those proposed constructions. Kaspersky, in its brief, however, contends that "[a] user's perception or opinion of software is not conveyed simply by a buying a license, if no other information is given. * * * There is no suggestion anywhere in the Lodsys patents that merely buying a license for a product would convey a user's perception or opinion of that product. The scope of the claims should be limited to user perception or opinion, which does not cover merely buying a license." Kaspersky's Corrected Response [Dkt. No. 590] at 3.

Kaspersky further argues that during prosecution, in response to claim rejections over prior art, the patent owner distinguished the claims from the prior art by making a distinction between an opinion about the commodity itself, and an opinion about content provided by the commodity. Namely, a prior art patent disclosed a kiosk that contained music CDs and asked users to rate the CDs. The patent owner distinguished that patent by arguing that the user's perception was not about the commodity, namely the kiosk, but rather the kiosk's content, namely the CDs. Kaspersky urges that "[i]n view of the arguments made by the patent owner during prosecution and reexamination, the scope of the term 'user's perception of the commodity' should be limited to the user's perception of the commodity itself, excluding any content conveyed by the commodity." Kaspersky's Corrected Response [Dkt. No. 590] at 3-4.

Lodsys urges in reply that "[d]efendants interpret the term 'prior' as being synonymous with 'actual,' but concede that the user information described in the claim phrases can be merely 'formed based on' the user's actual use of the product, which Defendants interpret to include information such as 'requests to schedule maintenance,' 'submission of a purchase order,' and 'requests for interactive assistance.' * * * While Defendants' expansive interpretation of their own constructions resolves much of the substantive dispute between the parties regarding the claim phrases' meaning, it also illustrates that their constructions do not clarify, but rather obscure, the plain meaning of the claim phrases." Lodsys' Reply [Dkt. No. 591] at 1. Lodsys further urges that "even Defendants' expansive interpretation of their own constructions risks

improperly limiting the claim phrases to exclude other examples in the specification such as obtaining information from a user about anticipated uses of the product." *Id*. at 2.

### 4. Discussion

Once again, "the words of a claim 'are generally given their ordinary and customary meaning.' * * * [T]the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

Lodsys notes that the common meaning of "perception" relates to the result of using human senses. Lodsys' Brief [Dkt. No. 555] at 5 (pointing, *inter alia*, to "perception" explained as "1. The act, process, or result of perceiving. 2. The ability to perceive: understanding or insight," and the meaning of "perceive" as "1. To become aware of directly by the senses, esp. to see or hear. 2. To achieve understanding or awareness of." Webster's II New Riverside Desk Dictionary [Dkt. No. 555-6] ECF 3. Another source similarly describes "perception" as "1. The ability to see, hear, or become aware of something through the senses. 2. The state of being or process of becoming aware of something in such a way." http://www.google.com (define perception). *See also* http://dictionary.reference.com/browse/perception, http://www.merriam-webster.com/dictionary/perception, (similar descriptions), http://www.bing.com/Dictionary/Search?q=define+perception ("1. perceiving: the process of using the senses to acquire information about the surrounding environment or situation 'the range of human perception' 2. result of perceiving: the result of the process of perception 'After watching the experiment closely, he noted his perceptions in his lab notebook.' 3. impression: an attitude or understanding based on what is observed or thought 'a news report that altered the public's perception of the issue. * * * Synonyms: view, opinion, reading, take, slant, assessment, experience, picture * * *."

Lodsys is correct that the specification uses "perception" similarly in a broad sense relating to the result of using human senses. Lodsys' Brief [Dkt. No. 555] at 4-5. Everyday experience confirms that one may form a "perception" or an "opinion" based on one or more of the human senses that does not necessarily require "prior" or "actual" use. For example, one may form a "perception" or "opinion" based on the human sense of "sight" alone without any "prior" or "actual" use of a "commodity." Indeed, one may have a "perception" or "opinion"

about the color of a device, for example a computer or computer component, or the aesthetic design or shape of a product, that has no direct relationship to how such product may be actually used – a white Apple iPad® more or less functions identically to a black Apple iPad®, but one may have a "perception" or "opinion" based on color alone – or one may form a "perception" or "opinion" of a current "smartphone," or computer, or computer tablet, based on the aesthetic design alone without regard to how the same actually functions in use. Or one may form a "perception" or "opinion" of a product or service from advertisements or a colleague's comments. Or from hearing a description – for example, "if a product was able to * * *, would that be a product you would consider purchasing? Why or why not?"

The defendants have not shown where the same are excluded by the description of the invention provided in the specification, or the express language of the claims. In short, the invention described in the patents-in-suit permits feedback on a variety of topics related to various products and services. In some instances, that feedback may require "actual" or "prior" use to answer the queries addressed to the "user." In other instances, though, those queries may solicit feedback that does not require any "actual" or "prior" use.

Accordingly, the Court declines to adopt the defendants' proposed construction of "user['s] opinion about the commodity formed from prior [or actual] use of the commodity." The Court also declines to adopt Kaspersky's proposed construction of "the user['s] opinion about the commodity formed from use of the commodity, * * *." Both require prior or actual "use" of the commodity – and such use is not required by the language of the claims or the specification.

With respect to Kaspersky's belated proposed construction, "[o]pinion about a commodity is not elicited simply by offering the commodity for sale," Kaspersky proposed that construction after the close of briefing. Furthermore, that proposed construction appears to simply further Kaspersky's argument in its brief that "[a] user's perception or opinion of software is not conveyed simply by a buying a license, if no other information is given. * * * The scope of the claims should be limited to user perception or opinion, which does not cover merely buying a license," Kaspersky's Corrected Response [Dkt. No. 590] at 3. That, however, is an issue reserved for determining infringement *vel non*. The subject phrase by its terms requires a

"user's perception" – whether that perception can be formed based on "merely buying a license" is a question for another day.

With respect to "information regarding a use of the product," again, the claim language is "a use of the product," not "prior use of the product." In context, claim 1 of the '565 patent calls for "configured to probe for information regarding a use of the product." Certainly one may "probe" for "information regarding a use of the product" that does not require "prior use" or "actual use." Or, stated differently, a user may clearly provide feedback information in the nature of a user's impression about "a use of the product" without "prior" or "actual" use. People every day evaluate and form impressions of products (and services), and even make purchasing decisions, based on sight alone, or with one or more of the other human senses, without ever actually using the product or service. That all is well within the general disclosures of the patents-in-suit, *i.e.*, the defendants have not persuasively shown that the patents-in-suit require prior or actual use.

With respect to Kaspersky's argument in its brief that, based on prosecution history disclaimer, "the scope of the term 'user's perception of the commodity' should be limited to the user's perception of the commodity itself, excluding any content conveyed by the commodity," Kaspersky's Corrected Response [Dkt. No. 590] at 3-4, it is not readily apparent that Lodsys contends otherwise. Indeed, it does not appear that Lodsys has specifically responded to that argument. It is also noted that defendants asserted in their brief that "[p]laintiffs do not dispute that, in the claimed system, 'user['s] perception of the commodity' does not include the user's perception of content delivered by the commodity. * * * For example, the user's opinion must be about a jukebox rather than the music played by that jukebox." Defendants' Response [Dkt. No. 578] at 3 n. 7. Lodsys has not contended otherwise. Accordingly, the Court does not currently see that the parties have a dispute on that issue.

Lastly, the Court declines to adopt Lodsys' proposed construction of "user['s] opinion about the commodity, including attitude, needs, desires, uses, understanding, and complaints with respect to the commodity." The parties all seem to agree that the claim language – "user's perception" – may be interpreted as "user's opinion." Lodsys' proposed "including" language apparently stems from the defendants' and Kaspersky's proposed constructions. Those proposed

48

constructions have been declined. Accordingly, there is no further need for such "including * * *" construction. Nor is there any need to change "user's perception" to "user's opinion."

In light of the foregoing, the parties' dispute has been resolved and there does not appear to be any need for further construction of either phrase.

## G. "perception information"

### 1. Parties' Proposed Constructions

The parties' contentions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"perception information"** | **'078**: 69 | This term is not indefinite under 35 U.S.C. § 112(2).<br><br>No construction necessary<br><br>This term is substantially identical to the term "information about the user's perception of the commodity" in claim 1, a substantial portion of which is addressed by the parties. | This term is indefinite under 35 U.S.C. § 112(2) | This term is indefinite under 35 U.S.C. § 112(2) |
| JCCC [Dkt. No. 615] at 5 | | | | |

### 2. The Parties' Arguments

Lodsys notes that "perception information," as used in claim 69 of the '078 patent, is substantially identical to the phrases "information about the user's perception of the commodity" and "results of the two-way local interaction." Lodsys' Brief [Dkt. No. 555] at 5. Lodsys urges that "not only is the claim phrase easily understood on its face, it is used in a manner that is substantially the same as other phrases that Defendants and Kaspersky have had no difficulty construing (i.e., 'user's perception of the commodity' and 'results')." *Id*. at 6. Accordingly Lodsys urges that the high standard for showing indefiniteness under § 112(2) has not been met.

The defendants contend that "[t]he term 'perception information' appears only in claim 69 of the '078 patent. Nowhere else does the specification use the term or otherwise provide guidance as to its construction. The term is thus indefinite because it is 'insolubly ambiguous' to one skilled in the art." Defendants' Response [Dkt. No. 578] at 20. The defendants urge that although "perception information" may be "substantially identical" to "information about the user's perception of the commodity" from claim 1 of the '078 patent, the phrases are not identical and "perception information" requires a separate construction. *Id*. at 20-21.

The defendants argue that "perception information" cannot mean the same thing as "information about the user's perception of the commodity" because that construction would read the "generating" limitation out of the claim. Namely, defendants argue, if the perception information that is "transmit[ed]" in the third limitation of claim 69 was the "user's perceptions" there would be no need for "gener[ating] perception information based on user input in the second limitation. *Id*. at 21. The defendants contend that "perception information" is something not described anywhere in the patent that is "generat[ed]" "based on inputs of the users at the respective user-interfaces." *Id*. Accordingly, the defendants contend that the phrase renders claim 69 "insolubly ambiguous" and indefinite under § 112(2).

Kaspersky does not separately argue the issue.

## 3. Discussion

The defendants are correct that the phrase "perception information" does not appear *per se* in the specification. However, the constituent words "perception" and "information" appear throughout the specification and claims. The Manual of Patent Examining Procedure (MPEP) § 2173.03, Correspondence Between Specification and Claims, advises:

> To meet the definiteness requirement under 35 U.S.C. 112, second paragraph, the exact claim terms are not required to be used in the specification as long as the specification provides the needed guidance on the meaning of the terms (e.g., by using clearly equivalent terms) so that the meaning of the terms is readily discernable [*sic.* discernible] to a person of ordinary skill in the art.

MPEP § 2173.05(e), Lack of Antecedent Basis, similarly advises:

> The mere fact that a term or phrase used in the claim has no antecedent basis in the specification disclosure does not mean, necessarily, that the term or phrase is indefinite. There is no requirement that the words in the claim must match those used in the specification disclosure. Applicants are given a great deal of latitude in

how they choose to define their invention so long as the terms and phrases used define the invention with a reasonable degree of clarity and precision.

Although the Court is not bound by the MPEP, the Federal Circuit has characterized the MPEP as being entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995)(" 'The MPEP [is] commonly relied upon as a guide to patent attorneys and patent examiners on procedural matters.' While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith."). *See also¸Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002)("The Guidelines, like the Manual of Patent Examining Procedure ('MPEP'), are not binding on this court, but may be given judicial notice to the extent they do not conflict with the statute.").

Thus, the fact that the phrase "perception information" does not appear *per se* in the specification does not necessarily mean that claim 69 is indefinite. *See also*, *Energizer Holdings v. U.S. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006)("When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.' The requirement of antecedent basis is a rule of patent drafting, administered during patent examination. * * * Whether this claim, despite lack of explicit antecedent basis for 'said zinc anode,' nonetheless has a reasonably ascertainable meaning must be decided in context." (paragraphing omitted).

Turning to the question of indefiniteness, "[b]ecause claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). The Court believes that standard has been met here.

The Federal Circuit has also advised that because issued patents are entitled to a statutory presumption of validity under § 282, the standard for finding that a claim is indefinite (and therefore invalid) is high, namely that a claim must be found to be "insolubly ambiguous:"

> We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.

*Exxon Research and Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). "By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity * * *." *Id.*

Claim 69 of the '078 patent calls for:

> 69. A method for gathering information from units of a commodity in different locations, each unit of the commodity being coupled to a remote database on a network, the method comprising:
>
> eliciting user perceptions of respective units of the commodity through interactions at a user-interface of the respective unit;
>
> generating perception information based on inputs of the users at the respective user-interfaces;
>
> transmitting the perception information to the remote database;
>
> receiving the transmitted perception information from different units of the commodity; and
>
> collecting and storing the received information at the remote database.

Contrary to the defendants' contentions, construing "perception information" as the "user perceptions" that were "elicited" in the first limitation does not "read out" the "generating step," or render "generating" surplusage. User perceptions are "elicited" in the first limitation. The second limitation says that "perception information" is "generat[ed]" "based on inputs of the users at the respective user-interfaces." "Eliciting" user perception is substantively different from "generating" information based on the user's inputs. Similarly, "transmitting" the information in the third limitation is substantively different from "eliciting" and "generating" that information.

Quite simply, as explained in the specification abstract, "[i]n an exemplary system, information is received at a central location from different units of a commodity. The information is generated from two-way local interactions between users of the different units of the commodity and a user interface in the different units of the commodity. The interactions elicit from respective users their perceptions of the commodity." '078 patent, abstract. The "perception information based on inputs of the users at the respective user-interfaces" reflects the "user perceptions" "elicit[ed]" in the first limitation.

Merely finding that a claim is amenable to construction does not necessarily end the inquiry. "In and of itself, a reduction of the meaning of a claim term into words is not dispositive of whether the term is definite * * * And if reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness." *Biosig Instruments, Inc. v. Nautilus, Inc.*, ___ F.3d. ___, ____ (Fed. Cir. 2013), quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008) ("*Star Scientific I*") (citations omitted). "Thus, a construed claim can be indefinite if the construction remains insolubly ambiguous * * *." *Biosig*, ___ F.3d at ___, quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011) ("*Star Scientific II*").

Here, "perception information" is amenable to construction, and that construction, namely "perception information based on inputs of the users at the respective user-interfaces" reflects the "user perceptions" "elicit[ed]" in the first limitation, is not insolubly ambiguous.

The Court concludes that "perception information" does not render claim 69 of the '078 patent insolubly ambiguous or indefinite under § 112(2).

## H. "elicit" / "probe"

### 1. Parties' Proposed Constructions

The parties' proposed the following contested constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"elicit"** | **'078**: 1, 22, 38, 60, 69, 74 | No construction necessary | "actively request" | "Ask for" |
| **"probe"** | **'565**: 1, 15, 27 | No construction necessary | "actively request" | "Ask for" |
| JCCC [Dkt. No. 615] at 5 | | | | |

### 2. The Core Disagreement and the Parties' Arguments

The core disagreement is whether "elicit" and "probe" cover purely passive activity.

Lodsys urges that "elicit" includes anything that provokes a response, whether that is an active request or not. Lodsys' Brief [Dkt. No. 555] at 9. In the JCCS, the defendants listed the <u>Webster's Ninth New Collegiate Dictionary</u> 404 (1990), as extrinsic evidence that the defendants would rely on in connection with "elicit." JCCS [Dkt. No. 505] at 27. Lodsys urges that dictionary's definition of "elicit," namely "1 a: to draw forth or bring out (something latent or potential) b: to derive (as truth) by logical processes 2: to call forth or draw out (a response or reaction)," illustrates that "even the extrinsic evidence referenced by Defendants in support of their construction actually describes that the term 'elicit' is broader than 'actively request.' " Lodsys' Brief [Dkt. No. 555] at 9.

The defendants urge that "the parties dispute whether the asserted claims can be expanded to encompass passively obtaining information without a user's involvement." Defendants' Response [Dkt. No. 578] at 27. Defendants contend that "figure 2 shows an illustration of a Customer-Based Product Design Module (CB-PD Module) that actively requests information from a user by asking 'How much do you like or dislike the method that you just used to program the fax machine's user settings?' For that reason, 'elicit' must be construed as

54

actively requesting and not simply passively obtaining information without the user's involvement." *Id*. at 28.

The defendants further contend the applicant distinguished "elicit" from a passive request, for example in claim 5 calling for "[t]he system of claim 1 in which the communication element also carries information from a passive probe that monitors the user's use of the commodity." *Id*. The defendants urge that the specification describes Customer Probes as "eliciting" data through prompts and questions. The defendants further urge that by not using the term "passive" in the present claims, the inventor intended "elicit" to mean "actively request." *Id*. The defendants also contend that "probe" in the '865 patent should be construed the same as "elicit." *Id*. at 28-29.

Kaspersky did not propose a construction for either "elicit" or "probe" in the JCCS [Dkt. No. 505] at 26-28. Kaspersky did, however, propose that "passive probe" should be construed as "a device or a program that gathers information about a unit of a commodity without requesting user input." *Id*. at 28.

In reply to the defendants' contention, Lodsys agrees that "elicit" and "probe" exclude passive activity ("as Defendants concede the scope of the terms merely excludes 'passively obtaining information without a user's involvement.' * * * Plaintiff agrees."). Lodsys' Reply [Dkt. No. 591] at 3. However, Lodsys urges that "construing these common terms to mean 'actively request' would only improperly narrow or obscure the terms for the jury." *Id*.

Lodsys urges that consistent with the common dictionary meaning of the terms, the specification explains that the "invention may draw out information by providing users with the option to perform 'Customer Initiated Interactions (CII) [which] are product Development Interactions (DI) that are triggered by the Customer.' " Lodsys' Reply [Dkt. No. 591] at 3-4. Lodsys contends that examples include "interactive evaluations and suggestions," a "help button," an "electronic suggestion pad," or "On-line Customer Support." Lodsys urges that "[s]uch interactions initiated by the user might not be captured by Defendants' proposed construction: 'actively request,' depending on the meaning of the phrase 'actively request.' " *Id*. at 4.

Lodsys also points to the "electronic suggestion pad" which Lodsys says is "a free-form entry area for users to enter information they want to report (such as problems and suggestions),

which does not include specific 'requests' of the user for information * * *." *Id*. Lodsys urges that "[t]hese examples illustrate that (as the parties agree) the scope of the terms 'elicit' and 'probe' merely excludes 'passively obtaining information without a user's involvement.' However, the examples also illustrate that it would be unwarrantedly narrowing (or at least confusing) to supplant these well-understood terms with the phrase 'actively request.' " *Id*.

### 3. Discussion

The parties thus agree that "elicit" and "probe" exclude "passively obtaining information without a user's involvement." On the other hand, the defendants have not pointed to a reference source that equates "elicit" and/or "probe" with "actively request." Rather, the references cited by the parties, as well as other similar references, indicate that "elicit" connotes "1. Evoke or draw out (a response or fact) from someone by actions or questions: 'their moves elicit exclamations of approval'. 2. Draw forth (something that is latent or potential) into existence: 'war elicits all that is bad in us'." www.google.com (define elicit). *See also* http://dictionary.reference.com/browse/elicit ("to draw or bring out or forth; educe; evoke: *to elicit the truth; to elicit a response with a question*."), http://dictionary.reference.com/browse/elicit ("1. a. To bring or draw out (something latent); educe. b. To arrive at (a truth, for example) by logic. 2. To call forth, draw out, or provoke (a reaction, for example).").

Lodsys is also correct that construing "elicit" and/or "probe" to mean "actively request" at least raises a question whether examples discussed in the specification would be excluded. The same question is raised *vis-à-vis* Kaspersky's proposed construction of "[a]sk for." Although the defendants are correct that the specification discusses examples in which the invention may be used to actively query customers about their perceptions, the specification also discusses examples in which that is less clear, as Lodsys notes.

The defendants said in their brief that "the parties dispute whether the asserted claims can be expanded to encompass passively obtaining information without a user's involvement." Defendants' Response [Dkt. No. 578] at 27. That dispute has been resolved. Lodsys agrees that "elicit" and "probe" exclude "passively obtaining information without a user's involvement." Accordingly, it appears to the Court that the parties' dispute has been resolved, and that no further construction is necessary.

56

## I. "component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location"

### 1. Parties' Contentions

The parties' contentions are:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location"** | **'078**: 1, 60 | This term is not governed by 35 U.S.C. § 112(6).<br><br>Nevertheless, in the event the Court holds that § 112(6) governs this term, the term is not indefinite under 35 U.S.C. § 112(2), as the specification discloses sufficient structure, referenced in the Joint Claim Construction and Prehearing Statement [Dkt. No. 505]. | This term is a means plus function limitation subject to 35 U.S.C. § 112, ¶ 6 and is indefinite under 35 U.S.C. § 112(2).<br><br>Function: managing the interactions of users in different locations and collecting the results of the interactions at the central location<br><br>Corresponding Structure: none for "managing the interactions of the users in different locations" | Same as Defendants. |
|  | | JCCC [Dkt. No. 615] at 6 | | |

### 2. The Parties' Arguments

As reflected above, the parties' dispute centers on whether "component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location" should be construed as a means-plus-function limitation governed by § 112(6), and if so, what is the "corresponding structure" disclosed in the specification that is "clearly linked" to the claimed function. The defendants (and now Kaspersky) contend that the specification does not disclose any "corresponding structure" that is "clearly linked" to the claimed function, and therefore claims 1 and 60 of the '078 patent are indefinite under § 112(2) and invalid.

### 3. Discussion

#### a) Background

Under § 112(6):

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Section 112(6) thus allows "an applicant [to] describe an element of his invention by the result accomplished or the function served, rather than describing the item or element to be used * * *." *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 27 (1997). Congress added this language to the Patent Act of 1952 to overcome restrictions imposed by *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 9 (1946). *See* P.J. Federico, *Commentary on the New Patent Act,* Preface to 35 U.S.C.A. (1954) (reprinted at 75, J. Pat. & Trademark Off. Soc. 161 (1993)).

The general hallmarks of a means-plus-function limitation are: (1) the limitation is expressed in terms using the words "means" or "step," which raises a presumption of an intent to invoke § 112(6), *Al-Site Corp. v. VSL Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999) ("[i]f the word 'means' appears in a claim element in combination with a function, it is presumed to be a means-plus-function element"); *see also Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996); (2) a specified function follows the "means" or "step" and is linked to the "means" or "step," *York Products, Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1574 (Fed. Cir. 1996), *see also Wenger Mfg., Inc. v. Coating Mach. Sys., Inc. and Vector Corp.*, 239 F.3d 1225, 1232 (Fed. Cir. 2001) (stating that "a limitation that uses the word 'means' but does not recite a function that corresponds to the means does not invoke § 112, ¶ 6"); and (3) there is insufficient structure, material, or acts set out in the claim for achieving the specified function. *Apex v. Raritan*, 325 F.3d 1364, 1372 (Fed. Cir. 2003); *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 530-31 (Fed. Cir. 1996), *cert. denied*, 522 U.S. 812 (1997). "Means-plus-function" limitations are construed, as required by § 112(6), to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. *In re Donaldson*, 16 F.3d 1189 (Fed. Cir. 1994)(*en banc*).

The Court must decide as a matter of law whether a particular term or phrase is governed by § 112(6). *Personalized Media Communications LLC v. United States Int'l Trade Comm'n*, 161 F.3d 696, 702 (Fed. Cir. 1998); *Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 1115 (2000).

"Once a court concludes that a claim limitation is a means-plus-function limitation, two steps of claim construction remain: 1) the court must first identify the function of the limitation; and 2) the court must then look to the specification and identify the corresponding structure for that function." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007); *see also Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006). "The determination of the claimed function and corresponding structure of a means-plus-function claim limitation is a question of law, reviewed de novo." *ACTV Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1087 (Fed. Cir. 2003). Thus, *Markman*-type claim construction of a means-plus-function limitation requires that the Court first identify the stated function and, secondly, identify the corresponding structure, material, or acts described in the specification that is clearly linked to or associated with that function.

The Federal Circuit has emphasized that in performing the first step, "a court may not construe a means-plus-function limitation 'by adopting a function different from that explicitly recited in the claim.' " *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1331 (Fed. Cir. 2005), *quoting Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). That is because "[a]n error in identification of the function can improperly alter the identification of structure in the specification corresponding to that function." *Id.* at 1258.

The Federal Circuit has explained that "[w]e consult the claim language to determine the function of the limitation * * * We then consult the written description to determine the corresponding structure necessary to accomplish the stated function." *Gemstar-TV Guide Int'l, Inc. v. United States Int'l Trade Comm'n*, 383 F.3d 1352, 1361 (Fed. Cir. 2004) (citations and paragraphing omitted). The stated function is that explicitly recited in the claim. *Micro Chem. Inc.*, 194 F.3d at 1250, 1258 (although § 112(6) "requires both identification of the claimed function and identification of the structure in the written description necessary to perform that function," the "statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim," nor "does the statute permit

incorporation of structure from the written description beyond that necessary to perform the claimed function."); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 249 F.3d 1314, 1324 (Fed. Cir. 2001) (a means-plus-function limitation cannot be broadened by "reading out" a function). *See generally, Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003); *Overhead Door Corp. v. Chamberlain Group, Inc.*, 194 F.3d 1261 (Fed. Cir. 1999); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1306 (Fed. Cir. 1998).

After identifying the claimed function, the Court must identify the "corresponding structure" disclosed in the specification that is "clearly linked" to the recited function. *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001) (quotes omitted) ("Structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim," quoting *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997); *see also Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("Under section 112, paragraph 6, structure disclosed in the specification is 'corresponding' structure 'only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim.' ").

"While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005), *citing Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002). On the other hand, "a court may not import into the claim structural limitations from the written description that are unnecessary to perform the claimed function." *Acromed Corp. v. Sofamor Danek Group*, 253 F.3d 1371, 1382 (Fed. Cir. 2001); *Micro Chem. Inc.*, 194 F.3d at 1258 ("The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim. Nor does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function."). "When multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments." *Micro Chem, Inc.*, 194 F.3d at 1258.

The Federal Circuit has advised that the specification must be read as a whole to determine the structure for performing the claimed function. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001) (citations omitted) ("The specification must be read as a whole to determine the structure capable of performing the claimed function. In construing terms used in patent claims, it is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent. In addition, it is important to construe claim language through the 'viewing glass' of a person skilled in the art.") However, the Federal Circuit has also cautioned that structure identified as "corresponding structure" must actually perform the recited function, rather than merely enable the pertinent structure to perform the recited function. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001) ("The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended * * *.").

### b) The Present Limitation

The Court concludes that "component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location" does not constitute a means-plus-function limitation governed by § 112(6). Accordingly, the Court does not reach the remaining steps, namely identifying the recited function and the "corresponding structure" disclosed in the specification and "clearly linked" to the claimed function.

First, the limitation does not use the word "means" and therefore enjoys a strong presumption that the limitation does not constitute a means-plus-function limitation governed by § 112(6). *See Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011)("The use of the term 'means' triggers a rebuttable presumption that § 112, ¶ 6 governs the construction of the claim term. * * * Conversely, where, as here, the claim language does not recite the term 'means,' we presume that the limitation does not invoke § 112, ¶ 6. * * * When a claim term lacks the word 'means,' the presumption can be overcome if the challenger demonstrates that 'the claim term fails to "recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function." ' "); *Lighting World v. Birchwood Lighting*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)(same).

The Federal Circuit has emphasized that "the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." *Inventio*, 649 F.3d at 1356, *Lighting World*, 382 F.3d at 1358. ("Our cases make clear, however, that the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome.").

Second, the Court must "assess whether a claim limitation recites sufficient structure to avoid means-plus-function claiming from the vantage point of an ordinarily skilled artisan. * * * To this end, 'considering intrinsic and extrinsic evidence is usually helpful [in determining whether] a claim limitation is so devoid of structure that the drafter constructively engaged in means-plus-function claiming.' " *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1364 (Fed. Cir. 2013).

Here, "component" carries a common structural connotation as does "circuit," *i.e.*, dictionary definitions for "component," like dictionary definitions for "circuit," indicate that "component" refers to structure. *See Power Integrations*, 711 F.3d at 1364 ("We have previously held on several occasions that the term 'circuit' connotes structure."), *MIT v. Abacus Software*, 462 F.3d 1344, 1355 (Fed. Cir. 2006) ("[D]ictionary definitions establish that the term 'circuitry,' by itself, connotes structure."). In *Lighting World*, addressing the term "connector," the Federal Circuit explained that "we have looked to the dictionary to determine if a disputed term has achieved recognition as a noun denoting structure, even if the noun is derived from the function performed. * * * Dictionary definitions in this case disclose that the term 'connector' has a reasonably well-understood meaning as a name for structure, even though the structure is defined in terms of the function it performs. 'Connector' is defined by Webster's Third New International Dictionary 481 (1993), as 'something that connects.' " 382 F.3d at 1360.

Available dictionary definitions indicate that "component" similarly connotes structure. *See e.g.,* MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (5th ed. 1994) at 424 ("component" in the electrical field: "Any electrical device, such as a coil, resistor, capacitor, generator, line, or electron tube, having distinct electrical characteristics and having terminals at which it may be connected to other components to form a circuit"), http://dictionary.reference.com/browse/component (defining "component," *inter alia*, as "a part of a mechanical or electrical system"), http://www.thefreedictionary.com/component ("A part of a mechanical or electrical complex"), http://www.merriam-webster.com/dictionary/component

("Examples of COMPONENT ● the components of an electric circuit * * *"), http://oxforddictionaries.com/definition/english/component ("a part or element of a larger whole, especially a part of a machine or vehicle").

In *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012), the Federal Circuit advised that "we will not apply § 112, ¶ 6 if the limitation contains a term that 'is used in common parlance or by persons of skill in the pertinent art to designate structure.' "

The Federal Circuit has also advised that "[i]n considering whether a claim term recites sufficient structure to avoid application of section 112 ¶ 6, we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World*, 382 F.3d at 1359-60.

In *Lighting World*, the Federal Circuit further advised that "[t]hus, while it is true that the term 'connector assembly' does not bring to mind a particular structure, that point is not dispositive. What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.' " 382 F.3d at 1360.

A "nonce" word is one "[c]oined for or used on one occasion." www.google.com (define nonce). *See also*, http://www.merriam-webster.com/dictionary/nonce ("occurring, used, or made only once or for a special occasion <a nonce word>"), http://oxforddictionaries.com/us/definition/american_english/nonce ("(of a word or expression) coined for or used on one occasion"). The word "component" is not a "nonce" word, but rather a common English language word that bears a structural connotation. Although "component," like "circuit" and "connector," does not identify specific structure, that, as noted, is not required.

Also, that the resulting limitation is broad is not decisive. The Federal Circuit in *Lighting World* explained that "[w]hile the terms 'connector' and 'connector assembly' are certainly broad, and may in the end include any structure that performs the role of connecting, the same could be said of numerous other terms, such as 'clamp,' or 'clip,' or even 'support member,' another term that is used in the [patent-in-suit]. Those terms are routinely treated as structural by

patent practitioners and courts, and we conclude that there is no reason to treat the term 'connector assembly' any differently for purposes of section 112 ¶ 6." 382 F.3d at 1361.

Third, the Federal Circuit has advised that "[t]he proper inquiry is whether the claim limitation itself, when read in light of the specification, connotes to the ordinarily skilled artisan sufficiently definite structure for performing the identified functions." *Power Integrations*, 711 F.3d at 1364. *See also*, *Inventio*, 649 F.3d at 1356-57 (claim is not read in isolation, but in conjunction with the specification to determine whether § 112(6) applies).

Here, the specification indicates that the "component capable" limitation connotes structure to one of ordinary skill in the art. Per the terms of the claim, the "component" "manag[es] the interactions of the users in different locations" and "collect[s] the results of the interactions at the central location" Lodsys notes that the specification discloses various "components" for doing so.

One embodiment described in the specification that Lodsys points to is the vendor's computer that includes an authoring system for designing or updating a unit's interactions, namely "managing interactions," and a reporting system that receives the various results of the interactions from different units, namely "collecting the results." '078 patent, col. 9, lines 50-67, col. 12, lines 43-56. Lodsys' Brief [Dkt. No. 555] at 14-16, Lodsys' Reply [Dkt. No. 591] at 8-9. Additionally, in one embodiment Lodsys points to, the "Instrument Design Repository" ("IDR"), described at col. 25, line 51 through col. 32, line 18, manages the user interactions, including the user interface the authoring system may provide, (col. 26, line 14-col. 28, line 27, Fig. 21), the options available to a user of the authoring system (col. 27, lines 1-22), the triggers that are available to a user (col. 28, lines 16-64), the commands used to download authored interaction onto a CB-PD module (col. 30, lines 30-60), and how the IDR may be used (col. 31, line 65-col. 32, line 18).

The specification also discloses, Lodsys notes, that the "Customer Data Reader/Programmer" (CDRP) manages user interactions. The specification explains that the CDRP is a "hardware device used in the collection and/or transmission of Aggregate Customer Desires (ACD) data to a Vendor, and in programming the CB-PD Module." '078 patent, col. 16, lines 41-44. Lodsys notes that "[t]he CDRP acts, in some embodiments, as a component that downloads new interactions on to a CB-PD Module (managing the interactions) and retrieves its

data to be stored centrally (collecting the results). Col. 21, l. 45–Col. 22, l. 50. The interactions and data can also be exchanged via a removable chip (Col. 23, ll. 1-10), a modem and telephone line (Col. 25, ll. 40-49), or any other communication method. Col. 24, ll. 1-11." Lodsys' Brief [Dkt. No. 555] at 15.

Lodsys further notes that "[i]n other places, the specification describes the component as the Customer-Based Product Design Report ("CB-PDR"). See, e.g., Col. 47, l. 11–Col. 49, l. 61. For one embodiment, the specification describes the structures for transmission (removable chips, modems, or other methods as described, supra) as well as the steps necessary for that transmission. Col. 47, ll. 12-34. Another embodiment describes the claim's component for managing customer interactions and collecting results as 'one or more computers at the Vendor 660 in FIG. 17 having an input via telephone 116 in FIG. 4 or other means for receiving Aggregate Customer Desires (ACD) data 378.' Col. 49, ll. 58-61. One embodiment's process for receiving and collecting the results is depicted in detail in Figures 11-13. See also Col. 49, l. 57–Col. 51, l. 2." Lodsys' Brief [Dkt. No. 555] at 15-16.

The defendants urge that "[n]one of the three embodiments identified by Plaintiffs – i.e., (1) the 'Instrument Design Repository (IDR)'; (2) 'Customer Data Reader/Programmer (CDRP)'; and (3) 'Customer Based Product Design Report (CB-PDR)" – denotes an algorithm or other analogous structure for performing the 'collecting' and 'managing' functions. Rather, these embodiments recite nothing more than a 'black box' that implements various functions in an undisclosed manner," Defendants' Response [Dkt. No. 578] at 23-24, citing *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).

In *Biomedino*, the claims called for "control means for automatically operating said valving." The claims used the word "means" and thus were subject to the presumption that those claims recited means-plus-function limitations governed by § 112(6). Biomedino argued that "control" recited sufficient structure to overcome that presumption. The Federal Circuit disagreed: "As the district court noted, the 'reference to "control" is simply an adjective describing "means:" [sic] it is not a structure or material capable of performing the identified function.' * * * We agree with the district court and hold that Biomedino has not rebutted the presumption that § 112, ¶ 6 applies to 'control means.' " 490 F.3d at 950.

The question then became whether Biomedino had disclosed "corresponding structure" in the specification that was sufficient to perform the claimed function, and was clearly linked to the claimed function. The Federal Circuit concluded that the specification was deficient. The Federal Circuit noted that "the only references in the specification to the 'control means' are the box labeled 'Control' in Figure 6 and a statement that the regeneration process may be 'controlled automatically by known differential pressure, valving and control equipment,' * * *." *Id*. The Federal Circuit concluded that such disclosure was insufficient to meet the requirements of § 112(6). *Id*. at 951-53.

Unlike *Biomedino*, here the subject limitation does not use the word "means" and enjoys the presumption that § 112(6) does not govern the limitation. Thus, in essence, the shoe is on the other foot. Here, the defendants have the burden of overcoming that presumption. The portions of the specification that Lodsys points to confirm that the presumption has not been overcome. *See Inventio*, 649 F.3d at 1358-59.

With respect to the defendants' argument that the three embodiments identified by Lodsys do not perform both of the recited functions, Lodsys notes that the specification explains that the systems can be combined into single units or divided into multiple units, as appropriate:

> The operation of the Customer Design System (CDS) in FIG. 1 is already described in the preferred embodiments as spanning multiple locations. The division points between those locations may be moved, so that many of the connecting "lines" between parts of this invention may become either local or long-distance lines. In other words, many of the lines in the Figures between various parts and functions in this invention may be within one physical unit or they may connect two or more physical units.

Lodsys' Reply [Dkt. No. 591] at 9, quoting '078 patent, col. 75, lines 19-27. Lodsys adds that "[m]oreover, both the managing and collecting functions of the disclosed system may be performed by 'the Vendor's computer.' " Lodsys' Reply [Dkt. No. 591] at 9, citing '078 patent, col. 9, lines 50-57 (managing); col. 76, lines 4-8 (collecting).

Once again, the Federal Circuit has advised that limitations not using the word "means" are presumptively not means-plus-function limitations governed by § 112(6), and, although rebuttable, that is a "strong" presumption, not easily overcome.

The Court concludes that the defendants and Kaspersky have not overcome that presumption here. Accordingly, the issue of whether the specification discloses "corresponding structure" that is "clearly linked" to the claimed function is not reached.

## J. "two-way local interaction"

### 1. Parties' Proposed Constructions

The parties' proposed the following constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"two-way local interaction"** | **'078**: 1, 24, 25, 46, 48, 49, 52, 60 **'908**: 37 | "interactions between the user and the unit at the user's location" | "two-way communication in the same physical location" Defendants are alternatively agreeable to use of the term "interaction" in place of "communication" in the claim construction. | "interaction between a unit of the commodity and the user by way of the user interface in the same physical location." |
| JCCC [Dkt. No. 615] at 6 | | | | |

### 2. Claim Language and the Parties' Arguments

Claim 1 of the '078 patent calls for:

1. A system comprising:

units of a commodity that can be used by respective users in different locations,

a user interface, which is part of each of the units of the commodity, configured to provide a medium for <u>two-way local interaction</u> between one of the users and the corresponding unit of the commodity, and further configured to elicit, from a user, information about the user's perception of the commodity,

a memory within each of the units of the commodity capable of storing <u>results of the two-way local interaction</u>, the results including elicited information about user perception of the commodity,

a communication element associated with each of the units of the commodity <u>capable of carrying results of the two-way local interaction</u> from each of the units of the commodity to a central location, and

a component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location. [emphasis added]

Initially, Lodsys urged that "[t]he primary dispute between Plaintiff and Defendants is that Defendants' proposed construction inexplicably restricts the term 'interaction' in the phrase 'two-way local interaction' to merely 'communication.' " Lodsys' Brief [Dkt. No. 555] at 30. However, the defendants agreed to change "communication" to "interaction" in their proposed construction, and urged that "[t]he dispute centers on whether the claimed interaction must be a 'local' one, as described in the patents and construed by Defendants." Defendants' Response [Dkt. No. 578] at 32. The defendants say that their "construction, requiring 'communication in the same physical location' properly recognizes that a 'two-way local interaction' does not include a remote interaction (i.e., communication between different locations)." *Id*.

The defendants urge that the specification contrasts local interactions from remote interactions. For example, the defendants contend, the specification discloses that "Customer Probes (CP)," namely the prompts, questions *etc.* stored in a CB-PB module for interacting with a customer, can be local or remote. *Id*., citing '078 patent, col. 26, lines 1-21. The defendants urge that the patent discloses that local CPs reside on the product itself, while remote CPs are located on a remote computer and must be downloaded prior to use. *Id*. The defendants contend that a "local" interaction "is a communication in one physical location that does not require remote communication – i.e., communication involving multiple physical locations." *Id*.

The defendants further contend that their construction is consistent with the claims which, they say, distinguish between local interactions and other interactions. *Id*. Defendants point to claim 54 which refers to "a two-way interaction," *i.e.*, minus "local," and provides that interaction occurs "online between the unit of the facsimile equipment and a vendor of the facsimile equipment." The defendants urge that claim 54 is thus an example of a "non-local" interaction. *Id*. at 33.

Defendants urge that Lodsys' proposed construction is ambiguous in that it is unclear whether "at the user's location" modifies "interactions," "user," or "unit." Defendants contend that Lodsys is attempting to broaden the claims to cover non-local interactions, *i.e.*, interactions that occur between a user, a product and a web server. *Id*.

Lodsys replies that "Plaintiff agrees that the interaction must occur at the user's location, as shown by Plaintiff's construction." The only dispute is whether Defendants' argument intends to improperly exclude any remote connection from the process. As the specification repeatedly

describes, interactions are sometimes downloaded to the units from a remote computer before they are available to the user." Lodsys' Reply [Dkt. No. 591] at 18. Lodsys urges that is illustrated by claim 54.

Claim 54 calls for:

> 54. A system comprising:
>
> units of a facsimile equipment that can be used by respective users in different locations,
>
> a user interface which is part of each of the units and is configured to trigger <u>a two-way interaction</u> to occur on-line between the unit of the facsimile equipment and a vendor of the facsimile equipment, the user interface being configured to generate information about use of the unit by the user,
>
> a communication element associated with each of the units capable of <u>carrying results of the two-way local interaction from each of the units to a central location</u>, and
>
> a component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location. (emphasis added)

The defendants had pointed to "a two-way interaction," *i.e.*, without "local," in the second limitation. Lodsys urges that "carrying results of the two-way local interaction from each of the units to a central location" shows that "even though the interaction has an online aspect, it also includes a 'local interaction' aspect." Lodsys' Reply [Dkt. No. 591] at 18.

Lodsys also notes the defendants' reference to column 26 of the specification, but urges that discussion "describes the interaction authoring system used by the vendor, not the unit of commodity used by the user. Moreover, that discussion confirms that remote interactions/probes may be downloaded, after which they become local interactions/probes. Col. 26, ll. 14-21." *Id.* at 33 n. 14.

### 3. Discussion

The Court concludes that "two-way local interaction" should be construed as "interactions between the user and the unit at the user's location." That construction is consistent with both the language of the claims and the specification.

Both the defendants' and Kaspersky's proposed constructions would add "in the same physical location," with the objective, apparently, of excluding any remote function. Doing so would be inconsistent with the specification, and is not required by the claim language.

With respect to the defendants' reliance on column 26, Lodsys is correct that the discussion relates to the interaction authoring system used by the vendor. For example, col. 26, lines 1-12 explain:

**26**

As represented in FIG. **8**, the Instrument Design Repository (IDR) is organized to have a number of main functions. These include choosing a local set of Customer Probes (CP) **218** or a local Customer Design Instrument (CDI) **218** which
5  may be accessible without charge or may be purchased from a Professional Expert, choosing a remote set of Customer Probes (CP) **228** or a remote Customer Design Instrument (CDI) **224** (i.e., which are located on a remote computer system and may be purchased from a Professional Expert),
10  choosing the triggers **232** for initiating Development Interactions (DI) with Customers, choosing downloading utilities **238** to program CB-PD Modules, or exiting **244** the IDR.

Lodsys is also correct that the specification explains that remote interactions/probes may be downloaded, after which they become local interactions/probes:

If the user chooses a local **218** or a remote **224** set of
15  Customer Probes (CP), or a local **218** or a remote **228** Customer Design Instrument (CDI) is chosen, the choice made is confirmed with the user **220**, **228** by displaying its descriptive data and giving the user the opportunity to change that data, if appropriate. If the connection is with a
20  remote computer system **226**, then the user's choice is downloaded to the user's system **230** before proceeding.

'078 patent, col. 26, lines 14-21.

Accordingly, Court concludes that "two-way local interaction" should be construed as "interactions between the user and the unit at the user's location."

## K. "trigger event"

### 1. Parties' Proposed Constructions

The parties' proposed the following constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"trigger event"** | **'565**: 1, 5, 7, 8, 10, 14, 15, 17, 19, 20, 22, 26, 27, 28 | "occurrence of a recognizable condition" | "an event that initiates an action" | Same as Defendants |
| JCCC [Dkt. No. 615] at 7 | | | | |

### 2. Discussion

Initially, Lodsys urged that the defendants' proposed construction was inconsistent with the claims and specification. Lodsys' Brief [Dkt. No. 555] at 18-19. The defendants, however, responded by noting, *inter alia*, that "an 'event' is not a 'trigger event' if it does not 'trigger' any action beyond the knowledge that the event occurred. That action can be as simple as incrementing a counter to as complex as initiating product development interactions by the vendor of the product." Defendants' Response [Dkt. No. 578] at 10. Lodsys replied that "[t]he parties apparently agree on the meaning of the term 'trigger event.' Defendants concede their construction is met by any event that results in an action 'as simple as incrementing a counter to as complex as initiating product development interactions.' * * * Plaintiff agrees, as this merely acknowledges the operation of the invention described in the claim language following the term 'trigger event.' " Lodsys' Reply [Dkt. No. 591] at 9-10. Although Lodsys continued to advocate its own construction, and characterized the defendants' construction, *inter alia*, as "unnecessary," it nevertheless appears that the parties agree.

Accordingly, the Court concludes that "trigger event" should be construed as "an event that initiates an action." The Court declines to adopt Lodsys' proposed construction because "occurrence of a recognizable condition" may be an "event," but not necessarily a "trigger event."

**L. "counter" / "increment a counter" / "if the counter exceeds a threshold"**

**1. Parties' Proposed Constructions**

The parties' proposed the following constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| "counter" | '565: 1, 5, 6, 14, 15, 17, 18, 26-29 | "a memory location for storing values that represent the number of occurrences of an event" | "an instrument for storing integers permitting them to be increased sequentially to represent the number of occurrences of an event" | Same as Defendants |
| "increment a counter" | '565: 1, 14, 15, 27 | "update a counter to reflect an increase in the number of occurrences of an event" | "to sequentially increase the numeric value of a counter" | Same as Defendants |
| "if the counter exceeds a threshold" | '565: 1, 15, 27 | "if the counter's value meets a predefined criteria" | "only when the counter exceeds a predetermined value" | Same as Defendants |
| JCCC [Dkt. No. 615] at 7 | | | | |

**2. The Parties' Arguments**

With respect to "counter," Lodsys urges that the claim language supports its proposed construction. For example, claim 1 of the '565 patent calls for:

> 1. A unit, comprising: a memory; a transmitter; and a processor, coupled to the memory and to the transmitter, configured to: monitor a product for an occurrence in the product of a trigger event of a predefined plurality of trigger events, increment a counter corresponding to the trigger event <u>upon detection of the occurrence of the trigger event</u>, cause the display of a user interface, configured to probe for information regarding a use of the product, <u>if the counter exceeds a threshold</u>, cause the memory to store an input received from the user interface, and cause the transmitter to transmit the input to a server.

Lodsys urges that, according to the foregoing emphasized language, "[a] counter must, therefore, in some manner 'represent the number of occurrences of an event.'" Lodsys' Brief [Dkt. No. 555] at 21. Lodsys further urges that the specification "supports the notion of tracking many types of events - for example, whether an event has occurred, how many times it has occurred,

and even changes in the rate of use and the passage of time: * * *." *Id*. at 21-22. Lodsys contends that "[t]hus, a counter need only represent the number of occurrences of an event such that the product may determine whether a threshold condition has been met. Such representations could be integers, time values, true/false values, etc., depending on the type of trigger and threshold involved: * * *." *Id*. at 22.

Lodsys urges that the defendants' proposed construction introduces unnecessary limitations, such as that the counter may only hold integers (such as 1, 2, 3, etc.). Lodsys contends that may apply to embodiments that track the "Nth use of a product," but would exclude other embodiments. Lodsys notes that an embodiment that runs an interaction "at product installation would track whether the product was installed – a true or false result. Other embodiments, according to Lodsys, track the passage of time, which is not necessarily an integer, and yet other embodiments track a ratio of product uses to a period of time, *i.e.*, the rate of use of a product, which also may be a non-integer value. Lodsys' Brief [Dkt. No. 555] at 22.

Lodsys further notes that the defendants' proposed construction would limit "counters" to being "increased sequentially." Lodsys contends that "[n]othing in the specification requires that a counter be increased instead of decreased (for example, counting down from 10 to 0, instead of counting up from 0 to 10), or that a counter be modified by 1 at each trigger event. For example, embodiments that track the passage of time might add or subtract an amount of time to represent an additional span of time." *Id*.

With respect to "increment a counter," Lodsys urges that the defendants' proposed construction, in conjunction with their proposed construction for "counter," would essentially limit the claims to adding 1 to the counter's value. That, Lodsys says, would read out embodiments disclosed in the specification. Some embodiments, Lodsys again notes, track "passage of time, whether a product has just been installed, or whether a button has been pressed. A counter that tracks these events would not necessarily do so by adding '1' to its value." Lodsys' Brief [Dkt. No. 555] at 23. Lodsys also points to embodiments used to track disposable supplies and permit reorders when supplies fall below a certain level. Lodsys urges that the defendants' "sequential" limitation would readout those embodiments.

With respect to "if the counter exceeds a threshold," Lodsys urges that the defendants' proposed construction "would require that the counter exceed a specific value, which contradicts the specification and therefore should be rejected." *Id*. at 24.

The defendants urge that a "counter" must be a component that "counts." According to the defendants, "Plaintiffs' construction ignores the sequential aspect of counting by referring only to storing a representative number irrespective of how the 'counter' arrives at that number. But storing the number seven is not the same as counting to seven. Counting involves incrementation; it does not involve, as Plaintiffs propose, oscillating between two states such as true and false." Defendants' Response [Dkt. No. 578] at 13.

The defendants argue that the specification discloses that a counter stores incremental iterations of integer values. The defendants point to various portions of the specification disclosing, for example, "A CB-PD Module in the typewriter would be programmed to interact with the Customers or users (such as at every Nth time the unit is turned on, like the 10th and each successive 100th time," "A counter is incremented at each occurrence of that same trigger. * * * [t]he actual triggers occur at specific instances when both the trigger increments the counter, and that counter reaches specific values* * * [a]t each of those specific values, a different trigger is fired and each are independent of the others (such as on the 2nd, 10th, 70th, and 95th use of a feature," "Frequency of use (triggers are based on frequency of use, such as during each Nth use of the product," *etc.* Defendants' Response [Dkt. No. 578] at 14.

The defendants further urge that their proposed construction matches contemporaneous technical dictionary definitions "almost word for word." *Id*. The defendants rely on: the IEEE Standard Dictionary of Electrical and Electronics Terms 214 (4th ed. Nov. 3, 1988) ("an instrument for storing integers, permitting these integers to be increased or decreased sequentially by unity or by an arbitrary integer, and capable of being reset to zero or to an arbitrary integer."), Laplante, Phillip A., Dictionary of Computer Science, Engineering & Technology, at 110 (2001) ("a variable or hardware register that contains a value which is always incremented * * * by a fixed amount, and always in the same direction (usually incremented by one * * *."), Digital Design with CPLD Applications VHDL, at 503 (2005) ("A sequential digital circuit whose output progresses in a predictable repeating patter, advancing by one state

for each clock pulse.") (defendants' emphasis omitted)  Defendants' Response [Dkt. No. 578] at 14.

The defendants further urge that Lodsys' examples of non-integer counters are "misleading."  The defendants urge that time may be represented by an integer, and Lodsys' other examples may be implemented using integers as well.  *Id*. at 15. With respect to Lodsys' argument that a counter may be decreased, the defendants note that all of the clams require incrementing the counter, and that there is no discussion in the specification of decrementing a counter.  *Id*.

The defendants also rely on prosecution history.  The defendants note that during prosecution the "counter" and "increment a counter" limitations were added to overcome a rejection, and the examiner subsequently allowed the claims.  In the Notice of Allowance, according to the defendants, the examiner commented that "[N]either McKenna, Moore, nor any other prior art of record discloses incrementing a counter corresponding to the trigger event upon detection of the trigger event, and causing the display of a user interface, configured to probe for information regarding a use of the product, if the counter exceeds a threshold."  Defendants' Response [Dkt. No. 578] at 15 (defendants' emphasis omitted).  The defendants argue that "Plaintiffs cannot read the counting aspect out of the term 'counter' because doing so directly conflicts with the Examiner's reason for allowance over McKenna and Moore." *Id*. at 16.  The defendants urge that adopting Lodsys' proposed construction would allow the claims to be read on McKenna and Moore prior art.  *Id*. at 16-17.

With respect to "increment a counter," the defendants similarly argue that "Plaintiffs also attempt to improperly read the counting aspect out of the 'increment a counter' term." *Id*. at 17. The defendants urge that their construction is consistent with the specification and prosecution history while "Plaintiffs' construction reads out the true meaning of the word 'increment' altogether and is inconsistent with the intrinsic record because it would encompass the features of Moore and McKenna that were given up during prosecution." *Id*.

With respect to "if the counter exceeds a threshold," the defendants urge that the plain claim language provides that a counter is incremented until it "exceeds" a numeric value and an interaction with a user is then performed.  According to the defendants, "Plaintiffs attempt to read out the exceeding aspect of the claims by arguing that the limitation is satisfied whenever a

predetermined criteria is 'met.' But meeting a numeric value is not the same as exceeding it." *Id.* at 18.

The defendants further urge that "if the counter exceeds a threshold" requires a "cause and effect" relationship between exceeding the threshold and an action. The defendants urge that during reexamination the patent owner, in response to prior art, argued "[t]herefore, while a 'display' may occur for any reason, only a 'display' that results from (i.e., is related to and occurs after the trigger counter exceeding the threshold could be found to anticipate the claimed feature of the '565 patent." *Id.* at 19, quoting response. The defendants urge that "[t]hus, this claim element would be satisfied if the user interface is displayed only when the counter exceeds the threshold." *Id.* (emphasis omitted)

Lodsys replies that its proposed construction is consistent with the ordinary meaning of "counter," pointing to <u>Webster's New World Dictionary of Computer Terms</u> 133 (5th ed. 1994)("A device, such as a register or computer storage location, used to represent the number of occurrences of an event."), Donald D. Spencer, <u>Spencer's Computer Dictionary for Everyone</u> 61 (3rd ed. 1985)("A device (e.g., a register or computer storage location) used to represent the number of occurrences of an event."). Lodsys' Reply [Dkt. No. 591] at 10. Lodsys notes that "Defendants' quotation of extrinsic evidence omits a virtually identical definition, matching Plaintiff's construction," *id*, pointing to the <u>IEEE Standard Dictionary of Electrical and Electronics Terms</u> 214 (4th ed. Nov. 3, 1988), which defines "counter" – in the context of test, measurement and diagnostic equipment – as:

> **counter (test, measurement and diagnostic equipment).** (1) A device such as a register or storage location used to represent the number of occurrences of an event: and (2) An instrument for storing integers, permitting these integers to be increased or decreased sequentially by unity or by an arbitrary integer, and capable of being reset to zero or to an arbitrary integer.

[Dkt. No. 578-13] at 214. As noted above, the defendants cited the second definition, but not the first definition.

Replying to the defendants' examples of embodiments from the specification that use integer values, Lodsys urges that the defendants' first two examples describe only the display of

a user interface upon the number of occurrences of an event, but do not describe a counter that is sequentially increased, and urges overall that those embodiments are "are, at best, merely several embodiments of the invention and should not be used to limit the scope of the term 'counter' to exclude the term's meaning as understood at the time." Lodsys' Reply [Dkt. No. 591] at 11. Lodsys argues that even if some embodiments could be implemented using an integer counter, that does not justify limiting the claims as the defendants propose. *Id*. at 11-12.

Lodsys denies that its proposed construction reads "counting" out of the claim, noting that in its proposed construction the counter is updated to "reflect an increase in the number of occurrences of an event." *Id*. at 12. Lodsys further contends that the defendants' proposed construction improperly narrows the meaning of "increment" by limiting the term to "sequentially increas[ing] the numeric value of a counter," contrary to extrinsic evidence cited by the defendants in the JCCS. *Id*.

With respect to the cited prosecution history, Lodsys argues that "Defendants' assertion is irrelevant because prosecution history estoppel is not an issue for claim construction," *id*. at 13, citing *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998). Lodsys further urges that the defendants are simply wrong in asserting that the examiner allowed the '565 patent over McKenna and Moore only because of the "counter" limitation. Lodsys contends that there was no clear and unambiguous disavowal of scope. Lodsys' Reply [Dkt. No. 591] at 13-14.

With respect to "if the counter exceeds a threshold," Lodsys says that it "merely proposes to construe this phrase consistently with the specification, which describes: 'actual triggers occur at specific instances when both the trigger increments the counter, and that counter reaches specific values.' " *Id*. at 14, citing '565 patent, col. 29, lines 52-54.

Lodsys further contends that the defendants mischaracterized the reexamination prosecution history. According to Lodsys, "[a]s the quoted language from the reexamination makes clear, however, Plaintiff merely asserted (and the Examiner subsequently agreed) that the claim element would only be satisfied if the user interface is displayed in response to the counter exceeding a threshold, regardless of whether the user interface was also displayed for any other reason." Lodsys' Reply [Dkt. No. 591] at 14.

### 3. Discussion

The Federal Circuit in *Phillips* made clear that the words of a claim should receive the ordinary and customary meaning for such words, absent (1) claim language that, in context, suggests or requires something other than the ordinary and customary meaning, (2) a disclosure in the specification that indicates that the patentee intended to be his/her own lexicographer and chose to adopt a different meaning, or the specification otherwise indicates that a meaning other than the ordinary and customary meaning was intended, or (3) prosecution history that similarly indicates, though amendment and/or argument, that the patentee intended a meaning other than the ordinary and customary meaning. 415 F.3d at 1313 *et seq.* Because, as the Federal Circuit explained in *Phillips*, prosecution history can frequently be unclear, generally reliance on prosecution history requires a clear and unambiguous disavowal. 415 F.3d at 1317. *See also*, *Omega Eng'g,* , 334 F.3d at 1324.

### a) "counter"

Here, the various references both parties rely on indicate that "counter" has a generally accepted meaning as a technical term of art. As noted above, the defendants principally rely on the IEEE Standard Dictionary of Electrical and Electronics Terms 214 (4th ed. Nov. 3, 1988) definition of "counter," but as Lodsys correct notes, that source has two definitions:

> **counter (test, measurement and diagnostic equipment).** (1) A device such as a register or storage location used to represent the number of occurrences of an event; and (2) An instrument for storing integers, permitting these integers to be increased or decreased sequentially by unity or by an arbitrary integer, and capable of being reset to zero or to an arbitrary integer.

The defendants point to the second definition, while Lodsys points to the first definition. In either event, that definition is in the context of "test, measurement and diagnostic equipment" which is not the context of the present invention. Also, though, the defendants have not pointed to anything in the specification or prosecution history that suggests that the patentee intended to limit "counter" to that second definition. Although perhaps, as the defendants allege, the various embodiments disclosed in the specification could be implemented through integers does not equate to evidence that the patentee actually intended that limited meaning.

Lodsys also points to <u>Webster's New World Dictionary of Computer Terms</u> 133 (5th ed. 1994)("A device, such as a register or computer storage location, used to represent the number of occurrences of an event."), and Donald D. Spencer, <u>Spencer's Computer Dictionary for Everyone</u> 61 (3rd ed. 1985)("A device (e.g., a register or computer storage location) used to represent the number of occurrences of an event.").  Those are consistent with the first or primary meaning provided in the IEEE reference.

Those sources also appear to offer explanations for "counter" most clearly within the context of the invention of the patents-in-suit.  It is additionally noted that those definitions are consistent with the MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (5th ed. 1994) at 472 – which defines "counter" in the field of computer science as "[a] register or storage location used to represent the number of occurrences of an event."

The other sources the defendants rely on do not actually support the proposed construction.  Phillip A. Laplante, <u>Dictionary of Computer Science, Engineering & Technology</u>, at 110 (2001), provides:

> **counter**  (1) a variable or hardware register that contains a value which is always incremented or decremented by a fixed amount, and always in the same direction (usually incremented by one, but not always).
>
> (2) a simple Moore finite state machine that counts input clock pulses.  It can be wired or enabled to count up and/or down, and in various codes.

[Dkt. No. 578-14] and is, at best, ambiguous (although defendants rely on the first definition, they do not explain why the second definition might also not be applicable, and instructing a jury that "counter" includes "a simple Moore finite state machine" hardly simplifies anything). The other reference that the defendants rely on, Digital Design with CPLD Applications VHDL, at 503 (2005), appears to be a textbook that includes the following:



**9.1 BASIC CONCEPTS OF DIGITAL COUNTERS**

■ KEY TERMS

**Counter** A sequential digital circuit whose output progresses in a predictable repeating pattern, advancing by one state for each clock pulse.

**Recycle** To make a transition from the last state of the count sequence to the first state.

**Count Sequence** The specific series of output states through which a counter progresses.

**Modulus** The number of states through which a counter sequences before repeating.

**UP Counter** A counter with an ascending sequence.

**DOWN Counter** A counter with a descending sequence.

**State Diagram** A diagram showing the progression of states of a sequential circuit.

**Modulo-n (or mod-n) Counter** A counter with a modulus of n.

**Modulo Arithmetic** A closed system of counting and adding, whereby a sum greater than the largest number in a sequence "rolls over" and starts from the beginning. For example, on a clock face, four hours after 10 A.M. is 2 P.M., so in a mod-12 system, 10 + 4 = 2.

The simplest definition of a counter is "a circuit that counts pulses." Knowing only this, let us look at an example of how we might use a counter circuit.

[Dkt. No. 578-15]. The defendants point to "A sequential digital circuit whose output progresses in a predictable repeating pattern, advancing by one state for each clock pulse," but ignore the statement that "[t]he simplest definition of a counter is 'a circuit that counts pulses.' " Also, the title of the book, "Digital Design with CPLD Applications VHDL," suggests that it has a narrow scope. Moreover, and perhaps most importantly, the defendants simply cite this textbook without any attempt to qualify this textbook as an authoritative source that a court could or should rely on. Simply because a book has been published does not make it authoritative or reliable. FED. R. EVID. 803(18) requires that such materials be established as "a reliable authority." Indeed, fundamentally, the defendants urge that this textbook reflects how one of ordinary skill in the art – generally, and more specifically within the context of the patents-in-suit – would construe "counter." But, the defendants have done nothing more than cite the book, and provide a copy of

a portion thereof. The defendants offered no evidence on which the Court may rely to adjudge whether the book is truly authoritative or "a reliable authority" or truly reflects how one of ordinary skill in the art – generally, and more specifically within the context of the patents-in-suit – would construe "counter."

Also, claim 1 of the '565 patent again provides:

> 1. A unit, comprising: a memory; a transmitter; and a processor, coupled to the memory and to the transmitter, configured to: monitor a product for an occurrence in the product of a trigger event of a predefined plurality of trigger events, increment a counter corresponding to the trigger event upon detection of the occurrence of the trigger event, cause the display of a user interface, configured to probe for information regarding a use of the product, if the counter exceeds a threshold, cause the memory to store an input received from the user interface, and cause the transmitter to transmit the input to a server.

The defendants have pointed to nothing in the claim language that supports their narrow construction of "counter" or "increment a counter," and the Court finds none.

Additionally, as noted above, the MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (5th ed. 1994) at 472, a source that has been repeatedly relied on by the Federal Circuit and other courts as an authoritative source, defines "counter" in the field of computer science, a field certainly related to the patents-in-suit, as "[a] register or storage location used to represent the number of occurrences of an event." That is consistent with the language of the claim.

Lodsys' proposed construction of "counter" is "a memory location for storing values that represent the number of occurrences of an event." The Court concludes that Lodsys' proposed construction is consistent with the ordinary and customary meaning of "counter," as reflected in the MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, the other sources discussed above, and is furthermore consistent with how "counter" is used in the claims, specification and prosecution history. More specifically, the Court concludes that the defendants have not identified any portion of the specification that suggests that the patentee intended any different meaning for "counter." Furthermore, the Court concludes that the portions of the prosecution history that the defendants rely on are not inconsistent with that ordinary and customary meaning of "counter," and, in all events, the prosecution history does not express a clear and unambiguous disavowal of that ordinary and customary meaning.

In that regard, the Court does not agree with Lodsys' contention that "Defendants' assertion is irrelevant because prosecution history estoppel is not an issue for claim construction," citing *Spectrum*, 164 F.3d 1372, 1378-79. In *Spectrum*, the Federal Circuit, in a footnote, commented: "Our recourse to language emphasizing the relinquishing of subject matter during prosecution should not be construed to undermine the 'clear distinction between following the statements in the prosecution history in defining a claim term, and the doctrine of prosecution history estoppel, which limits expansion of the protection under the doctrine of equivalents when a claim has been distinguished over relevant prior art.' "

Prior to more recent cases such as *Omega Eng'g*, 334 F.3d at 1324, the phrase "prosecution history estoppel" was frequently used by the courts to refer to two distinct types of estoppel: (1) estoppel arising from amendments and arguments made during prosecution that may limit the meaning of claim terms and the scope of the claims, and (2) estoppel also arising from amendments and arguments made during prosecution that foreclose, or limit, a patentee's ability to rely on the doctrine of equivalents in asserting infringement in the absence of literal infringement. The Federal Circuit in *Omega Eng'g*, and other cases, began using "prosecution history disclaimer" to refer to the first type of estoppel to distinguish the two. In all events, contrary to Lodsys' argument, amendments and arguments made during prosecution – either original prosecution or during a reexamination – may impact on the construction of claims.

Here, the defendants note that during examination, the examiner commented that "[N]either McKenna, Moore, nor any other prior art of record discloses incrementing a counter corresponding to the trigger event upon detection of the trigger event, and causing the display of a user interface, configured to probe for information regarding a use of the product, if the counter exceeds a threshold." Defendants' Response [Dkt. No. 578] at 15 (defendants' emphasis omitted). Adopting the construction "a memory location for storing values that represent the number of occurrences of an event" neither reads "counting" out of the limitation nor conflicts with the examiner's reason for allowance over McKenna and Moore.

b) **"increment a counter"**

As for "increment a counter," the defendants simply have not provided any persuasive evidence that one of ordinary skill in the art would construe that phrase narrowly as "to sequentially increase the numeric value of a counter."

The MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (5th ed. 1994) at 1001, defines "increment" in the field of scientific technology, as simply "a small change in the value of a variable." Given the foregoing construction of "counter" as "a memory location for storing values that represent the number of occurrences of an event," Lodsys' proposed construction of "increment a counter" as "update a counter to reflect an increase in the number of occurrences of an event" is consistent with the claim language, the specification and the prosecution history. Contrary to the defendants' arguments, the defendants' have not shown that adopting Lodsys' proposed construction would encompass the features of Moore and McKenna, the prior art applied during prosecution. Moreover, even if so, that is an issue that is more properly addressed in the context of whether the asserted claims are valid under the heightened standard of "clear and convincing evidence" applicable in light of the presumption of validity under § 282.

c) **"if the counter exceeds a threshold"**

Lodsys proposes "if the counter's value meets a predefined criteria" while the defendants (and Kaspersky) propose "only when the counter exceeds a predetermined value." The defendants generally contend that Lodsys' proposed construction reads "exceeds" out of the claim. The Court agrees.

Lodsys says that its proposed construction "merely proposes to construe this phrase consistently with the specification, which describes: 'actual triggers occur at specific instances when both the trigger increments the counter, and that counter reaches specific values.' " *Id.* at 14, citing '078 patent, col. 29, lines 52-54 (although the phrase appears in the asserted claims of the '565 patent, Lodsys cites to the specification of the '078 patent), which discloses, in context:

> For one example, FIG. **22** illustrates the expected learning curve for one product feature and the corresponding match of types of questions. A counter is incremented at each occurrence of that same trigger (which may be using a particular product feature, exiting an important new product feature without using it, accessing any one of a set of related but infrequently used features, etc.). The actual triggers occur at specific instances when both the trigger increments the counter, and that counter reaches specific values. At each of those specific values, a different trigger is fired and each are independent of the others (such as on the 2nd, 10th, 70th and 95th use of a feature), as follows:

Although the specification refers to "[t]he actual triggers occur at specific instances when both the trigger increments the counter, and that counter reaches specific values," the patentee chose to claim "if the counter <u>exceeds</u> a threshold." As noted above, during claim construction, the courts do not have the province to re-write the claims in a form that the patentee, on reflection, preferred. *See K-2 Corp.*, 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *SRAM Corp.*, 465 F.3d at 1359, *Hoganas AB*, 9 F.3d at 951, *Tex. Instruments, Inc.*, 988 F.2d at 1171. Rather, if the patentee believes that a claim was wrongly drafted, a patentee must resort to the other statutory procedures for correcting a claim – *i.e.*, reissue or reexamination, to the extent permitted.

In all events, a patentee cannot, through a proposed claim construction, seek to "read out" express claim limitations. Here, the asserted claims clearly call for "if the counter <u>exceeds</u> a threshold." Accordingly, Lodsys' proposed broader proposed construction of "if the counter's value meets a predefined criteria" is declined.

The Court's conclusion that the asserted claims calling for "if the counter <u>exceeds</u> a threshold" will be construed as written appears to resolve the parties' dispute. Accordingly, no further construction is deemed necessary.

## M. "forwarding the input" / "a priority code associated with the input"

### 1. Parties' Proposed Constructions

The parties' proposed the following constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"forwarding the input"** | '565: 16 | No construction necessary | "transmitting the input from the server to a destination other than the product" | Not proposed for construction because claim 16 is not asserted against Kaspersky. |
| **"a priority code associated with the input"** | '565: 16 | No construction necessary<br><br>If the Court determines this term should be construed:<br><br>"a property indicative of the input" | "information received from the product that indicates the priority of the input" | Not proposed for construction because claim 16 is not asserted against Kaspersky. |

## 2. Claim Language in Context

Claim 16 of the '565 patent calls for, with parent claim 15:

15. A method, comprising:

monitoring a product for an occurrence in the product of a trigger event of a predefined plurality of trigger events;

incrementing a counter corresponding to the trigger event upon detection of the occurrence of the trigger event in the product;

displaying a user interface, configured to probe for information regarding a use of the product, if the counter exceeds a threshold;

storing an input received from the user interface on a device; and transmitting the input to a server.

16. The method of claim 15, further comprising: <u>forwarding the input</u> based on <u>a priority code associated with the input</u>.

## 3. Discussion

### a) "forwarding the input"

It is not clear that there is a continuing dispute. The defendants contend that "[t]he parties' dispute over the meaning of 'forwarding the input' focuses on one discrete issue: whether 'forwarding the input' can be broadened to read on the server sending the input back to the product from which the input originated, as proposed by Plaintiffs. Simply put, the plain meaning of 'forwarding' as discussed in the specification does not encompass replying as Plaintiffs contend. Defendants' Response [Dkt. No. 578] at 37.

Lodsys in reply agrees: "Defendants incorrectly contend that Plaintiff's position is that 'forwarding' can mean sending the input, which originated at the product, back to the product. The plain meaning of 'forward,' which will be apparent to the jury without construction, means transmitting the input to another location other than the original source of the input. To the extent that Defendants' construction captures that concept, the plain meaning of the term 'forwarding' is sufficient. Indeed, Defendants admit that the word is easily understood to anyone familiar with email." Lodsys' Reply [Dkt. No. 591] at 21.

The parties thus agree that "forward" is distinct from "reply," and means transmitting the input to another location other than the original source of the input. The Court concludes that no further construction is necessary.

**b)  "a priority code associated with the input"**

Lodsys says that "[c]ontrary to Defendants' assertion that the <u>product</u> must supply the priority code, the specification shows the priority code is used to determine whether or how to forward the input, a determination that may be made <u>by an analysis system</u>, and not necessarily by the product: * * *." Lodsys' Brief [Dkt. No. 555] at 33. Lodsys urges that while it is possible for the product to assign a priority to the input, the specification contains a broader disclosure. Lodsys says that this portion of the specification, '078 patent, column 54, lines 52-64, discloses that the priority code does not need to relate to the priority of a single input, but rather may be forwarded based on a metric that is related to the input regardless of the priority of the individual input. Lodsys' Brief [Dkt. No. 555] at 34.

The defendants, on the other hand, urge that the dispute is whether Lodsys improperly reads "the term as broadly encompassing functionality performed by the analysis server which has nothing to do with forwarding the input as claimed." Defendants' Response [Dkt. No. 578] at 38. Defendants say that "[i]n fact, the patent discloses 'a priority code' in the context of an 'urgent' or 'special' transmission code that can be sent, from the product to the server, along with the user's input." *Id*. Defendants urge that Lodsys' "interpretation of the term is wholly unsupportable; nowhere does the specification indicate that the analysis system forwards the input. At most, the analysis system may send an alert 'based on a metric that is related to the input.' * * * But that is not 'forwarding the input based on a priority code associated with the input,' and, thus, is not relevant to the issue." *Id*.

Lodsys in reply says that "Defendants contend this term cannot include a priority code set by the analysis system because the only embodiments illustrating 'forwarding the input' involve priority codes set by the product. * * * However, even where a patentee has described, in every embodiment, only one kind of structure for the term, that fact does not compel limiting the term to only that structure." Lodsys' Reply [Dkt. No. 591] at 22. Lodsys also continues to maintain that the analysis system can assign a priority code to an input, and can forward an input, in the

form of a report, "to the person who is to be notified of the report." *Id*. Lodsys points to the '078 patent, column 54, lines 52-67.

The portion of the specification that Lodsys points to (although the disputed terms appear in the '565 patent, Lodsys' reference is actually to the specification of the '078 patent) explains:

> In this case a trigger may be pre-set by recording and having the analysis system act upon parameters such as:
>
> 55    The frequency for analyzing the data for the presence of trigger conditions (such as hourly, daily, weekly, a list of particular dates, the time of day on any of these dates, etc.),
>
> 60    The particular data items to analyze (such as the spectrum questions and data exemplified by the above illustrations),
>
> The data levels which comprise a threshold to issue an alert (such as, in the medical device, two or more life-threatening conditions for each 1,000 units that
> 65    send in reports),
>
> The person who is to be notified of the report (a list of one or more individuals),

The Court, like the defendants, has some difficulty in assessing the relevance of the foregoing to claim 16 calling for "forwarding the input based on a priority code associated with the input." However, the Court finds it unnecessary to resolve whether the "analysis server" can assign priority codes.

The defendants have proposed "information received from the product that indicates the priority of the input." However, the claim language is not limited to "received from the product." Even if the disclosed embodiments use information received from a product, that does not necessarily mean the claims are so limited. *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. * * * In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. * * * That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.").

Accordingly, the Court concludes that "a priority code associated with the input" should be construed as "information that indicates the priority of the input."

## N.  "passive probe" / "server" / "communication element" / "memory"

### 1.  Parties' Proposed Constructions

The parties' proposed the following constructions:

| Disputed Terms | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"passive probe"** | **'078**: 5 | No construction necessary | No further construction necessary | "a device or a program that gathers information about a unit of a commodity without requesting user input" |
| **"server"** | **'078**: 7, 62 '565: 1, 15, 18, 27, 29 | No construction necessary | No construction necessary | "a computer that is distinct from the unit of a commodity ('078 patent). A computer that is distinct from the unit or product or computing device ('565 patent). " |
| **"communication element"** | **'078**: 1, 5, 51, 60 | No construction necessary | No construction necessary | "a hardware device that allows transmission of data" |
| **"memory"** | **'078**: 1 '565: 1, 6 | No construction necessary | No construction necessary | "physical device used to store programs or data on a temporary or permanent basis for use in a computer or other digital electronic device" |
| JCCC [Dkt. No. 615] at 8-9 | | | | |

### 2.  Discussion

Kaspersky urges that "software by itself does not include 'memory,' a 'user interface' that provides a 'medium' for 'two-way local interaction,' or a 'communications element' that can carry information from users to a 'central location,' along with information from 'passive probes' as recited in dependent claim 5."  Kaspersky's Corrected Response [Dkt. No. 590] at 6.

Kaspersky does not otherwise explain why "passive probe" requires construction. Kaspersky similarly does not address why "server," "communication element," and "memory" require construction, or otherwise explain the proposed construction. *Id*. at 5-7.

The Court concludes, along with Lodsys and the defendants, that these terms do not require construction.

### O. "interaction scripts" / "carrying information about the value to users of using the product"

#### 1. The Parties' Proposed Constructions

The parties' contend as follows:

| Disputed Terms | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"interaction scripts"** | **'908**: 37 | "instructions for the display of interactive content" | This term is indefinite under 35 U.S.C. § 112(2) | No assertion because the '908 patent is not asserted against Kaspersky. |
| **"carrying information about the value to users of using the product"** | **'908**: 37 | No construction necessary | "containing users' subjective opinions about the value of using the product" | Not proposed for construction because the '908 patent is not asserted against Kaspersky. |
| JCCC [Dkt. No. 615] at 9 | | | | |

#### 2. Discussion

##### a) "interaction scripts"

The phrase "interaction scripts" does not appear in the specification – only in the claims of the '908 patent. Claim 37 of the '908 patent calls for:

> 37. A system for managing information about a value to users of units of a computer product that are in use by the users, the system comprising
>
> in each of the units of the computer product, a user interface which provides a medium for two-way local interaction between the user and the unit of the product,
>
> <u>interaction scripts that mediate two-way interaction</u> between each of the users and the corresponding unit of the product via the user interface, <u>each of the interaction scripts carrying information about the value to users of using the product,</u>

a value information server accessible via a public communication network from each of the units of the computer product and by a vendor of the computer product, the value information server storing <u>interaction scripts and the value information that results from the interaction scripts</u>, and

a communication element that <u>carries the interaction scripts and the information that results from the interaction scripts</u> between the units of the products and the value information server, and between the value information server and the vendor. (emphasis added)

Lodsys urges that it is clear from claims 1, 36 and 37 of the '908 patent that "interaction scripts" are instructions for the display of interactive content. Lodsys' Brief [Dkt. No. 555] at 25. Lodsys says that function of the "interaction scripts" is described in the specification *vis-à-vis* Customer Design Instruments" (CDIs). *Id.*

The defendants urge that the intrinsic evidence is ambiguous whether the "interaction scripts" are instructions for the display of interactive content or the actual interactive content itself. Defendants' Response [Dkt. No. 578] at 25. The defendants urge that the intrinsic evidence that Lodsys relies on could apply to either. *Id.* at 25-26. As a result, the defendants argue, the asserted claim is indefinite under § 112(2), and invalid.

Lodsys replies that simply because a term may be susceptible to more than one meaning does not necessarily render the claim indefinite. Lodsys' Reply [Dkt. No. 591] at 15, citing *Process Control v. HydReclaim*, 190 F.3d 1350, 1356 (Fed. Cir. 1999).

As discussed above, the question of indefiniteness focuses on whether the claim is "insolubly ambiguous." Here, the asserted claim is claim 37 of the '908 patent, and thus the question is whether "interaction scripts" is "insolubly ambiguous within the context of that claim. It is not.

In the context of claim 37, the Court concludes that "interaction scripts" refers to "interactive content." Claim 37 first calls for "interaction scripts that mediate two-way interaction between each of the users and the corresponding unit of the product via the user interface." That language is more consistent with "content" than with "instructions" for displaying content. The claim further provides "each of the interaction scripts carrying information about the value to users of using the product." Again, "information about the value to users of using the product" is more consistent with "content" than with "instructions" for displaying content.

Claim 37 next calls for "a value information server" for "storing [1] interaction scripts and [2] the value information that results from the interaction scripts." That likewise suggests that "interaction scripts" refers to "interaction content" – and "the value information that results from the interaction scripts" refers to a customer's responses.

Claim 37 lastly calls for "a communication element that carries [1] the interaction scripts and [2] the information that results from the interaction scripts * * *." Once again, "interaction scripts" in that context is more consistent with "interaction content" than with "instructions" for displaying content.

Construing "interaction scripts" as "interaction content" is also consistent with the specification. As noted above, Lodsys urges that the function of the "interaction scripts" is described in the specification *vis-à-vis* Customer Design Instruments" (CDIs). The defendants, on the other hand, contend that "Plaintiffs cannot seem to decide whether 'interaction scripts' are analogous to the 'Development Interactions (DI)' or the 'Customer Design Instruments (CDI)' described in the specification of the patent." Defendants' Response [Dkt. No. 578] at 25.

However, the defendants agree that "Development Interactions are the actual interactions between the user and the product, not instructions for the display of interactive content." *Id.* The defendants moreover criticize Lodsys' proposed construction urging that "the applicant does not refer to CDIs as a set of instructions anywhere in the specification." *Id.* at 26. The defendants contend that "[i]n fact, the specification expressly defines CDI as 'a specific set of Customer Probes (CP),' and 'Customer Probes (CP)' are in turn defined as 'the prompts, questions, etc. stored in a CB-PD module for interacting with a customer.' "*Id.* The defendants thus agree that CDI refers to "content" rather than "instructions" for displaying content.

Lastly, the defendants note that during prosecution the applicant replaced the term "two-way dialog" with "interaction scripts" in response to a rejection by the PTO. *Id.* The examiner's rejection was in an office action dated September 15, 1998, and provided:

> Claims 2-5, 7, 8, 14, 16-22, 48, and 52 are also rejected under 35 U.S.C. 112, first paragraph because the specification fails to provide written description or enablement of the element "two-way dialog". The specification fails to define the term "two-way dialog", although it does disclose "customer probes" comprising sets of stored prompts and questions. It should be noted that the responses of users cannot constitute part of the "two-way dialogs" because the actions of the users are not structural elements of the system. Thus, it is unclear what structural element

"two-way dialog" is intended to define. For the purpose of applying art in this action, it will be assumed that the applicant intended to refer to (i) a set of prescripted computer prompts and questions (as in a user feedback system) or (ii) a set of prescripted computer responses (as in a help system).

[Dkt. No. 578-23] at 10.   Although the defendants say that "the examiner defined 'two-way dialog' as a set of either prescripted computer prompts or prescripted computer responses," Defendants' Response [Dkt. No. 578] at 26, in actuality the examiner referred to "(i) a set of prescripted computer prompts and questions (as in a user feedback system) or (ii) a set of prescripted computer responses (as in a help system)," namely "content" – as opposed to "instructions" for displaying content as in using a computer scripting language.

The applicant filed a response dated March 15, 1999, that, *inter alia*, changed "two-way dialog" to "interaction scripts."   The applicant commented that "[c]laims 48 and 52 have been amended to refer to 'interaction scripts'. However, applicant disagrees that 'interaction scripts' is limited to the two examples given by the examiner."   File History for the '908 patent, USP5999908_SFH.pdf (provided on CD after the close of the *Markman* hearing), Response dated March 15, 1999, at 18.   Although the applicant referred to application claims 48 and 52, other application claims were similarly amended, including application claim 53, which became patent claim 37.

The defendants urge that "the prosecution history creates further ambiguity as to the meaning and scope of the term 'interaction scripts.' "   Defendants' Response [Dkt. No. 578] at 26.   The Federal Circuit in *Phillips* commented that the prosecution history is sometimes an unreliable basis for resting claim construction because of the interaction between the PTO and the applicant.   *Phillips*, 415 F.3d at 1317.   Here, the prosecution history reveals only the factual matters discussed above.   The prosecution history does not necessarily resolve the "content" vs. "instructions" for the display of content issue, but likewise does not render claim 37 of the '908 patent "insolubly ambiguous."

As noted at the outset, the Court concludes that "interaction scripts" in the context of claim 37 refers to "interactive content."   The Court further concludes that, as a result, claim 37 is not "insolubly ambiguous," is not indefinite under § 112(2), and is not invalid under § 112(2).

Finally, in response to Lodsys' argument that simply because a term may be susceptible to more than one meaning does not necessarily render the claim indefinite, based on *Process*

*Control v. HydReclaim*, 190 F.3d 1350, 1356 (Fed. Cir. 1999). The Federal Circuit in *Process Control* commented that "[i]t is true, as HydReclaim urges, that we should attempt to construe the claims to preserve their validity, * * *. However, contrary to HydReclaim's assertions, this is not a case where the claim language is reasonably susceptible to two constructions. Rather, the claim as written by the patentee is susceptible to only one meaning." *Id*. The rationale of *Process Control* does not apply here. This is not a case in which the Court must decide between one construction that preserves validity and another equally applicable construction that does not.

The Court concludes that "interaction scripts" refers to "interactive content," the claim is not insolubly ambiguous, and therefore is not invalid as indefinite under § 112(2).

### b) "carrying information about the value to users of using the product"

The defendants say that "[a]lthough Plaintiffs do not offer a proposed construction for this term, they appear to implicitly construe 'carrying' as 'transmitting' or 'communicating.' " Defendants' Response [Dkt. No. 578] at 26. The defendants urge that Lodsys' proposed construction for "interaction scripts" "makes clear that 'carrying' means containing, and not transmitting or communicating. Plaintiffs claim that the term 'interaction scripts' means 'instructions for the display of interactive content,' and equate the 'Customer Design Instruments ('CDIs') with 'interaction scripts.' * * * The specification defines a CDI as 'a specific set of Customer Probes (CP) that are intended to elicit the raw data.' * * * It also defines 'Customer Probes' as 'prompts, questions, etc stored in a CB-PD Module for interacting with a Customer.' * * * An ordinary skilled artisan would understand that 'instructions' or a specific set of 'prompts, questions, etc.' cannot transmit or communicate information. As such, Plaintiffs' construction for the term 'interaction scripts' support Defendants' view that 'carrying' means 'containing.' " *Id*.

"In addition," the defendants argue, "the specification supports Defendants' view that 'information about the value to users of using the product' corresponds to a user's subjective opinion about the value of using the product per the Defendants' proposed construction. * * * Although Plaintiffs argue that the specification describes 'a large variety of valuable feedback * * * not all of which are subjective opinions,' Plaintiffs do not, and cannot, point to any

information about 'the value to users of the product' that are not subjective opinions, because the value the user attaches to the product is inherently subjective." *Id.*

Lodsys replies that "Defendants fail to demonstrate that 'carrying' has been used in a way that requires construction in order to be understood by the jury." Lodsys' Reply [Dkt. No. 591] at 15. Lodsys further replies that "[a]s discussed above regarding the 'user's perception of the commodity,' the specification identifies types of information that Defendants' contend are not 'subjective.' " *Id.* at 15-16.

As noted above, the Court has not adopted Lodsys' proposed construction for "interaction scripts." The subject claim limitation clearly calls for "<u>carrying</u> information about the value to users of using the product." The defendants have provided no persuasive reason why the Court should re-write the claim to substitute "containing" for "carrying." Nor have the defendants identified why that is necessary to resolve any issue in this case.

As for "subjective opinions," the claim language refers to "language about the value to users of using the product." That language appears to be clear and readily understandable. That language may include "subjective opinions," but is not necessarily limited to the same.

Here, as in other instances, the parties have not advised the Court on how a proposed construction may truly impact any actual infringement and/or validity issue being asserted in this case. The parties furthermore debate whether various types of information disclosed in the specification are "subjective opinion" or not.

The Court, at this juncture, therefore, must conclude that the actual claim language, "information about the value to users of using the product," is not necessarily limited to a user's "subjective opinion," and defendants have not provided a persuasive showing that the specification necessitates so construing that claim language.

Accordingly, the Court concludes that, in light of the foregoing comments, no further construction is necessary.

**P. "a transaction for sale of a product or a service contract for the commodity"**

**1. Parties' Proposed Constructions**

The parties' proposed the following constructions:

| Disputed Term | Claims | Lodsys | Defendants | Kaspersky |
|---|---|---|---|---|
| **"a transaction for sale of a product or a service contract for the commodity"** | **'078**: 24 | "a transaction for sale of a product for the commodity or a service contract for the commodity" | No construction necessary | The transaction for sale of a product need not be "for the commodity." |
| JCCC [Dkt. No. 615] at 9 | | | | |

**2. Claim Language in Context**

The disputed claim language appears in claim 24, which is dependent on claim 1 of the '078 patent. Those claims provide:

1. A system comprising:

units of a commodity that can be used by respective users in different locations,

a user interface, which is part of each of the units of the commodity, configured to provide a medium for two-way local interaction between one of the users and the corresponding unit of the commodity, and further configured to elicit, from a user, information about the user's perception of the commodity,

a memory within each of the units of the commodity capable of storing results of the two-way local interaction, the results including elicited information about user perception of the commodity,

a communication element associated with each of the units of the commodity capable of carrying results of the two-way local interaction from each of the units of the commodity to a central location, and

a component capable of managing the interactions of the users in different locations and collecting the results of the interactions at the central location.

24. The system of claim 1 wherein the two-way local interactions comprise a transaction for sale of a product or a service contract for the commodity.

### 3. Discussion

Lodsys says that "Plaintiff has proposed this claim phrase for construction merely to clarify a grammatical ambiguity. Specifically, Plaintiff's construction clarifies that the prepositional phrase 'for the commodity' attaches to both 'product' and 'service contract.'" Lodsys' Brief [Dkt. No. 555] at 34. Lodsys urges that "[t]he specification repeatedly refers to products for the commodity, such as upgrades for a product or disposable items used with the product: * * *." *Id*. at 34-35. Lodsys contends that "[s]imilarly, Figure 19 demonstrates the claimed product would allow users to communicate with 'vendors of related products.' Thus, the specification provides that the additional products that may be purchased through the two-local interaction are 'products for the commodity.'" *Id*. at 35.

The defendants respond that "Defendants see no grammatical ambiguity and therefore fail to see the need to construe the term." Defendants' Response [Dkt. No. 578] at 39. Lodsys did not address the phrase in its reply.

Kaspersky originally did not propose a construction. JCCS [Dkt. No. 505] at 37-38. In the Rule 4-5(d) JCCC, Kaspersky proposed "[t]he transaction for sale of a product need not be 'for the commodity,'" but that submission was after the close of briefing, and Kaspersky has not provided any rationale to support that proposed construction.

The Court concludes that no construction is necessary. Lodsys says that its proposed "construction clarifies that the prepositional phrase 'for the commodity' attaches to both 'product' and 'service contract.'" The defendants have advised that they "see no grammatical ambiguity and therefore fail to see the need to construe the term." The Court thus understands that the defendants do not disagree with Lodsys' proposed construction, and therefore there is no dispute left to decide. Defendants, of course, are consequently precluded from arguing any construction contrary to Lodsys' construction to the jury.

Kaspersky's proposed construction is both belated under the Court's Local Patent Rules, and is unsupported. Kaspersky has not requested leave of the Court to submit a belated proposed construction. Accordingly, the Court concludes that Kaspersky has waived its proposed construction.

**V.**

**Conclusion**

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon by the parties. As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation. Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.

**So ORDERED and SIGNED this 14th day of June, 2013.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE